UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| VERE O. PLUMMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 15-cv-2147 (RDM) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant District of Columbia ("District") hereby submits this statement of

material facts as to which there is no genuine issue.

Plaintiff

1.      Plaintiff Vere Plummer lives at 1222 Fairmont Street, NW, Washington.

2.      Plaintiff is an attorney license to practice law in the District and Maryland.  Ex. 1-Pl.

Dep. at 7:21-9:11.

3.      On July 4, 2014, Plaintiff went to a friend's house in Maryland for a Fourth of July

gathering.  Pl. Dep. P27:19- P30:15.

4.      While at Ms. Robinson's home, Plaintiff drank at least a "couple" of beers and drank

punch that contained hard liquor.  Pl. Dep.  P32:3-4 (Q How many beers did you have.  A. I'm

not sure, but a couple.); P32:5-9; P33:17-P34:2.

5.      Plaintiff arrived home at approximately 2:45 am.  Pl. Dep. P39:9-13; 40:16-19.

6.      When Plaintiff reached his house, he drove down the behind his house to park in his

garage.  Pl. Dep. P41:5-12.

7.      Across the alley from Plaintiff's garage was a garage belonging to Kenneth Taylor. Pl. Dep. P41:19-P42:8.

8.      Plaintiff lost control of his car and struck Mr. Taylor's garage, damaging the frame of the garage.  Pl. Dep. P46:20-22; P54:18-P55:4; Ex. 4 (Deposition Exhibit 3).

9.      When the police arrived on the scene, Plaintiff called 911, and the call lasted for sixteen minutes.  Ex. 9.

10.     When the 911 operator asked Plaintiff is he had crashed into someone's garage, Plaintiff denied hitting a garage.  Ex. 9 at 1:20-1:28 ("No I did not, I'm in my garage."); at 3:00-3:14 ("No vehicle has crashed. There is no crash here.").

11.     Plaintiff asks one of the police officers what garage did he hit, and when to officer told him, he denied striking Taylor's garage.  Ex. 9 at 6:50-7:30 ("These people are lying to me, telling me that I hit a garage.").

12.     Plaintiff told the 911 operator "I'm sitting here listening to my music minding my own business."  Ex. 9 at 6:50-7:30.

13.     Plaintiff told the operator several times that he wants to go home or that he wants to go to sleep.  *Id.*, at 3:18 ("…I'm trying to go into my house …"); at 3:51 ("I want these people to get from in front of my car so that I can go into the house."); at 6:24 ("You need to get these people from in front of me. Cause I need to go into my house.); at 9:25 ("I want to go home and go to bed. I can't, I cannot go home and go to bed."), at 10:35 ("… its five o'clock in the morning, and I want to go to sleep."); at 11:21 ("This is false imprisonment, because I can't move out of my car. I can't go home and go to sleep."); and at 13:13 ("I'm under seize. I want to go to bed.").

14.     At no time during his 911 call did Plaintiff acknowledge that he damaged or even hit Mr. Taylor's garage.  Ex. 5-Pl. 911 Call.

15.    Plaintiff told the 911 operator "I've done absolutely nothing.   Hello." Pl. 911 Call.

16.    There were no visible signs of a pothole prior to the July 5, 2014.  Pl. Dep. P119:16-17 (So that day if you'd come out and looked at that, you would never see a hole.).

17.    Plaintiff told the 911 operator that he was not getting out of the car.  Ex. 9 (There are six police officers outside of my house bothering me. I want them to leave me alone. They're trying to get me out of my car and I'm not moving here.).

18.    When the window was broken, Plaintiff stepped out of his car.  Pl Dep. 76:20-77:3.

19.    Plaintiff license had been suspended as of May 19, 2014 as a result of unpaid ticket in Virginia. Ex. 13.

### Edwin Landrum

20.    Plaintiff's garage is located in the rear of his house, and it is accessible through a common alleyway that separates the 1200 block of Fairmont Street from the 1200 block of Euclid Street.   (Ex. 2-Declaration ("Decl.") of Edwin Landrum, ¶ 3).

