# EXHIBIT 1

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

IN THE MATTER OF:                    :
                                     :
VERE O. PLUMMER,                     :
                                     :
            Plaintiff,               :
                                     : C.A. No.
      v.                             : 15-cv-2147 (RDM)
                                     :
DISTRICT OF COLUMBIA, ET AL.,        :
                                     :
            Defendants.              :
                                     :

                  Thursday,
                  September 8, 2016

                  Washington, DC

DEPOSITION OF:

            VERE O. PLUMMER

            called for examination by Counsel for
the Defendants, pursuant to Notice of Deposition,
in the Office of Attorney General, located at 441
4th Street, NW, when were present on behalf of
the respective parties:

2

APPEARANCES:

On Behalf of the Plaintiff:

TILMAN L. GERALD, ESQ.
1220 L Street, NW
Suite 700
Washington, DC 20005
(202) 742-2004

On Behalf of the Defendants:

DAVID A. JACKSON, ESQ.
Assistant Attorney General
of:    Office of the Attorney General
441 4th Street, NW
Suite 630 South
Washington, DC 20001
(202) 727-3400
davida.jackson@dc.gov

C-O-N-T-E-N-T-S

| WITNESS | DIRECT | CROSS |
|---------|--------|-------|
| Vere Plummer | 7 | -- |

E-X-H-I-B-I-T-S

| NO. | DESCRIPTION | MARKED |
|-----|-------------|--------|
| 1 | Photo of Mr. Plummer in his vehicle | 47 |
| 2 | Photo of Mr. Taylor's garage | 49 |
| 3 | Close-up photo of Mr. Taylor's garage | 53 |
| 4 | Photo of pothole | 55 |

(202) 234-4433                Neal R. Gross and Co., Inc.            www.nealrgross.com
                                  Washington DC

4

P-R-O-C-E-E-D-I-N-G-S

(10:27 a.m.)

MR. JACKSON:  Sir, will you please state your full name and spell for the record?

MR. PLUMMER:  My name is Vere Owen Plummer, V-E-R-E, O-W-E-N, P-L-U-M-M-E-R.

MR. JACKSON:  Good morning, Mr. Plummer.  We've introduced ourselves earlier, but let me just for the record, again, introduce myself.

I'm David Jackson.  I'm an Assistant Attorney General.  I'm representing the Defendant's in this lawsuit as brought by you, including to the City and the individual defendants that have been named.  Okay.

Your occupation is an attorney, correct?

MR. PLUMMER:  Yes.

MR. JACKSON:  Okay.  Have you ever had your deposition taken before?

MR. PLUMMER:  I don't think so.

MR. JACKSON:  Okay.  Have you ever taken depositions before?

MR. PLUMMER:  I may have to give you my answers standing.

MR. JACKSON:  That's fine with me.  As long as the court reporter can accurately record.

WHEREUPON,

VERE O. PLUMMER

was called as a witness by Counsel for the Defendant and, having been first duly sworn, assumed the witness stand, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. JACKSON:

Q     What did you do, if anything, to prepare for today's deposition?

A     Nothing.

Q     You didn't review any documents?

A     I did not.

Q     Okay.  Did you review your answers to interrogatories?

A     I did not.

Q     Now, we already discussed that you are an attorney.  Are you a practicing attorney?

27

A    No.

Q    Do you have any problems with coordination?

A    What do you mean, from the medication?

Q    Yes, from the medication.

A    No.  I have problems with coordination from my condition --

Q    Okay.

A    -- but not from the medication.

Q    Does the medication make you drowsy?

A    You mean generally?

Q    Generally.

A    Like if I took the medication would I be drowsy an hour later?  Is that what you mean? I don't know what you're talking about.  At what point?  Is that what you're talking about?

Q    Yes.

A    No.

Q    So at some point you did leave your house, correct?

A    Yes.

Q    Okay.  What time did you leave the

-- how long did you stay at the friend's house?

A    Well, when I got there it was daylight and when I left it was night, so let me think.   I don't know.

Q    Who was the friend?

A    Who?

Q    Yes.

A    Are you asking me for a name?

Q    The name.

A    Kimberly Robinson.

Q    Kimberly?

A    Robinson.

Q    Robinson.   Okay.   And where does Mr. Robinson live?

A    She lives in Maryland.

Q    Do you know her address?

A    I do not.   I mean, I don't know it offhand.   Usually when I went there she would -- I know where the house is and if I got lost I'd call her and she'd tell me.   And I do -- I mean, she's told me the name of the street and the number before, but I have no recollection.

33

Q    Okay.  Normally, how many pills would you take?

A    One.

Q    All right.  How many pills did you take on July 4th of 2014?

A    One.

Q    Do you recall what time that was?

A    That probably was towards the end. That was probably around 8 o'clock.

Q    Okay.

