**EXHIBIT 6**

# In The Matter Of:

*VERE O. PLUMMER v.*
*DISTRICT OF COLUMBIA, et al.*

---

*DEPOSITION OF OFFICER SANDRO LUKANOVIC*
*October 4, 2016*

---

*COURT REPORTERS, ETCetera, INC.*
*"We Guarantee Accuracy, Quality & Consistency!"*
*2833 Smith Avenue, #260*
*Baltimore, MD  21209*
*(410) 653-1115   1-800-947-DEPO   (202) 628-DEPO (3376)*



*"We'll Cover Your Job ANYWHERE in the Country!"*

Original File LUKO1004.TXT

Min-U-Script® with Word Index

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

VERE O. PLUMMER,              *

        Plaintiff     *

vs.                   *   Civil Action No.:

DISTRICT OF COLUMBIA,    *   15-CV-2157(RDM)

et al.,               *

        Defendants   *

        *      *      *      *      *

DEPOSITION OF:

        OFFICER SANDRO LUKANOVIC

was held on Tuesday, October 4, 2016, commencing

at 1:00 p.m., at the Law Offices of Tilman L.

Gerald, 1220 L Street, NW, Suite 700, Washington,

D.C., before Sherry Brooks, Certified Reporter.

        *      *      *      *      *

        COURT REPORTERS, ETCetera, INC.

        Maryland                   Washington

        (410) 653-1115          (202) 628-DEPO

        "We'll cover your job ANYWHERE in the country!"

                1-800-947-DEPO

Page 2

APPEARANCES:

On behalf of the PLAINTIFF:

        TILMAN L. GERALD, ESQ.
        LAW OFFICES OF TILMAN L. GERALD
        1220 L Street, NW
        Suite 700
        Washington, DC  20005
        (202) 742-2004
        E-mail:  Tilmanlg@gmail.com

On behalf of the DEFENDANTS:

        DAVID A. JACKSON, ESQ.
        OFFICE OF THE ATTORNEY GENERAL
        One Judiciary Square
        441 4th Street, NW
        Suite 630 South
        Washington, DC  20001
        (202) 724-6618
        E-mail:  Davida.jackson@dc.gov

ALSO PRESENT:  Vere O. Plummer

Page 3

I-N-D-E-X

Deposition of Officer Sandro Lukanovic

        October 4, 2016

EXAMINATION BY: PAGE:

Mr. Gerald                      4

EXHIBITS                        PAGE:

1    Amended Verified Complaint          10

2    Deft's Answer to Amended

     Verified Complaint          12

3    Deft's Lukanovic's Responses

     and Objections              25

4    Copies of Photographs in Black & White  50

5    Code of the District of Columbia      100

6    Photographs in Black & White        131

CERTIFIED QUESTIONS:

Page 6 - Line 11

Page 117 - Line 6

(Exhibits included with ORIG transcript ONLY.)

Page 4

        P-R-O-C-E-E-D-I-N-G-S

WHEREUPON --

        OFFICER SANDRO LUKANOVIC,

a Witness called for examination, having been

first duly sworn, was examined and testified, as

follows:

        EXAMINATION

        BY MR. GERALD:

    Q.    Good afternoon, sir.

    A.    Good afternoon.

    Q.    I'm Tilman Gerald.

    A.    Nice to meet you, sir.

    Q.    I represent Mr. Vere Plummer, the

plaintiff in this case --

    A.    Okay.

    Q.    -- the facts of which arise out of an

incident on July 5th, 2014.

        Now, I know you probably have

testified in court before.  But have you ever had

a deposition taken?

    A.    No.

Case 1:15-cv-02147-TJK    Document 14-8    Filed 05/08/17    Page 4 of 10
VERE O. PLUMMER v.                                    DEPOSITION OF OFFICER SANDRO LUKANOVIC
DISTRICT OF COLUMBIA, et al.                                                    October 4, 2016

Page 21

Q. No. I'm asking you if you --

A. Yeah. I couldn't tell you.

Q. You couldn't tell me?

A. No.

Q. What -- you came through the Metropolitan Police Department training?

A. Yes, sir.

Q. And when were you trained?

A. 2008.

Q. 2008?

A. Yes, sir.

Q. So in 2014, you've been on the force for six years?

A. Something like that, yeah.

Q. Can you tell me what your duties were, other than -- were you training anybody else?

A. No, sir. I don't train.

Q. You don't train?

A. No.

Q. Have you ever trained?

A. I believe so, one here; one there.

Page 22

But I, you know -- because the training officer had the day off or something.

