# EXHIBIT 7

**In The Matter Of:**

*VERE O. PLUMMER v.*
*DISTRICT OF COLUMBIA, et al.*

*DEPOSITION OF OFFICER JOHN F. NELSON*
*October 4, 2016*

*COURT REPORTERS, ETCetera, INC.*
*"We Guarantee Accuracy, Quality & Consistency!"*
*2833 Smith Avenue, #260*
*Baltimore, MD  21209*
*(410) 653-1115   1-800-947-DEPO   (202) 628-DEPO (3376)*



*"We'll Cover Your Job ANYWHERE in the Country!"*

Original File NELS1004.TXT

Min-U-Script® with Word Index

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

VERE O. PLUMMER,              *

　　　　　　　Plaintiff       *

vs.                          *   Civil Action No.:

DISTRICT OF COLUMBIA,        *   15-CV-2157(RDM)

et al.,                      *

　　　　　　　Defendants       *

　　*     *     *     *     *

DEPOSITION OF:

　　　　　OFFICER JOHN F. NELSON,

was held on Tuesday, October 4, 2016, commencing

at 9:47 a.m., at the Law Offices of Tilman L.

Gerald, 1220 L Street, NW, Suite 700, Washington,

D.C., before Sherry Brooks, Certified Reporter.

　　　*     *     *     *     *

　　　　COURT REPORTERS, ETCetera, INC.

　　Maryland　　　　　　　Washington

　　(410) 653-1115　　　　　(202) 628-DEPO

　"We'll cover your job ANYWHERE in the country!"

　　　　　1-800-947-DEPO

---

Page 2

APPEARANCES:

On behalf of the PLAINTIFF:

　　TILMAN L. GERALD, ESQ.
　　LAW OFFICES OF TILMAN L. GERALD
　　1220 L Street, NW
　　Suite 700
　　Washington, DC　20005
　　(202) 742-2004
　　E-mail:　Tilmanlg@gmail.com

On behalf of the DEFENDANTS:

　　DAVID A. JACKSON, ESQ.
　　OFFICE OF THE ATTORNEY GENERAL
　　One Judiciary Square
　　441 4th Street, NW
　　Suite 630 South
　　Washington, DC　20001
　　(202) 724-6618
　　E-mail:　Davida.jackson@dc.gov

ALSO PRESENT:　Vere O. Plummer

---

Page 3

I-N-D-E-X

Deposition of Officer John F. Nelson

October 4, 2016

EXAMINATION BY:                                   PAGE:

Mr. Gerald                                           4

EXHIBITS                                          PAGE:

1    Amended Verified Complaint                      6

2    Deft's Answer to Amended
　　 Verified Complaint                               8

3    Code of the District of Columbia               30

4    Arrest #031423358 - D-1 Vere Plummer           72

5    Special Order-MPD                              81

6    Leaving After Colliding                        87

7    Defendant's Supplemental Responses and
　　 Objections                                      116

(Exhibits included with ORIG transcript ONLY.)

-oOo-

---

Page 4

　　　　P-R-O-C-E-E-D-I-N-G-S

WHEREUPON --

　　　　OFFICER JOHN F. NELSON,

a Witness called for examination, having been

first duly sworn, was examined and testified as

follows:

　　　　EXAMINATION

　　BY MR. GERALD:

　　Q.　Good morning, sir.　How are you?

　　A.　Good morning.

　　Q.　I'm Tilman Gerald and I represent Mr.

Vere Plummer as the Plaintiff in this case.

　　　　I know that you're a police officer.

You probably testified in court before?

　　A.　Yes.

　　Q.　Have you ever had a deposition taken

before?

　　A.　No.

　　Q.　A deposition is similar to appearing

in court.　You'll be recorded by our court

reporter.

Page 13

my field training officer, who is MPO Arrington. Also there was Officer Lukanovic and his trainee, Officer Page. And there were also some fire officials there.

Q. Were all of you in the same car?

A. No.

Q. Where were you immediately prior to being at -- you said 1219 Euclid Street (sic)?

A. Where was I prior?

Q. Yes. Do you know?

A. I was driving with my field training officer. I don't know exactly where we were.

Q. Alright. And how did you end up at 1219 Euclid Street?

A. We were dispatched there for what was told to us was an accident with injuries and that the fire department was on scene.

Q. Alright. And what did you find when you arrived on the scene?

A. We saw an ambulance. We couldn't quite figure out initially whether it was on the

Page 14

street or in the alley. We saw fire officials or fire department employees coming out of the alley.

They stated that there was someone that was back there, seemed intoxicated, had been in an accident, but had refused any type of medical service. So we had walked back into the alley where they had directed us.

Q. And did you leave your squad car on the street?

A. I don't remember.

Q. And do you recall the names of the personnel from the DC fire department that you met on the scene?

A. The only one that I remember was the battalion fire chief that came out on scene, which I later read in his report was, I believe, Lieutenant or Battalion -- Welsh, Chief Welsh.