21.    Residents of Euclid Street also access their garage through the same common alleyway. Landrum Decl. ¶ 4.

22.    Edwin Scott Landrum lived at 1221 Euclid Street, and was home sleeping when Plaintiff crashed into Mr. Taylor's garage.   Landrum Decl.  ¶¶ 2, 3.

23.    Mr. Landrum was woken from his sleep because he heard "a noise that sounded like a car crash" and he heard "the engine of a car running."  Landrum Decl.  ¶ 7.

24.    Mr. Landrum walked down the alley and saw Plaintiff's car against Taylor's garage.

25.    While walking down the alley, Mr. Landrum saw "that a black sedan had crashed into the garage belonging to Mr. Taylor," his neighbor.  *Id*. ¶ 9.

26.     Mr. Landrum observed that "the car's engine was still running, the car was in the drive position and the lights were on."   Landrum Decl. ¶ 9.

27.     Mr. Landrum observed a lot of smoking coming the car because its tires were spinning, which then created a hole in the road surface of the alleyway.  *Id*., ¶ 10.

28.      Mr. Landrum saw Plaintiff sitting in the driver's seat, with his head "slummed against the steering wheel."  Landrum Decl.  ¶¶ 12-14.

29.     Plaintiff appeared to Mr. Landrum to be unconscious.  Landrum Decl. ¶ 13.

30.     Mr. Landrum called 911 and reported, in real time, what he was observing.  Landrum Decl. ¶¶ 9 and 12, Ex. 5-Landrum's 911 Call.

31.      According to Mr. Landrum, Plaintiff backed his car into his own garage but only after making four attempts to do so.  Landrum Decl. ¶ 16.

32.     The surface of the alley road way was in good condition. Landrum Decl. ¶ 16.

Gary Cooper

33.     Gary Cooper, lived at 1221 Euclid Street, and was home sleeping when Plaintiff crashed into Mr. Taylor's garage.   Ex. 3-Cooper Decl.  ¶ 6.

34.     Mr. Cooper was awakened from his sleep "by the smell of something burning."  Cooper Decl.  ¶ 6.

35.     When Mr. Cooper went into the alley he saw Plaintiff's car against Mr. Taylor's garage. Cooper Decl.  ¶ 7.

36.     Mr. Cooper observed a large amount of smoke from the spinning of the Plaintiff's car's tires.  Cooper Decl. ¶ 7.

37.     Mr. Cooper recognized the car as a black Jaguar that belonged to Plaintiff.  Cooper Decl. ¶ 8.

38.    Mr. Cooper observed Plaintiff with his "head down and his chin pressing against the upper portion of his chest." Cooper Decl.  Cooper Decl.  ¶ 10.

39.    Because the driver side window was down, Mr. Cooper was able to reach into the car and "shook Mr. Plummer very hard but he was unresponsive."  Cooper Decl. ¶ 11.

40.    Plaintiff responded the second time Mr. Cooper shook him.  Cooper Decl. ¶ 11; Pl. Dep. P63:4-6 (Mr. Cooper "banged on the side [of the car], and woke me up.").

41.    Mr. Cooper offered to help Plaintiff but Plaintiff "waived him off."  Cooper Decl.  ¶ 11.

42.    The roadway in the alley as being in "good condition."  Cooper Decl. ¶ 9.

Master Patrol Officer Darryl Arrington

43.    The 911 operator sent the police to investigate. Ex. 8-Arrington Dep. P22:9-20.

44.     Master Patrol Officer Darryl Arrington ("MPO Arrington"), MPO was the training officer for Officer Nelson.  Arrington Dep. P12:12-P13:20.

45.    MPO Arrington determined that Mr. Plummer caused the accident, because the damage was consistent with the damage on the garage. Arrington Dep. P31: L.4-12.