A    It may have been 7:30.  I, you know, the time I'm not exactly sure, but that would be the time period.

Q    Did you have any wine while you were at the get together?

A    I don't think so.

Q    Other than beer and wine was there any hard liquor there?

A    Could have been.

Q    Did you have any?

A    I did not that I recall.  I mean, I may have had a punch and there may have been

32

that you --

A    I had beer.

Q    How many beers did you have?

A    I'm not sure, but a couple.

Q    Do you recall approximately what time you drank the last beer?

A    I don't recall the actual time, but I would think the time period would probably be around 7/8 o'clock, that area.

Q    While you were at this get together did you consume or did you take any of the medication that you had?

A    I did.

Q    And normally what is the dosage that you take?

A    Okay.  So normally I don't really take it.  The dosage of it, my recollection, I don't really remember the dosage, but it -- I don't really remember.  I can't tell you right now.

Q    Okay.  Does this medication come in pill form?

A    Yes.

40

Q    At the point that you left from where you parked.

A    Go ahead.

Q    At that point.  When you got into your car to leave, at that point, were you feeling drowsy or sleepy?

A    Before I left there --

Q    Yes.

A    -- I had been relaxing, okay.  And I was listening to music, okay.  So I don't know if I was drowsy, but I wasn't drowsy when I drove home.  Okay.  By that time it was late, so, you know, it wasn't like I was at my best, you know, and so forth, but I wasn't drowsy.  I didn't have any problems driving home.

Q    Okay.  From where you were parked where did you go once you drove away?  Where did you go from there?

A    I went home.

Q    You went home.  Okay.

A    Do you want the direction?

Q    No, I'm fine.  And am I correct that

41

the garage to your house is accessed, at least for the car purposes, when driving a car through the alleyway, correct?

A    Yes.

Q    Okay.  So tell me what happened once you reached the alleyway to the best that you can recall.

A    I'm going to try to answer the question this way.  Okay.  When I got in the alley, I do what I normally do, all right.  I drive down the alley, I angle my car and I try to back it in.  Okay.

Q    Okay.  So let me just stop you.  When you angle your car --

A    I did that.

Q    You --

A    I'm just letting you answer your question.  That's what I did.

Q    Okay.  So you angled your car with your front pointing to the left or to the right?

A    Left.

Q    Okay.  So am I correct that you sort

of drive beyond your driveway or your garage --

A      Exactly.

Q      -- angle your car to the left which then would be pointed to a property in the back of Euclid Street.

A      Mr. Taylor's property.

Q      Mr. Taylor's property.

A      His garage.

Q      Okay.

A      That's correct.

Q      And then you back in, that's what you do --

A      Then I back into my --

Q      -- when you're backing up?  Okay.  And is that what you did on this particular night up until that point?

A      When I drove in, yes.

Q      Yes.

A      I do that all the time.  I've been living in that house over 30 years.

Q      Okay.

A      Okay.  I've been doing this for over

30 years.

Q    Okay.

A    All right.

Q    And so then --

A    So I did that the same way.  Now, what was different about the normal activity is that when I backed up I got stuck.

Q    You got stuck in what?

A    A hole.

Q    And the hole is where?

A    It was in front of his garage.

Q    Which tire got stuck in the hole?

A    The right rear tire.

Q    Oh, how long has that hole been there?

A    You mean how long had it become a hole, or how long -- it was patched up by the District.  It had been there for years, but it was patched up for the most part.

Q    So you're saying the hole was -- I'm sorry.  You said that your -- which tire got stuck in the hole?

A    My right rear tire go stuck in a hole.

46

Q    Okay.

A    Okay.  The night that I came in and drove in, my car wound up in that hole.

Q    How did your right tire or the right rear tire end up in the hole that's close to the garage belonging to Mr. Taylor.

A    The substance that they filled it with came out.

Q    Okay.  What did you do once your tire got stuck in the hole?

A    Okay.  I tried to get it out.  You're from Boston.  I'm from Boston.  I tried to rock it out like you're in a, you know, a hole from the snow.  You rock the car, right?  That's what I did.  All right.  And it was kind of strange because this was July and I'm rocking the car, you know, like I was in snow, which I was pretty experienced at doing.  I lost control of the car in one of the rocks.

Q    Okay.

A    Okay.  It hit Mr. Taylor's car -- I mean, garage, the side of his garage.

Q      Okay.

A      And when it came back I wound up back in the hole.  Okay.  I wound up back in the hole and I was in there for a long time and couldn't get out.

Q      Mr. Plummer, I'm showing you what has been marked as Exhibit Number 1.

(Whereupon, the above-referred to document was marked as Exhibit No. 1 for identification.)

BY MR. JACKSON:

Q      Do you recognize the individual sitting in or shown in this picture?

A      Yes.

Q      Okay.  That's you, correct?

A      That's me.

Q      Okay.  The clothing that you have on, is that the clothing that you were wearing the night of this incident?