Q. Do you remember an incident on July 5th, 2014?

A. Yes.

Q. Can you tell me what happened?

A. We got a call for a man striking a garage door with a green vehicle. He hit the door; accident, involving a vehicle.

Q. That was the radio run that you received?

A. Yeah.

Q. Alright. What time did you receive it?

A. I can't recall the time.

Q. You can't recall. Was it late at night? Early in the morning?

A. I believe it was early in the morning.

Q. And were you by yourself in your car?

A. Yes, I was.

Q. Alright. And do you recall where you

Page 23

were when you received the radio call?

A. I can't recall.

Q. Okay. And when you arrived -- did you go to the scene?

A. Yes, sir.

Q. And do you recall what time you arrived at the scene?

A. I can't recall.

Q. And do you recall who was present when you arrived at the scene?

A. Who was present?

Q. Yes.

A. Nobody in the alley.

Q. Nobody --

A. Nobody at the scene of the accident.

Q. So you were the first to arrive?

A. I was -- I can't really recall if I was first or not. I can't recall.

Q. But you know there was nobody else in the alley?

A. Well, we were looking for a vehicle.

Page 24

That's what I meant by there was nobody else in the alley. That's what I meant by that, nobody else in the alley.

Q. So there was no vehicles in the alley?

A. Correct.

Q. Were there any people in the alley?

A. I don't believe so.

Q. Were there any police officers in the alley?

A. Myself and whoever came after.

Q. Do you recall who that was?

A. I can't really recall. I think it's Officer Nelson and MPO Arrington. I'm not sure.

Q. At least the three of you were there?

A. Correct.

Q. Do you recall whether anybody else was there?

A. I don't recall.

Q. You don't recall?

A. No.

Q. Do you recall whether there were any

VERE O. PLUMMER v.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF OFFICER SANDRO LUKANOVIC
October 4, 2016

Page 45

Q. You've never been assigned to traffic?

A. No. That's just the training I received prior to the Metropolitan Police Department.

Q. And can you explain to me if that is the case why you responded to the radio call that there was an accident on Euclid Street?

A. I was called by the dispatcher.

Q. And you were directed to go there?

A. Yes, sir.

Q. Okay. Was the dispatcher aware that you had no training in traffic?

MR. JACKSON: Objection as to what the dispatcher knew.

BY MR. GERALD:

Q. Did you tell the dispatcher that you did not have any training in traffic matters? Did you or did you not?

A. Did I -- I don't --

Q. You got the call?

A. I got the call. I got that far.

Page 46

Q. And what you heard was that there was an automobile accident, correct?

A. Yeah. It was a 1050, property damage. I believe that's what they called it.

Q. Okay. And what was your response to the dispatcher?

A. 1099.

Q. And what does that mean?

A. That means I'm by myself and I acknowledge the radio run.

Q. Was the dispatcher -- strike that. Were you expected to go to the scene?

A. Yeah. When you're dispatched, you have to go. That's your radio run.

Q. And when you arrived, what did you advise the dispatcher?

A. I'm on scene.

Q. Okay. And did you tell the dispatcher what you observed upon arriving at the scene?

A. I don't recall advising the dispatcher.

Page 47

Q. Did you take any notes?

A. No, I did not.

Q. Did you speak to anybody?

A. No, I did not -- I spoke to Mr. Plummer.

Q. You spoke to Mr. Plummer?

A. Yeah.

Q. What did you say to Mr. Plummer?

A. Can you come out of the vehicle, please.

Q. And when you asked Mr. Plummer to come out the vehicle, where was Mr. Plummer?

A. Inside of the vehicle.

Q. Alright. And were you in the alley when you spoke to Mr. Plummer?

A. No.

Q. Where were you?

A. He was in a garage.

Q. And you entered the garage?

A. Yes.

Q. And did you enter with his permission?

Page 48

A. I didn't need the permission.

Q. Why did you not need the permission?

A. Because there was probable cause that a crime has been committed and that person committed it, and that gave me enough to go inside.

Q. What was the probable cause?

A. There was damage to the garage door and there was damage to Mr. Plummer's vehicle --

Q. Alright.

A. -- and he matched the description of the call.

Q. What was the description?

A. It was a green Jaguar, if I recall correctly.

Q. A green Jaguar?

A. Yes.

Q. How did you know that the damage to the structure was not there before you arrived -- had not occurred before you got the call, rather?

A. How do I know?

Page 57

A.   What's that?

Q.   Can you describe how Mr. Plummer was removed from the vehicle?

A.   I believe the window was broken by the fire department and the door was opened.

Q.   And can you describe or relate any conversations or discussions that were had between the police officers on-site that led to Mr. Plummer being removed from his vehicle?