Q. Was he there when you arrived?

A. No.

Q. Do you know when he came?

Page 15

A. I think when we were asking for additional -- again, for the ambulance to come back.

It was later. By this time, the sun had risen. I remember that.

Q. Did the ambulance leave at some point?

A. The ambulance that was there initially did, yes, because they didn't accompany us back into the alleyway. And so we called again.

Q. And why did you call again?

A. Because we believe that we had someone who was mentally confused or intoxicated.

Q. And why did you believe that he was intoxicated?

A. He was passed out behind the wheel of his running car. There was clearly an accident that had taken place in the alley across the street from his garage.

He was unable to answer questions, repeatedly was asking for the battalion fire chief's name. He seemed extremely confused. So

Page 16

we didn't know whether we had, again, someone who was intoxicated or someone who was having a medical emergency.

Q. So you called the ambulance back once you attempted conversation with Mr. Plummer?

A. Yes. Well, we called for fire to come back when he was refusing to exit the vehicle.

Q. Okay. What did you discover when you first arrived on the scene?

MR. JACKSON: Objection as to the form of the question.

You can answer.

A. I'm sorry. Can you repeat it?

Q. What did you see when you first arrived on the scene?

A. We saw --

Q. When you went into the alley, what did you see?

A. We saw damage to a garage, saw a black substance and what looked to be basically like substance tar, possibly even burning rubber that

Page 17

was sprayed throughout the alley. Saw the defendant -- or, I'm sorry. Mr. Plummer, saw him behind the wheel passed out with his car running. And the garage door was open to us.

Q.   Okay. Did you have any conversations with anybody prior to trying to talk to Mr. Plummer?

MR. JACKSON: Objection as to the form of the question.

A.   I don't remember exactly what the conversation was between initially myself and my field training officer.

Q.   Did you talk to anybody else, other than your field training officer?

A.   Eventually, witnesses came out.

Q.   Were they there when you first arrived on the scene?

A.   Not when we first arrived on the scene.

Q.   At what point did they come out?

A.   I don't recall.

Page 18

Q.   You have no recollection as to exactly what time you talked to them?

A.   I don't. I mean, all I can tell you is that at that point it was still dark out when they came out.

Q.   Did you have any conversations with them?

A.   Yes.

Q.   And did you identify who they were?

A.   Yes.

Q.   And who were they?

A.   I remember one -- one's name being Gary Cooper. The other one, I don't recall his name.

Q.   And do you recall what Mr. Cooper might have said to you, if anything?

A.   I don't remember which one stated which. I would have to review my notes.

Q.   You didn't bring your notes?

A.   No. It was something that I provided. It was asked of me and I provided.

Page 19

Q.   But you said you reviewed your -- some documents and you prepared for this deposition?

A.   Correct.

Q.   And you didn't think you should review your notes?

A.   I did review my notes.

Q.   Alright. But you can't testify what was in your notes?

A.   If you can show me a copy of my notes, I'd be more than happy to show you.

Q.   That wasn't my question, Mr. Nelson. You can't independently tell me what was in your notes or what was said by Mr. Cooper?

A.   Exactly, no, not specifically. I would have to review my notes to be able to tell you which one said which, but it's something I had documented.

Q.   Alright. Now, how did you know -- you said that when you walked into the alley you saw damage to a garage; is that correct?

A.   Yes.

Page 20

Q.   How did you know that that damage was caused by Mr. Plummer?

A.   You could see the damage to the vehicle angled in a situation that backed up to where we could see a tire indentation, which basically looked like he had worn away the pavers. So it wasn't a normal, like, blacktop paved alley.

It was almost like what I remember to be pavers. And that had worn through. And there was a pile of black substance, which I believe at the time to be a portion of his tire with that substance that led back into the garage.

And there was also white paint transfer that was consistent with the color of the garage on Mr. Plummer's vehicle.

Q.   How do you know that the paint substance that was on Mr. Plummer's vehicle was the same as the paint that was on the garage? Did you test the paint?

A.   No.

Case 1:15-cv-02147-TJK    Document 14-9    Filed 05/08/17    Page 6 of 17
VERE O. PLUMMER v.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF OFFICER JOHN F. NELSON
October 4, 2016

Page 21

Q.   Did you ever test the paint?

A.   No.

Q.   And did you know whether Mr. Plummer had paint on his bumper prior to July 5th, 2014?

A.   I do not.

Q.   So you just concluded that the paint that was on his bumper was the same as the paint that was on -- from the garage?

A.   We had probable cause to believe --

Q.   I didn't ask you that.

A.   -- by the totality of the circumstances that that's what it was.

Q.   So what was probable cause?

A.   What is it?

Q.   Yes.  What is probable cause?

A.   It's a set of facts, circumstances, or reliable information which would lead a reasonable, prudent, cautious police officer to believe that a crime has been committed or was about to be committed and that a certain person committed it.