46.    MPO Arrington took pictures of the scene. Ex. 4.

47.    MPO Arrington observed that there was paint transfer consistent with his vehicle. The burnt rubber that was on the alley also determined this prediction.  Arrington Dep. P31: L.4-12.

48.     MPO Arrington observed Plaintiff slumped over as if he was sleep, and he would open and close his eyes. Arrington Dep. P119:15-21.

49.    Plaintiff was mumbling.  Arrington Dep. P119:15-21.

50.    Plaintiff "cranked up his car occasionally." Arrington Dep. P119:15-21-P12:6.

51.    MPO Arrington gave Plaintiff several commands to "step out of the vehicle" but Plaintiff refused to do so.   Arrington Dep. P49:9-18; P51:12-17.

52.    MPO Arrington wanted Plaintiff to get out of his car so that he could check on Plaintiff's "welfare." Arrington Dep. P51:1-6.

53.    MPO Arrington explained that "any time there's an accident, we would call for … [FEMS] to come out and do an assessment of the operator of the vehicle to see if they've been injured or if they've been drinking." Arrington Dep. P30:3-9.

54.    MPO Arrington, as the senior officer on the scene, made the decision that Plaintiff was going to be arrested for failing to make his identity known after hitting Mr. Taylor's garage. Arrington Dep. at P61:13-16; P62:1-12.

55.    MPO Arrington testified that he believed that Plaintiff's arrest was authorized under District law. Arrington Dep. at P64:13-65:7.

Officer Nelson

56.     When Officer Nelson first arrived on the scene he saw damage to a garage, black substance, and what looked to be a tar like substance, possibly burning rubber sprayed throughout the alley. Ex. 7-Nelson Dep. P16:14-21; P17:1-2.

55.    Officer Nelson observed white paint transfer that was consistent with the color of the garage on Mr. Plummer's vehicle. Nelson Dep. P20:14-16.

56.    Officer Nelson observed Plaintiff "passed out." Nelson Dep. P15:13-16 (Q. And why did you believe that he was intoxicated? A. He was passed out behind the wheel of his running car.); P17:1-4, P35:1-2.

57.    Officer Nelson "didn't know whether [they] had ... someone who was intoxicated or someone who was having a medical emergency." Nelson Dep. P16-1-3.

58.    Officer Nelson believed that there was probable cause to believe that Plaintiff was intoxicated. P47:1-12.

59.    Officer Nelson believed that probable cause was supported by what Landrum and Cooper had told him.  Nelson Dep. P25:10-16.

60.    The fire department was called when Plaintiff refused get out of his car.  Nelson Dep. P16:4-7.

61.    Officer Nelson was the arresting officer.  Nelson Dep. P72:17-P77:4; Ex. 11-Arrest Report.

62.    Officer Nelson testified that he should have arrested Plaintiff for driving while intoxicated but because he was a new officer he made a "rookie mistake." Nelson Dep.  P53:7-21.

63.     Nelson testified that he believed that Plaintiff was either intoxicated or having a medical emergency.   Nelson Dep. P15:13-P16:3.

64.    Officer Nelson testified that he should have arrested Plaintiff for driving while intoxicated but because he was a new officer he made a "rookie" mistake. Nelson Dep.   P42:6-20; P53:7-54:3.

65.    Plaintiff "revved" the engine to his car.   Nelson Dep.  P101:3-15.

66.    Officer Nelson believe that there was probable for arresting Plaintiff for leaving after colliding and driving under the influence totality of the circumstances.  Nelson Dep.  P22:1-3.

67.    Officer Nelson spoke with Landrum and Cooper who told him what they had observed. Nelson Dep. P24:4-21.

68.    Officer Nelson believed that Plaintiff had the opportunity to report the accident at the time he hit Taylor's garage but did not do so. Nelson Dep.  P53:7-21.

69.    Officer Nelson did not discuss with Officer Lukanovic what charges he was going to bring against Plaintiff. Nelson Dep. P137:8-17.