A      Yes.

Q      Okay.  Do you recall somebody taking this picture?

54

MR. JACKSON:  Yes.

THE WITNESS:  -- it's difficult for me to whether or not this is a accurate depiction of Mr. Taylor's garage on the night of the incident if I don't know when the picture was taken.  I can't really answer that question.

MR. JACKSON:  Fair enough.

THE WITNESS:  Okay.

BY MR. JACKSON:

Q    Did you have the opportunity to observe the damage that was caused to Mr. Taylor's garage?

A    When?

Q    The night that the damage occurred.

A    Did I see the damage?

Q    Yes.

A    I saw the damage.

Q    I'm showing your what has been marked as Exhibit Number 3.  Does that reflect your recollection as to whether or not that was the damage that you observed to the garage --

A    That looks like it.

55

Q    -- on the night of or the morning of the incident?

A    That looks like it.  That looks like what happened when I hit the garage.

MR. JACKSON:  And I'm showing you what has been marked as Exhibit Number 4.

(Whereupon, the above-referred to document was marked as Exhibit No. 4 for identification.)

BY MR. JACKSON:

Q    Now, I will represent to you is that this is a picture of, I guess, it's the whole of a tire mark that was created from the spinning of the tires.  Now, have you ever seen this before?

A    What are you saying that is again?

Q    I said I believe it is either the hole that was created from you spinning your tire or it is the tire mark that's left on the ground from the spinning of the tires.

A    Is that an assumption you're making or is that what you're saying it is?  I want to understand.

60

A    But the garage door, I think, was open at the time, so that's probably the way he came out.

Q    Okay.

A    Yes.

Q    So you just recall at some point he was there?

A    Yes.

Q    Okay.

A    I had been out there for a long time.

Q    How long?

A    In my estimation 30 minutes, maybe longer, okay, before he arrived.

Q    Yes.  Rocking your car back and forth?

A    No, by that time I was resting because I had been out there so long.

Q    Okay.  Let me --

A    I had --

Q    Before you go on, where were you resting?  Where was your car situated at the time that you were resting?

A    In the hole.

61

Q    If your car was in that hole --

A    Yes.

Q    -- does you car then block the alley way if somebody wanted to go through?

A    They couldn't.

Q    They couldn't because your car was there?

A    Yes.

Q    Okay.  And so you sat in your car for approximately 30 minutes?

A    I ended up falling asleep.  I don't remember exactly the time.

Q    Okay.

A    Okay.  What I'm saying to you is that I rocked the car, I hit the garage, I got stuck back in the hole.

Q    Yes.

A    Okay.  At some point I got out the car and I looked to see what the heck was going on because at that point it was frustrating.  I didn't know what was going on.  I couldn't see everything very well, but I could see I was in a

63

understand why.  I didn't understand what was going on.  All right.  So by that time when I figured that out I got back in the car --

Q    Okay.

A    -- and I end up falling asleep and Gary banged on the side and woke me up.

Q    Okay.  And do you recall what Gary said to you at that point?

A    Yes.

Q    What did he say?

A    He wanted me to get out of the car. He wanted to get in there and do something with it.  He wanted to do it.

Q    Okay.  And what was the substance of your conversation with him?

A    It was very short.  I was not even a conversation.  It was like he was telling me to, you know, get out of the car and let him take over and I said, no, that's not necessary.

Q    Okay.  And what did you do after that?

A    I went back to getting the car and I got it out.

76

A    Well, the only one that I know that was around there was him.  So I don't know if he did it or if he had one of his people do it.

Q    Okay.  Well, let me ask you this.  Do you know if it was a firefighter or a police officer that broke the car window?

A    It was a firefighter.

Q    Okay.  Which window was it that was broken?

A    The passenger side window.

Q    The front or rear?

A    Front.

Q    The front passenger side?

A    Yes.

Q    Okay.  And at this point where was your car at?

A    In my garage.

Q    Still in your garage.  And --

A    It never left the garage.

Q    Okay.  And once they broke the window what do you recall happening next?

A    Well, the police were there and they

(202) 234-4433                                        www.nealrgross.com

119

A    Yes.

Q    Okay.

A    Yes.  Yes, so this is the stuff that came out the hole and it kept coming out.  See, what happened was the stuff deteriorated.  And what I was told by somebody that was around that area who was knowledgeable.  He was an engineer or some kind of a construction engineer or something like that.

He said that they drilled that hole or they cut it with some kind of machine, the hole, to repair it.  And this is the stuff and he had a name for it.  I don't recall what the name was.  But this is the stuff that was inside there to pack it down, all right.

So that day if you'd come out and looked at that, you would never see a hole.  Okay.  But what happened was, he said the pressure like from my car caused something.  And so, it caused the imbalance is the way he described it.  He said the pressure from the tire caused the imbalance and they couldn't get the