A.   I don't understand. I apologize. I don't mean to look at him. I just --

Q.   You said earlier, a few minutes ago, that Mr. Plummer was -- he was forcibly removed from the vehicle.

A.   Negative. I did not say that.

Q.   I'm asking you. That's the question. Was he forcibly removed from the vehicle?

A.   No.

Q.   He voluntarily got out of the vehicle?

A.   No, he did not.

Q.   In fact, the fire department broke

Page 58

his -- the window on the driver's side?

A.   I can't recall, sir. I'm sorry.

Q.   Do you know who removed him from the vehicle?

A.   Who removed who?

Q.   Mr. Plummer.

A.   Oh, the door was open and he came out.

Q.   Who opened the door?

A.   I don't -- I can't recall.

Q.   Do you recall the events leading up to the fire department breaking the window?

A.   Yes, somewhat. Yeah.

Q.   What happened?

A.   Mr. Plummer was found in the vehicle. Asked him to come out. And he started acting strange and erratic. He kept calling 911 with his cell phone saying that there's some strange men inside of his garage.

I kept telling the dispatcher -- I was like: "We're here. We're the police. And I don't know why he keeps calling 911."

Page 59

Send an ambulance because there's got to be some kind of medical issue. And I kept asking him to come out of the vehicle. "Open the window. I'm police." I had a badge number. I was in full uniform. And he just didn't want to open.

He kept calling the 911 dispatch. And that's basically what led to the -- him -- his vehicle -- the fire department to go in and -- in his broken window and open the door to hit the lock.

Q.   Do you know who authorized the breaking of the window?

A.   I believe there was a chief or fire department -- or deputy chief.

I'm not sure. I think it was named in your lawsuit. So he was there. And Lieutenant Kutniewski was notified also.

Q.   Who gave the permission to break the window?

A.   I guess it was corroboration (sic)

Page 60

between the fire department and --

MR. JACKSON: Don't guess. If you don't know --

A.   I don't know, sir. I apologize.

Q.   Now, you indicated that Mr. Plummer was calling 911?

A.   Yes, sir.

Q.   And am I to understand that because you were there, there was no reason to call 911?

A.   Well, I mean, that's obvious, I guess. It's obvious. I mean, what does he -- if I come to you and I'm in your garage and I have three different police officers that says can you come out of the vehicle and you're acting strange and you start calling 911 saying there's some strangers in my garage; send me police, who else is going to show up?

Q.   Did he use the word, "strangers"?

A.   That's basically what the dispatcher said.

Q.   That's what the dispatcher said to

VERE O. PLUMMER v.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF OFFICER SANDRO LUKANOVIC
October 4, 2016

Page 61

you?

A.   Yeah.  She said that he keeps calling 911 and saying strangers and --

Q.   Is there a record of your conversation with the dispatcher?

A.   I believe so.  It should be --

Q.   Is there a recording?

A.   Yes.  I believe so.

Q.   And that would have been recorded after the initial radio run; is that correct?

A.   Everything is recorded on the radio, sir.

Q.   I know.  But there was a radio run --

A.   That's recorded.

Q.   Hold on a second.  There's a radio run that you received before you got to the scene; is that correct?

A.   There was a radio run before I got to the scene.  Correct.

Q.   And the radio run talked about some sort of accident; is that correct?

Page 62

A.   I was given instruction on what the 911 caller received.

Q.   Right.

A.   Right.

Q.   And then you say Mr. Plummer started dialing 911, is that correct, after you arrived?

A.   After we located Mr. Plummer in his vehicle, that's when he started -- it's not when I arrived then he started calling.

Q.   Okay.  But after you saw him in his vehicle, you said he started dialing 911, right?

A.   No.

Q.   Correct me.

A.   He didn't start dialing 911.  He was behind the vehicle asleep.

Q.   He was in the vehicle asleep?

A.   Yes, and the car was running.

Q.   And at some point he was awakened?

A.   I knocked on the window.

Q.   And you asked him to come out of the vehicle; is that correct?

Page 63

A.   No.  He looked up and he asked me what am I doing?

Q.   Did he say what are you doing on my property or what are you doing?

A.   What are you doing?

Q.   Did he ask you to leave his property?

A.   What's that?

Q.   Did he ask you to leave his property?

A.   I believe so some time during our -- during our interaction he did.  I don't know if it was to me or -- but he did.

Q.   Did you leave?

A.   No.

Q.   Why did you not leave?

A.   Because your client was acting erratically and the crime has been committed, which it was passed the point anyway that he struck the door or whatever it is.