Page 22

Q.   Alright.  So what crime was committed?

A.   Leaving after colliding and probably driving under the influence.

Q.   Now, was he tested for driving under the influence?

A.   He was given a field sobriety test once back at --

Q.   Let me rephrase the question.
     Was he tested on the scene for driving under the influence?

A.   No.

Q.   Was he ever charged with driving under the influence?

A.   No, he was not.

Q.   And -- oh, Mr. Plummer is coming.
     (Whereupon, Mr. Plummer entered the deposition.)
     MR. GERALD: State your name for the record.
     MR. PLUMMER: Vere Plummer.
     BY MR. GERALD:

Page 23

Q.   Now, Mr. Nelson, you testified that Mr. Plummer was not tested for driving under the influence on the scene; is that correct?

A.   Correct, in the alley.  That's correct.

Q.   Okay.  And you only recall the name of one person who came to the alley after you arrived; is that correct?

A.   No.  That's not what I said.

Q.   What did you say?

A.   You asked me who I recalled being in the alley after I had arrived?

Q.   Yes.

A.   So I gave you the names of Officer Lukanovic, Officer Page, the battalion fire chief, and then there were other fire department employees on scene.

Q.   Am I to understand that Mr. Cooper, who you described as a witness, was not there when you arrived?

A.   Not when I initially arrived, no.

Page 24

Q.   And you don't recall the exact time that Mr. Cooper came to the alley?

A.   I do not, know.

Q.   And did Mr. Cooper explain to you how he witnessed what supposedly happened?

A.   Mr. Cooper did, as well as his roommate.

Q.   And what did Mr. Cooper relate to you?

A.   Again, if you're asking me what Mr. Cooper specifically said, I would have to review my notes.  I can tell you what both of them said, but I can't really differentiate what one said over the other.

Q.   They both witnessed the accident?

A.   They didn't witness the accident take place.  No.  I think they witnessed the aftermath.

Q.   And the aftermath was what?

A.   From both people on scene, they told us that one -- and I can't remember whether it was Mr. Cooper or not -- stated that he woke up

Page 25

to the smell of fire, smoke.

He thought that there was a house fire and that they both came outside, saw Mr. Plummer behind the wheel unconscious, up against the garage with his foot on the gas. The wheels were spinning with smoke.

One of them stated that they reached in and nudged him awake and that he then backed his car into the -- into his garage and fell back asleep.

Q. And you credited what they told you?

A. I took into account what they said, yes.

Q. And that was part of what you claim would be probable cause?

A. Yes.

Q. Now, Mr. Plummer was on his private property at the time that you arrived; is that correct?

A. That's correct.

Q. And how far is that from the garage

Page 26

that he supposedly struck?

A. I don't know the specific feet. It's a normal sized alley.

Q. So it would be -- is it more than 10 feet?

A. Yes.

Q. 12 feet?

A. Probably around there. I honestly don't know.

Q. But it wasn't very far?

A. No.

Q. Alright. And did Mr. Cooper tell you that Mr. Plummer was a neighbor of theirs?

A. I don't recall whether he said he was a neighbor or not. I don't remember how we identified him.

Q. But you knew that Mr. Plummer lived close to Mr. Cooper, right across the alley from Mr. Cooper?

A. Again, I don't know whether it was Mr. Cooper or not, but both of the witnesses gave

Page 27

their address to where they lived.

Q. Do you recall the address that was given?

A. For the two witness?

Q. Yes.

A. No.

Q. Do you recall the address for where the garage was located?

A. I believe it might have been 1219.

Q. 1219. And do you recall whether the Cooper -- Mr. Cooper lived next door, to the left of 1219 or to the right of 1219?

A. I'm not sure. I don't recall.

Q. Did Mr. Cooper tell you how far -- where he was in his house when he heard whatever he heard that -- did Mr. Cooper call the police? Do you know?

A. I don't know.

Q. Do you know who called 911?

A. I have no idea.

Q. But someone did?

Page 28

A. Someone did, yes.

Q. And did you have a radio run from the dispatcher --

A. Correct.

Q. -- directing you to the alley behind 1219?

A. Correct.

Q. Did you talk to anybody else, any other neighbors?

A. We -- once the sun came up towards the end when we were ready to leave, the owner of the home came out who had the damage to his garage.

Q. And who was that?

A. I don't recall his last name.

Q. Now, Mr. Cooper and his roommate heard what he described as a loud noise to you; is that correct?

A. One of them described a loud noise.

Q. Did the owner of the garage speak to you and tell you what he heard?

A. No.

VERE O. PLUMMER v.
DISTRICT OF COLUMBIA, et al.

Page 33

he should have left his vehicle against the garage?

A.    Sure.  Called us, attempted to make notification to the owner of the property, any of those things.

Q.    But he could have done that, could he not?

A.    He could have.  He did not.

Q.    Okay.  Now, how soon after the collision should he provide identifying information?

MR. JACKSON: Objection as to the form of the question.

If you understand it, you can answer it.

BY MR. GERALD:

Q.    Do you understand it?

A.    Can you repeat it?

Q.    Do you know -- let me rephrase.  Is there a specific period of time within which he has to provide identifying information, according

Page 34

to the statute?

A.    I don't see any time frame.

Q.    Alright.  Did you have a time frame in mind that he should have provided the identifying information to you or to the owner of the property?