Officer Sandro Lukanovic

70.    Officer Sandro Lukanovic he responded to a call about "a man striking a garage door with a green vehicle." Ex. 6-Lukanovic Dep. P22:3-P22:5.

71.    Upon arriving at the scene Officer Lukanovic entered Plaintiff's garage without permission because he determined that there was probable cause to believe Plaintiff's car had struck Mr. Taylor's garage because there was damage to the garage and to Plaintiff's vehicle. Lukanovic Dep. P47:19-48:17.

72.    Officer Lukanovic testified that when he asked Plaintiff to get out of the car Plaintiff started to act "strange and erratic" by calling 911 to report that there were strange men in his garage. Lukanovic Dep. P58:10-21.

73.    According to Officer Lukanovic, Plaintiff was sleeping behind the steering wheel with the engine running.  Lukanovic Dep. P62:16-21; P98:17-18 ("we walked in and found Mr. Plummer asleep behind the wheel.").

74.    Officer Lukanovic knocked on the window at which point Plaintiff looked up and asked Officer Lukanovic "what are you doing?"  Lukanovic Dep.P63:1-5.

75.     Officer Lukanovic saw the damage to Mr. Taylor's garage door. Lukanovic Dep. P. 96:14.

77.    When Officer Lukanovic entered Plaintiff's garage the car was running and Plaintiff was behind the steering wheel and Plaintiff appeared to be sleeping.  Lukanovic Dep. P62:16-21; P98:17-18 ("we walked in and found Mr. Plummer asleep behind the wheel.")

78.    Plaintiff's car doors were locked.

8

79.    When Officer Lukanovic knocked on the car window Plaintiff looked up and asked Officer Lukanovic "what are you doing?"  Lukanovic Dep., P63:1-5.

80.    Officer Lukanovic described Plaintiff as acting "strange and erratic" because Plaintiff calling 911 to report that there were "strange men" in his garage. *Id*., P58:10-21.

81.    As Plaintiff continued to talk to the 911 operator, Officer Lukanovic was asking Plaintiff to get out of the car.  Lukanovic Dep. P59:1-11.

82.    Officer Lukanovic asked Plaintiff several times to open his car door P59:1-11.

83.    Officer Lukanovic concluded that there was reasonable suspicion to investigate the accident based on the description of the car from the 911 dispatcher and the damage to the garage door and Plaintiff's car.  Lukanovic Dep. P96:7-21.

84.    Officer Lukanovic believed that Plaintiff violated the law when he parked his car in the garage after the accident and fell asleep without making his identity known.   Lukanovic Dep. P101:11-21.

85.    Officer Lukanovic left the scene before Plaintiff and he had no involvement with criminal charges being brought against Plaintiff, he did not prepare the arrest report, and had no input to the report because he was checking off as his shift was ending.   Dep. P37:15-P38:19; P55:8-11 (Q So after you signed off, you were done with this case.  A Yes, sir.  I was – I was checking off.); P56:13-19 (I didn't review the arrest paperwork because I didn't make the arrest …"); P. 37: L. 19-21 P. 38: L. 1-11.

Battalion Fire Chief Henry Welsh, III

86.    Battalion Fire Chief Henry Welsh, III, testified that he went to the scene after receiving a call for assistance from Sergeant Johnny Butler, an officer on fire Truck Company 6.  Ex. 10- Welsh Dep. P6:14-19; P12:1-9.

87.     When he arrived on the scene he saw the damage to the garage, a tire mark on the roadway, and he could smell the burning rubber.  Welsh Dep. P15:17-P16:4.

88.     Chief Welsh was dismayed when he approached Plaintiff's car because the car was still in gear, possibly in the drive position.  Welsh Dep. P16:1-14.

89.     Chief Welsh he tried to tell Plaintiff to get out of the car to be medically checked but Plaintiff would respond by asking "Why do I 1 have to get out of the car?"   Welsh Dep. P16:15-P17:1.