My major concern and the concern of the fire department and the other officers is because of the acting of Mr. Plummer, the way he

Page 64

was acting and the way he was found calling the police while we're already there, we're thinking that he has some kind of medical emergency.  Basically, that was my thought.

Q.   Did you ever think that he was calling the police because he was in fear of what would happen to him while you guys were there?

A.   I can't really speak to what he thought.  I mean, I can't really answer what he thought.  You can ask him that.

Q.   Alright.  I will.  But can you understand why he would have called 911?

A.   No.  Actually, I don't understand.

Q.   You don't understand?

A.   No.  No, sir.

Q.   So because you and Officer Nelson and other officers were there, there was no need for him to have any concern about why you were there?

MR. JACKSON: Objection as to the form of the question.

But you can answer.

Page 97

Accidents do happen.

Q. What was the description of his vehicle that --

A. I can't really recall. I remember it was a Jaguar. I just -- I can't recall.

Q. You don't recall what color?

A. No. I really don't. I'd be guessing. Do you want me to guess?

Q. No, sir. And you were able to match Mr. Plummer's vehicle with the vehicle that was described in the radio run?

MR. JACKSON: Objection as to "match."

BY MR. GERALD:

Q. How did you know that Mr. Plummer's vehicle was the vehicle that was mentioned in the radio run?

A. By the description of the vehicle, damage to the vehicle, and --

Q. So the radio run described the damage to the vehicle?

A. No. The radio run described the

Page 98

vehicle by the caller. The radio run described the vehicle.

Q. The radio run described the vehicle?

A. Correct.

Q. Did it describe the damage to the vehicle?

A. I don't recall.

Q. You don't recall?

A. No.

Q. So based on what was -- you heard in the radio run, you connected Mr. Plummer's vehicle to the damage to the garage?

A. I can't really -- I mean, I don't -- what do you mean?

There was damage to the door. Mr. Plummer's vehicle matched the description of the vehicle that was on the radio run. And we walked in and found Mr. Plummer asleep behind the wheel. That's why we talked to him.

There was damage on his vehicle. Connecting, matching, I don't know what you call

Page 99

it. But that's what happened.

Q. But probable cause, is it not, is based upon some factual considerations that you have to --

A. Yes. It's circumstances and facts and reasonable information that a crime has been committed or somebody committed it.

Q. So did Mr. Plummer commit a crime or was it a traffic violation?

A. Well, it was a crime after he left the scene, and he didn't notify the police or the owner.

Q. Alright. Now, he was in his car; is that correct?

A. Yes.

Q. In his garage; is that correct?

A. Um-hum.

Q. And the other garage was right across the alley; is that correct?

A. I can't really tell you where in proximity.

Page 100

Q. Can you tell me if it was somewhere other than in the alley where you found Mr. Plummer's --

A. No. It was in the alley. I don't know if it was directly across. I'm telling you I can't really remember.

Q. And what is the basis for saying that Mr. Plummer left the scene? What are the facts that would support the claim that he left the scene?

A. He was in a garage parked.

Q. Okay. And are you familiar with the statute that relates to leaving after colliding? Are you familiar with the statute that defines leaving after colliding?

A. Yeah. When you strike a vehicle and you don't get your identity known and you flee the scene.

MR. GERALD: Exhibit Number 5.

(Lukanovic Deposition Exhibit No. 5 was marked for identification.)

Page 93

specificity all facts that support the defendants' denial of allegations of trespass and destruction of property/vicarious liability as is alleged in Count II of plaintiff's Amend Complaint."

Q.   And your answer is that you're not authorized to speak on behalf of all defendants; is that correct?

A.   Yes.  That's what I was advised to do.

Q.   Now, on your own behalf, can you tell me what the facts are that would support your denial of allegations of trespass and destruction of property?

A.   What's that?

Q.   Can you -- strike that.

A.   You can do that, say strike that?

Q.   Yeah.

A.   Can I do that?

Q.   Yeah.

MR. GERALD: Now, whether she will let you do that, I don't know.

Page 94

Q.   Alright.  My question to you is:  What are the facts that support your denial of the allegations of trespass and destruction of property?

A.   My denial means -- what do I --

Q.   You personally?

A.   I personally -- that I denied for what, that I'm --

Q.   The trespass.

A.   So basically you're saying if I had -- did I have a lawful reason to be there?  I did.

Q.   So you do?  You did?

A.   Yes, probable cause.

Q.   Probable cause?

A.   Correct.

Q.   And that, again, relates to something that you did not witness; is that correct?

A.   There was witnesses.

Q.   But you did not personally witness it?

A.   No, I did not. Yes.

Q.   Okay.  As a matter of fact, your

Page 95

investigation as to what actually happened was limited to asking Mr. Plummer to exit his car; is that correct?