A.    While he was on scene before he left and tried to go into his garage, yeah.

Q.    Did he close the door to his garage?

A.    No.  He passed out before that.

Q.    How do you know that, Mr. Nelson?

A.    Because that's what one of the witnesses stated after they woke him up with his car up against the garage.

Q.    Pardon?

A.    That's what one of the witnesses stated.  And that's also what they stated when he backed his car into the garage, is that he fell back asleep.

Q.    Alright.  But you didn't observe him falling asleep; is that correct?

Page 35

A.    I observed him asleep or unconscious when I arrived on scene.

Q.    And you didn't observe him driving -- backing his car back into his garage?

A.    No.

Q.    And when you first arrived on the scene, he was on his property; is that correct?

A.    That's correct.

Q.    And that is private property?

A.    Correct.

Q.    And you did not witness a crime or any violation of the traffic regulation, did you?

MR. JACKSON: Objection as to the form of the question.

Go ahead.

A.    We witnessed evidence of a crime.

Q.    Did you witness the crime, Mr. Nelson?

A.    As it took place?

Q.    Yes.

A.    Immediately did I witness him drive his car into the garage?

Page 36

Q.    Yes, sir.

A.    No, I did not.

Q.    Alright.  Did you witness him strike the garage?

A.    No.

Q.    Alright.  So you're relying upon the word of Mr. Cooper and his roommate?

A.    That's what we always do when -- initially, we take that into consideration when we start our investigation.

If anyone is calling us stating that they've just been struck by a vehicle that has left the scene, as a complainant would do, that's something that we take into consideration.

Obviously, that's how we would get leaving after colliding.

Q.    Isn't this a little bit different since it's involving neighbors?

A.    No.

Q.    It is not?

A.    What difference would it make if it

Page 37

was your neighbor --

Q.   Well --

A.   -- neighbor versus a stranger?

Q.   When you arrived on the scene, you said it was 4:00 in the morning?

A.   No.

Q.   What time did you arrive?

A.   I believe the report said 0444, 0445 hours.

Q.   4:00 to 4:45, right?

A.   Um-hum.

Q.   And that's at the wee hours of the morning; is that correct?

A.   That would be 12:45 (sic) a.m.

Q.   4:45 a.m.?

A.   I'm sorry.  It was 04:45, so yeah.

Q.   It was 4:45 in the morning?

A.   If that's what the report stated, yes.

Q.   And at that time, the neighbor -- the owner of the property had not yet come down to the scene?

Page 38

A.   Correct.

Q.   And to your knowledge, no one had gone up to knock on his door to let him know that his garage had been damaged?

A.   I don't remember if anyone made an attempt to knock on his door.  I just don't recall.

Q.   Did you make an attempt to knock on his door?

A.   No, I did not.

Q.   Did any other officer make an attempt to knock on his door?

MR. JACKSON: Objection to the form of the question.

BY MR. GERALD:

Q.   Well, do you know whether any other police personnel or fire department personnel attempted to bring -- to get the owner of the property to come down to the scene?

A.   Not to my knowledge.

Q.   Alright.

Page 39

A.   I know that his door was inaccessible to us from the back alley.

Q.   But he had a front door?

A.   Yes.

Q.   And you parked your car on Euclid Street, did you not?

A.   I don't remember.

Q.   Do you remember whether -- where is the alley entrance that you --

A.   We came in from the north and then went into the south alley.

Q.   And you don't know whether you entered from Fairmont or from Euclid Street?

A.   I can't remember.  I don't remember if we parked on the street or whether we parked in the alley.

Q.   Didn't you testify earlier that you parked on the street?

A.   No, I did not.

Q.   Where did you say you left your squad car?

Page 40

A.   I said I did not recall.

Q.   Okay.  Was the ambulance -- the fire department and ambulance in the alley?

A.   No.  No.  When we first got on scene, the ambulance was on the street.

Q.   Okay.  But when you got to the scene, you did realize that the address for that garage was 1219 Euclid Street?

A.   I don't recall.  Again, I don't recall.  I believe it was 1219.  But I'm not 100 percent sure.

Q.   Alright.  Let's assume that it was 1219.  Neither you, nor Mr. Arrington went around to awaken the owner of the property or let him know that his garage had been damaged?

A.   No, we did not.

Q.   And am I to understand as well that you don't recall the exact time that you approached Mr. Taylor or the owner of the property to let him know that his property had been damaged?

VERE O. PLUMMER v.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF OFFICER JOHN F. NELSON
October 4, 2016

Page 41

A. He approached us. He came out from his back -- from the back of his property. He came out to us.

Q. And did --

A. And he stood on the other side of his fence while we talked to him.

Q. Did he say anything to you?

A. He gave me all of his contact information.

Q. And did he acknowledge that he knew Mr. Plummer?

A. I don't recall how he stated his relationship was with Mr. Plummer.

Q. Do you recall asking the owner if he knew Mr. Plummer?

A. I don't remember.

Q. Is that something that you would have done in, I guess, conducting an investigation?

A. It depends on whether it was relevant or not.

Q. You didn't think it was relevant that

Page 42

these folks live across the alley from each other, whether they knew each other?