90.     Chief Welsh tried to explain to Plaintiff "i[n] every which way I could, that we just needed to get him out of the car to take a look at him.  Welsh Dep. P17:2-21.

91.     Chief Welsh testified that although Plaintiff told him that he was okay, Plaintiff did not appear to be okay, based on Chief Welsh experience of being an EMT since 1983.  Welsh Dep. P17:8-15.

92.     Plaintiff appeared "glazed." Welsh Dep. P19:10-20.

93.     Chief Welsh told Plaintiff that if he let the EMT check his sugar, the fire department would leave if everything was fine. Welsh Dep. P18:16-P19:9.

94.     Once out of the car, Plaintiff's sugar was checked and found to be a little high but otherwise Plaintiff was medically okay.  Welsh Dep.  P24:5-8.

Officer Hakan Huseyin Karaali

95.     When Plaintiff was transported to the Third District police station he was given the Standardized Field Sobriety Test (SFST) by Officer Hakan Huseyin Karaali, an MPD certified SFST officer.  Ex. 12- Karaali Decl.

96.     Plaintiff failed the test because he could not passed HGN test, which test for rapid eye movement common in people who are intoxicated. Karaali Decl.

97.     Plaintiff also failed the physical portion of the SFST test because he could not do the heal-to-toe steps, made improper turns, and used his arm and the cell wall to keep his balance. Karaali Decl.

98.     Officer Karaali recommended that Plaintiff be charged with DUI.  Karaali Decl.

District of Columbia

99.     On January 13, 2015, the District received Plaintiff's purported § 12-309 notice letter. Ex. 14-Decl. of Lana Craven.

100.    The letter is dated January 4, 2015, but the post mark on the envelope January 5, 2015. Craven Decl.

101.    The facts in Officer Nelson's report detail a lawful arrest based his own observation and statements from witnesses. Ex. 11.

102.    Here, there is no record evidence that the District failed to use reasonable care supervising Lieutenant Kutniewski, Officers Lukanovic, and Nelson, or Chief Welsh.

103.    There is no record evidence that any of these individuals had a proven history of violating the constitutional rights of citizens.

104.    There is no record evidence that any Lieutenant Kutniewski, Officers Lukanovic, and Nelson, or Chief Welsh employee had been disciplined or the subject of any form of internal investigation.

105.    There is no record evidence that any of these individuals were incompetent in conducting accident investigation such that close supervision or additional training was required, or that any supervisor failed to perform his or her duties in an inappropriate manner.

106.    Moreover, there is no record evidence the MPD officer or FEMS employees were improperly trained or that there was a wide spread problem with the MPD and FEMS training programs relating to accident investigations,

107.    There is no evidence that Lieutenant Kutniewski or Officer Lukanovic had any involvement criminal charges being brought against Plaintiff.

108.    Lieutenant Kutniewski never went to the scene, and there is no evidence that he approved, direct, or ordered the arrest of Plaintiff.

109.    Moreover, there is no evidence that Lieutenant Kutniewski had any contact with Plaintiff when Plaintiff was at the Third District police station.

Arron Horton

110.    Arron Horton is responsible for overseeing the District's Department of Transportation, Street and Bridge Maintenance Branch, which is responsible for road repair.  Ex. 15- Horton Dep. P8:2-P9:2.

111.    Prior to July 5, 2014, DDOT has no records of any complaints regarding the alley at issue.  Horton Dep. P32:18-21.

112.    There were no records of any repairs being made in the alley within five year prior to the incident.  *Id.*, P31:3-13.

113.    There is no evidence as to how long the pothole has existed.


Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Michael K. Addo*
MICHAEL K. ADDO [1008971]
Chief, Civil Litigation Division Section IV

/s/David A. Jackson
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW
Suite 630 South
Washington, DC  20001
 (202) 724-6618
 (202) 741-8999 (fax)
davida.jackson@dc.gov

13