A.   Can you repeat?

Q.   I said your involvement in -- your involvement was limited and the investigation of this incident is limited to asking Mr. Plummer to get out of his car; is that correct?

A.   I don't understand.  I don't know what you mean by, "limited."  Can you ask me like a regular question?  Because I don't --

Q.   A regular question?

A.   Yeah.  I'm not a lawyer.  I know you speak to Mr. Jackson differently.  Can you speak to me a little bit different like a regular question?  And I'll answer it.  I just don't understand because there's so many fancy words in there.  And I can't --

Q.   Alright.  Please excuse me.

A.   Sorry.

Q.   I'm not trying to be difficult.

Page 96

A.   I'm just trying to make it easier so I can answer your questions.

Q.   And I want to get you out of here so you can go home and go to bed.

A.   Listen, we're here.  We're not going anywhere, so go ahead.

Q.   Other than asking Mr. Plummer to exit his vehicle, what else did you do as part of the investigation?

A.   Well, we noticed the damage to the door --

Q.   What did you do?  Not what we did. What did you do?

A.   I noticed the damage to the door.  I noticed Mr. Plummer's vehicle in the garage matched the description of the radio run.  I saw damage to the vehicle, and that gave me probable cause and reasonable suspicion to investigate further.

That's why I knocked on his window to ask him a question because it was an accident.

Page 101

BY MR. GERALD:

Q.   Are you familiar with the DC Code Chapter 50-2201?

A.   Not really.

Q.   Not really.  Have you had a chance to read it?

A.   The whole thing?

Q.   Does it refresh your recollection as to what it is?

A.   Yeah, somewhat.

Q.   Can you explain to me what you understand about the statute?

A.   That a person who was involved in the accident should stop, call 911, and stay on the scene.

Q.   Alright.  And would you say that Mr. Plummer fled the scene?

A.   Yeah.  He did not stop.  He didn't get his -- Mr. Plummer did not stay on the scene.  He was in his garage parked asleep behind his wheel.  That's what constitutes leaving after colliding.

Page 102

Q.   So is the sleeping part of the reason that he was charged with leaving after colliding?

MR. JACKSON: Objection to the form of the question.  He told you he did not make the charges.  He did not --

MR. GERALD: We're talking about the statute, Mr. Jackson.

MR. JACKSON: No.  Your question was, was that why he was charged.

MR. GERALD: And that's what he said.  He said Mr. Plummer was sleeping, blah, blah, blah, blah.

Q.   Isn't that what you said?

A.   I didn't say sleeping and blah, blah, blah.  I mean, we can go back to it.  But I don't remember me saying, blah, blah, blah.

THE WITNESS: Did I say blah, blah, blah?  Or can you strike that?

MR. GERALD: We can strike that.

THE WITNESS: Okay.  I'm just asking.  I mean, you know.  Please strike that.

Page 103

BY MR. GERALD:

Q.   Alright.  But you sort of define what you believe to be the reason that --

A.   Well, they're just facts, sir.  I don't make decisions or beliefs or whatever it is.

I can explain something if you would allow me.  Just with the police work, we get called -- I get a call to respond to an address and I get ambiguous or not ambiguous --

Q.   Dispatch?

A.   -- dispatch.  One is disorderly.  It can be a man with a knife stabbing somebody.

One is 1050, property damage.  I come in there, there is injuries, and the car is flipped.  So basically you look for -- you come in there and you don't know what you're getting and you investigate.

And that's basically what happens in every case.  I can't tell you -- do I make determinations or my beliefs and everything else?

Page 104

No.

If I see -- if I got called to Mr. Plummer's, 1050 property damage or whatever the dispatcher dispatched me to, and I came in there and I see no damage to any kind of door and I don't see any damage to Mr. Plummer's vehicle, you know what I'm going to do?  I'm going to leave because there is no reason for me to stay there.

That's why we talked to Mr. Plummer.  And that's basically what happened.  That's how we do business.

I mean, I don't know how else I can explain it to you.  I wish that we were not here.  I wish that Mr. Plummer came out and gave the driver's license and I wish -- and I'm glad that he's okay.  That's why we're here.

Other than that, I can't really testify you -- you know, the questions.  I mean, I hope that clarified a little bit.

Q.   Yeah, a little bit about what you do.