A. Not particularly to the crime that had taken place. Because initially, you have to understand --

Q. What was the crime, Mr. Nelson?

MR. JACKSON: I'll just ask if you'll allow Officer Nelson to finish his answer.

MR. GERALD: I will, Mr. Jackson. I apologize, Mr. Nelson.

A. At the time we were on scene, we were also asking for a standardized field sobriety, that's an alcohol certified officer, which was not able to respond to the scene.

So there were a couple of different factors that were going on, other than just the leaving after colliding charge that originally stuck, which was my mistake.

In hindsight, I would have charged him with driving under the influence as well.

Q. Hindsight is always 100 percent.

Page 43

A. It's 20/20.

Q. 20/20. And 20/20 is perfect vision, right?

MR. JACKSON: Objection. Argumentative.

BY MR. GERALD:

Q. Yes? No?

A. I believe 20/10 is better, is it not?

Q. Alright. So even though Mr. Taylor came down at some point, you had no discussions with him relative to whether he knew Mr. Plummer or what their relationship was --

A. Not that I can recall.

Q. -- or whether he wanted you to charge Mr. Plummer with any violation?

A. No. I don't remember him stating that he did or did not.

Q. Did you know whether Mr. -- the owner of the property had the identifying information that was required under the statute, the leaving after colliding statute?

Page 44

A. What information are you referring to?

Q. It says identifying information, right? What the driver is required to do is to provide identifying information; is that correct?

I think you testified earlier that the identifying information would be his driver's license and his insurance information. Is that what you said earlier?

A. Yeah. It states here to provide identifying information to the owner operator of the property --

Q. Alright.

A. -- and also to provide identifying information and the location of the collision to law enforcement or 911.

Q. That's in the alternative? If he does one, he doesn't have to do the other one; is that correct?

A. It looks like it's either-or.

Q. Right. So if he had provided the identifying information to the owner of the

Page 45

property, then there would not have been any basis for the charges; is that correct?

A.   I think that would depend on whether the owner would want to press charges or not.

Q.   Right.  But leaving after colliding is a traffic violation; is that correct?

A.   It's a moving violation.

Q.   Moving violation.  And does the owner of the property have any say-so about whether or not the operator should be given a moving violation for colliding with property?

MR. JACKSON:  Objection.  Relevance to the form of the question.

A.   Can you repeat, please?

Q.   Alright.  Does the statute indicate that the owner of the property has any discretion with respect to whether or not charges should be brought against the person that damages his property?

MR. JACKSON:  Objection.

BY MR. GERALD:

Page 46

Q.   You can answer.

A.   He can state whether he wants to press charges or not.

Q.   Was the owner of the property of 1219 given that opportunity, that option?

A.   He didn't state either way.

Q.   Did you let him know that he had an option of either agreeing to charges being brought against Mr. Plummer or not?

A.   As far as the damage to his property?

Q.   Yes.

A.   Not that I recall.

Q.   Is there a reason you didn't do that?

A.   No, because at the time -- and again, this goes back to my mistake as an officer in training, which was, we were also going to charge him with driving under the influence which had taken place on a public space.

And that, coupled with leaving after the colliding, would have been just a secondary charge.

Page 47

Q.   But you don't know whether he was intoxicated or not, do you?

A.   We had probable cause to believe so.

Q.   And what was that, Mr. Nelson?

A.   The fact that he was confused, passed out behind the wheel directly after an accident, according to witnesses, left the scene, and then passed out behind the wheel before he was even able to close his garage door.

Q.   Is that indicative of one being intoxicated?

A.   Yes.

Q.   Are there any other, say, symptoms or characteristics that would describe one who was intoxicated?

A.   Confusion, unable to follow commands, directions, repeatedly asking someone their name.

Q.   Alright.

A.   Many different things.

Q.   And you've been trained in determining whether one is intoxicated or not?

Page 48

A.   At the time there was no formal training for whether someone is intoxicated. But --

Q.   You had not received any training that would lead you to believe that Mr. Plummer was intoxicated?

A.   I had not received training for signs and symptoms of someone intoxicated.  That's from personal experience and witnessing many intoxicated people in my life.

Q.   Have you ever been intoxicated?

A.   Yes.

Q.   And so you would collapse?

A.   I'm sorry?

Q.   You would collapse, as you described Mr. Plummer being?

MR. JACKSON:  Objection.

BY MR. GERALD:

Q.   Did you not indicate that Mr. Plummer had collapsed behind the wheel?

A.   He was passed out behind the wheel.

Page 53

Q.   And was he charged with intoxication at the station?

A.   No.

Q.   And you weren't there at the station when he underwent that test, were you?

A.   I was.

Q.   You were?  Why didn't you charge him with driving under the influence or being intoxicated?

A.   It was my mistake, as far as not adding the charge.

Q.   I want to know why.  Why did you not charge him with driving under the influence?

A.   Because I was a rookie and I also didn't realize that he had failed the standard field sobriety test in the station.

It made it into the arrest paperwork that went downtown.  But at the time I did not know that they had actually gotten verification through his SFSTs that he had failed.

And again, it was my mistake that I

Page 54

did not add that charge on because technically I don't need to have SFST experience to make an arrest for DUI.

Q.   But my point is that you did not -- you determined that he had failed a sobriety test?

A.   No.  I did not determine that.

Q.   Well, somebody did at the station; is that correct?

A.   Correct.  And it did not make it to me.

Q.   And you never amended the charges?

A.   No, I did not.

Q.   Why did you not amend the charges?

A.   I didn't know that I could.

Q.   Wasn't your training officer with you?

A.   He was.

Q.   Was that Officer Arrington?

A.   MPO Arrington.

Q.   Did you discuss it with him whether or not the charges should be amended to include

Page 55

intoxication?

A.   Again, I wasn't --

Q.   I asked you did you talk to him?

A.   Not about the intoxication -- yeah.  I don't recall talking to him about the intoxication charge and whether we could amend that.

That's not something I knew that I could do after we had filed the paperwork and processed the arrest.

Q.   Did you talk to the Assistant Attorney General who was handling the case?

A.   No.

Q.   You never spoke to him?

A.   No.  I was called to court one day.  And then when I got down there, the case had been continued.  So it was cancelled for the day.  And I never heard anything about this case ever again until being subpoenaed for this.

Q.   So on the date that you appeared for court, were you expecting to testify for the

Page 56

District of Columbia?

A.   Yes.

Q.   Alright.  And you did not have any meetings or conversations with the Assistant Attorney General who was handling the case?

A.   That's correct.

Q.   Is that the way it works in these kinds of cases?

A.   Sometimes it can be, yes.

Q.   Is it or not, based on your experience?

MR. JACKSON: Objection.  Asked and answered.

BY MR. GERALD:

Q.   Is it your experience that -- in these kinds of cases, leaving after colliding, intoxication, that you don't discuss the case with the Assistant Attorney General prior to going to court?

A.   I have never spoken with an Assistant Attorney General prior to going to court as court

Page 69

or some belief that Mr. Plummer may have collapsed because of diabetes or a diabetic seizure?

A. It was unknown. And where he was stating that he hadn't consumed alcohol, the battalion fire chief expressed his concern to Mr. Plummer that he believed that he was having, you know, a diabetic issue or low blood sugar. And I remember him saying that he wanted to check for that.

Q. And he did check for that; is that correct?

A. Someone did.

Q. Someone did. Somebody from the Metropolitan Fire Department checked Mr. Plummer's blood --

A. Correct.

Q. -- to determine whether he was having a -- his sugar was low?

A. They pricked his finger. That's all I know.

Page 70

Q. Okay. And they pricked his finger solely for the purposes of determining whether or not his blood sugar was low. Is that what you understood?

A. That was my understanding. They were checking to see if he was having a medical emergency.

Q. Alright. And did they determine that he was having a medical emergency?

A. They determined that his blood --

Q. Answer the question. Did they determine that --

A. I'm trying to answer your question.

Q. The question is yes or no. It's not what --

A. They determined that he was not -- that his blood sugar was not low.

Q. Alright. And that he was not having a medical emergency?

A. I guess. I mean, otherwise he would have gone to the hospital.

Page 71

Q. And he did not go to the hospital?

A. No.

Q. Did the fire department remain on the scene after taking his blood and determining that there was no medical emergency?

A. I don't believe so. I don't know when exactly they left. But once it was determined that their services weren't needed --

Q. And did you call a -- someone to determine whether or not he was intoxicated?

A. What do you mean?

MR. JACKSON: Objection as to the form of the question.

BY MR. GERALD:

Q. Within the police department, there are units that do nothing but check to see if people are driving under the influence; is that correct?

A. Correct.

Q. Alright. Did you place a call to your dispatcher to try to -- to request a unit to come

Page 72

determine if Mr. Plummer was intoxicated?

MR. JACKSON: Objection. Asked and answered.

Go ahead and answer again.

A. Yes, we did.

Q. Alright. Was one available?

A. Not while we were out in the field, no.

Q. And how long were you in the field?

A. Again, I don't remember. I mean, we had the call when it was taking place. I don't remember when we actually left the scene.

MR. GERALD: Exhibit Number 4, please.

(Nelson Deposition Exhibit No. 4 was marked for identification.)

BY MR. GERALD:

Q. Can you identify that document for me -- those documents for me, Mr. Nelson?

A. This is an arrest packet from the Metropolitan Police Department.

Q. And that was prepared by whom?

Page 73

A.   Myself.  It was a different -- it was in a different system, a different software system.

So this has since been transported over to our new format.

Q.   But the information is still the same and still accurate?

A.   I mean, I'd have to go through it completely to make sure.

Q.   Did you review it before it was provided to me?

A.   Yes -- well, actually, I don't know when it was provided to you.

I mean, I have reviewed it, but I don't know when it was provided to you.

Q.   Did you review it within the past six months?

A.   Yes.

Q.   And was it accurate when you reviewed it?

A.   To my knowledge, yes, except -- well,

Page 74

actually, no.  There's one inaccuracy here.

Q.   Where is the inaccuracy, Mr. Nelson?

A.   It lists an assisting officer as Paul Dittamo.  He is a deceased officer.  I've never met him.  He died before I came on the police force.  And I believe if you look at his CAD number being 9065, my CAD number is 9865.

So I believe that that was a typo put in by --

Q.   Did you type this yourself?

A.   I did the arrest portion of it.  So the statement of facts for the arrest, my field training officer, MPO Arrington, did the accident side.

At the time you had to do basically two separate pieces of software and then it would combine it at the end if there was an arrest that was linked to a traffic accident.

Q.   Now, what part did Mr. Arrington do?

A.   The accident side.

Q.   What page is that?

Page 75

A.   I don't see it.  There's no -- you just have the arrest packet.  There would be an accident packet that's separate.

Q.   What would the accident packet consist of?

A.   It would show a diagram of the location, basically like a -- you know, where the placement of the vehicle was.  It would also give a statement of facts, as far as the accident was concerned.

It's just -- it's different.  This is not -- this does not include that.

Q.   Would you happen to know where it is or why it was not attached?

A.   Again, it was attached in the original arrest packet.

Q.   My question is:  Do you know why it was not attached to this particular document?

A.   I have no idea.

Q.   Now, you said that Mr. Arrington prepared the accident portion of this report --

Page 76

of this -- this arrest; is that correct?

A.   Correct.

Q.   What else did Officer Arrington do while on the scene?

A.   He took crime scene photos.  He was a crime scene certified officer.

Q.   Alright.  And he was training you?

A.   Yes.

Q.   And how long had Officer Arrington been on the force?

A.   I have no idea.  Years.

Q.   Years?

A.   He was a veteran.

Q.   And did he give you advice as to how best to handle this investigation?

A.   I can't recall any specific advice given.  But I mean, I was overseen and supervised by him, guided by him.

Q.   Did you ask him whether or not the facts attendant to this case warranted the arrest of Mr. Plummer?

VERE O. PLUMMER v.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF OFFICER JOHN F. NELSON
October 4, 2016

---

Page 77

A.   Well, I don't think he would allow me to make an arrest if he didn't believe that the facts that we saw on scene were pertinent to involve arresting an individual.

Q.   And what is the rank of Officer Arrington?

A.   He -- well, at the time he was a Master Patrol Officer.  I don't know -- I haven't seen him in quite some time.

Q.   How long had Officer Arrington been your training officer?

A.   Maybe 2 1/2 weeks.

Q.   And did you have a training officer before that?

A.   Yes.

Q.   Who was that?

A.   There were three phases or was three phases to the field training program.  Prior to that, it was Master Patrol Officer Johnson.

Q.   And what would each phase entail?  What was -- or what was --

---

Page 78

A.   Just working different shifts.

Q.   Working different shifts?

A.   Correct.  So I started on the evening shift for approximately 30 days.  It's usually supposed to be 30 days and then move to day work.  And then my last phase with MPO Arrington was the midnight shift.

Q.   And is there anything specific that you were supposed to learn on the midnight shift?

A.   Nothing specific -- nothing different than answering calls for service, proactive patrol.

Q.   How much discretion do you have, Mr. Nelson, in terms of making a determination as to whether an arrest is warranted as opposed to just giving someone a ticket or a notice of infraction?

A.   What do you mean?

Q.   Would you normally arrest a person -- I may have asked this before.

But I'm trying to find out whether you

---

Page 79

would normally in the circumstances that are attendant to this case -- that an arrest was warranted?

MR. JACKSON: Objection.  Asked and answered.

A.   I mean, I would -- especially being an uncertified officer and never having experienced this type of call, I would have been guided by my field training officer --

Q.   Alright.

A.   -- supervised by, and to check in with just to make sure that I was doing things correctly, you know.

Q.   But I think you testified earlier that you had conducted similar investigations or at least automobile accident investigations before.

I think you said the number was around 20; is that correct?

A.   No.

MR. JACKSON: Objection.  Misstates --

BY MR. GERALD:

---

Page 80

Q.   That wasn't what you said?

A.   No.

MR. JACKSON: It misstates his testimony.

BY MR. GERALD:

Q.   Forgive me if I did.  I wasn't trying to.  Was it 20 misdemeanor cases?

A.   No.  You asked me how many arrests that I had.  And I stated that it was approximately in the 20s for arrests.

Q.   And --

A.   As far as misdemeanors and felonies, I have no idea.  Again, you'd have to check my arrest record.

Q.   And do you recall whether any of those arrests related to an investigation or a matter that involved leaving after colliding?

MR. JACKSON: Objection.  Asked and answered.

A.   I don't recall.

Q.   You don't recall?

---

Page 101

handling the charge of failure to comply with an order when enforcing traffic violations."

Q.   Now, when you arrived on the scene, was Mr. Plummer's vehicle still running?

MR. JACKSON: Objection.  Asked and answered.

MR. GERALD: It has not been.

A.   I believe it was.

Q.   But you're not sure?

A.   I can't remember because I remember he revved the engine at some point.  So I don't know whether he started the vehicle and did it or whether it was running at the time.  I just don't recall.  I'd have to look at my notes and look at the statement of facts.

Q.   Are you aware at any point in time that Mr. Plummer provided or showed his driver's permit to anyone who was present, to the police officer or to the fire department?

A.   I don't remember how we ended up identifying him.

Page 102

Q.   Did Mr. Cooper tell you who he was?

A.   Did he tell me his first and last name?

Q.   Yes.

A.   I don't recall.

Q.   Did Mr. Cooper tell you that he resided at 1222 Fairmont Street, Northwest?

A.   I don't recall whether he stated he was a resident of that place or not.

Q.   Did you ask?

A.   I don't recall.

Q.   Was it more probable that you did ask?

A.   If he lived there?

Q.   Yes.

MR. JACKSON: Objection.  Speculation.

A.   I don't know.

Q.   But you conducted an investigation of this accident; is that correct?

A.   Correct.

Q.   And you have a man sitting in a garage in a car, and you have neighbors who come out and

Page 103

tell you that they witnessed whatever they saw; is that correct?

A.   Correct.

Q.   Alright.  You did not ask, do you know this man?

A.   I don't recall.

Q.   Alright.  And they did not tell you that this is Vere Plummer; he lives at 1222 Fairmont Street?

MR. JACKSON: Objection to the form of the question.

A.   I don't recall.

Q.   Did Officer Arrington advise you to find out if they knew Mr. Plummer, Mr. Cooper and his roommate?

A.   I don't remember.

Q.   You don't remember.  But you do remember at some point in time Mr. Plummer provided his driver's permit to one of the police officers that was on the scene?

A.   As stated, I don't recall.

Page 104

Q.   You don't recall.  Did anybody ask him to provide his driver's permit (sic) or identification?

A.   I would assume so, but I'm assuming. I don't recall.

Q.   You don't recall.  Now, on -- going back to exhibit number -- it might be 5 -- 4, there are some pages that you looked at.

Let's say beginning with 15, page 15. Can you identify the folks that are listed on this page 15?

A.   In what manner?  I mean, I can read the names off.

Q.   Do you know who they are?

A.   The only name I know is Darryl Arrington.

Q.   You don't know Thomas Thompson?

A.   No.

Q.   And can you tell me what the numbers in the parentheses stand for?  Let's start with Harry Carrington, Jr., Number 9387.  What does

Page 137

ceiling. He stopped the door from closing on us.

And again, you know, all I really remember is us trying to verbally get him to step out of the car, flashing flashlights in there trying to see what was going on.

We were, like, in cramped quarters in between his car and his garage wall.

Q. So Officer Lukanovic stopped the door from closing?

A. Yes.

Q. Did he do anything else?

A. Just what I've stated.

Q. Okay. Did he take any notes?

A. I don't know.

Q. Did you discuss with him what charges should be brought against Mr. Plummer?

A. Not to my knowledge, no.

Q. What other police officers were on the scene, other than you, Mr. Arrington, and Mr. Lukanovic?

A. Well, Officer Page, who was being

Page 138

trained by Officer Lukanovic.

Q. Okay. So Officer Lukanovic is a sergeant or master sergeant?

A. No.

Q. What is he?

A. An officer.

Q. What was he at that time?

A. I believe he was just an officer.

Q. Alright. And he was training Mr. Page?

A. Yes.

Q. Were there any other officers present?

A. Not that I can remember.

Q. Was Mr. Page also in the garage?

A. I don't think so. I don't really remember where he was spatially, and I don't really remember anything that he said. He's kind of a quiet guy.

Q. Do you still know him?

A. Yeah. We were in the academy together.

Page 139

Q. Okay. Have you had any dealings with Officer Lukanovic since 2014?

MR. JACKSON: Objection as to the form of the question.

BY MR. GERALD:

Q. Have you conducted any investigations with Officer Lukanovic since 2014?

A. I know that I've been on scenes with him, but I don't think -- you know, there hasn't been any, like, one-on-one investigations, no.

Q. When you investigated Mr. Plummer's case, did you have in your possession at the time a notebook that would show you how to conduct that investigation?

A. No.

Q. Did you have any materials with you that would demonstrate to you how to best conduct that investigation?

A. Like what? Like --

Q. A manual of some sort.

A. No.

Page 140

Q. Did Officer Arrington have with him in his possession any manual or procedure that would demonstrate to you how to conduct an investigation of leaving after colliding, property damage?

A. I don't know.

Q. He didn't show you one?

A. No.

Q. And he didn't discuss with you how to conduct that investigation, did he?

A. I don't remember fully what our conversations were on scene. But, again, he was my supervisor, you know.

Q. Okay. So my question is: Do you recall your supervisor ever telling you how to conduct that investigation?

A. I don't recall any specifics, no.

Q. So you were left to your own -- you were on your own, basically, in conducting an investigation?

MR. JACKSON: Objection as to the form