**EXHIBIT 8**

# In The Matter Of:

*VERE O. PLUMMER vs.*
*DISTRICT OF COLUMBIA, et al.*

---

## DEPOSITION OF OFFICER DARRYL ARRINGTON
*November 2, 2016*

---

*COURT REPORTERS, ETCetera, INC.*
*"We Guarantee Accuracy, Quality & Consistency!"*
*2833 Smith Avenue, #260*
*Baltimore, MD 21209*
*(410) 653-1115   1-800-947-DEPO   (202) 628-DEPO (3376)*



*"We'll Cover Your Job ANYWHERE in the Country!"*
Original File ARRI1102.TXT
Min-U-Script® with Word Index

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF OFFICER DARRYL ARRINGTON
November 2, 2016

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 1

VERE O. PLUMMER,    * UNITED STATES

Plaintiff,  * DISTRICT COURT

vs.    * FOR THE

DISTRICT OF COLUMBIA,  * DISTRICT OF COLUMBIA

et al.,    * Civil Action No.:

Defendants.  * 15-CV-2157(RDM)

*  *  *  *  *

DEPOSITION OF:

OFFICER DARRYL ARRINGTON,

was held on Wednesday November 2, 2016,

commencing at 2:15 p.m., at the Law Offices of

Tilman L. Gerald, 1220 L Street, NW, Suite 700,

Washington, D.C., before Cheryl Jefferies,

Certified Court Reporter.

*  *  *  *  *

COURT REPORTERS, ETCetera, INC.

Maryland        Washington

(410) 653-1115    (202) 628-DEPO

"We'll cover your job ANYWHERE in the country!"

1-800-947-DEPO

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 2

APPEARANCES:

On behalf of the PLAINTIFF:

TILMAN L. GERALD, ESQ.
LAW OFFICES OF TILMAN L. GERALD
1220 L Street, NW
Suite 700
Washington, DC  20005
(202) 742-2004
E-mail:  Tilmanlg@gmail.com

On behalf of the DEFENDANTS:

DAVID A. JACKSON, ESQ.
OFFICE OF THE ATTORNEY GENERAL
One Judiciary Square
441 4th Street, NW
Suite 630 South
Washington, DC  20001
(202) 724-6618
E-mail:  Davida.jackson@dc.gov

ALSO PRESENT:  Vere O. Plummer

-oOo-

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 3

I-N-D-E-X

Deposition of Officer Darryl Arrington

November 2, 2016

EXAMINATION BY: PAGE:

Mr. Gerald                4

Mr. Jackson              168

EXHIBITS: PAGE:

1  Traffic Crash Report        74

2  Arrest Packets              95

(Exhibits included with transcript.)

-oOo-

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 4

P-R-O-C-E-E-D-I-N-G-S

WHEREUPON --

OFFICER DARRYL ARRINGTON,

a Witness called for examination, having been

first duly sworn, was examined and testified as

follows:

EXAMINATION

BY MR. GERALD:

Q.  Would you prefer for me to call you

MPO Arrington, or Mr. Arrington, or --

A.  Whatever.  Arrington is fine.

Q.  Arrington is fine?

A.  Yes.

Q.  All right.  Well, MPO Arrington, my

name is Tilman Gerald, as I said downstairs.

A.  Yes, sir

Q.  And I represent Mr. Vere Plummer, who

is the Plaintiff in this case.

A.  Yes.

Q.  And I don't know whether you've had

your deposition taken before.  Have you?

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 13

Q.   Who was that?

A.   Officer Nelson.

Q.   And how long has Officer Nelson been on the force?

A.   I have no idea how long he's been on.

Q.   I said how long had he been when he was with you?

A.   Oh, a short period of time.  Maybe -- a few months, maybe.

Q.   A few months?

A.   Yes.

Q.   And what responsibilities were you given with respect to Officer Nelson?

A.   I was supposed to record his activities and interaction with the citizens of the District of Columbia, assist him in doing various paperwork.  Just the overall monitoring of his demeanor, how he handles himself on the street.  Just basically trying to keep him safe so he can make it home at the end of the tour.

Q.   And your tour lasted from what time?

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 14

Well, let me strike.

What time did your tour begin?

A.   We have staggered tours.  I might have been working the 2200 to 0600 hour tour.  I'm not sure of the actual tour I was working that day, but it staggers.  We have shift change -- different -- they change the shifts quite often.

Q.   All right.  And do you know who your watch commander was on that day?

A.   Yes.

Q.   What was his name, his or her name?

A.   Lieutenant Kutniewski.

Q.   And what, if you can tell me, does the watch commander do, is responsible for doing?

A.   A watch commander has the overall responsibility of monitoring all the officers in the District, what goes on in the District.  He has to monitor us, and then he has to report to his supervisors above him what goes on.  That's as much as I get into what his responsibilities is.

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 15

Q.   Do you report directly to him?

A.   Do I?

Q.   Yes.  Or did you?

A.   You mean on the day in question?

Q.   Yes.

A.   I'm pretty sure I did, yes.

Q.   So if anything were to have happened while you and Officer Nelson were out in the field, you -- let's say the report that you were recording for Officer Nelson in terms of his training, would that go to Lieutenant Kutniewski?

A.   Not exactly.  My paperwork that I turn in, I turn in to a sergeant.

Q.   All right.

A.   And the sergeant turns it into the coordinator of whoever is running the probation officer program.  Whoever they deem to put in charge that day, or that month, they would get his paperwork.

Q.   So at the time, Officer Nelson was on probation?  When he was your partner?

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 16

A.   Yes.

Q.   And how long is probation?

A.   It varies on your level of expertise.  I mean, if you seem to know what you're doing and you can handle yourself, it's shortened.  The time is shortened.  But usually it's -- it could be like up to two or three months, sometimes longer if a person needs that extra push.

Q.   Okay.  The records that you maintained on Officer Nelson's training, do you know where those records are?

A.   No.

Q.   Were they given to a sergeant?

A.   Yes.  I don't know if it was given to -- at this time, the check-off -- well, it had to be given to the check-off sergeant, whoever checked us off duty that particular day.

Q.   Do you have any idea who that is?

A.   I have no clue.

Q.   Do you have any idea who the sergeant -- is there such a thing as a watch

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

Q. Which one?

A. The radio assignment reference to this case here.

Q. The radio run in this case was July 5, 2014; is that correct?

A. I'm not sure. I work midnights. I'm not sure. Believe it was the 4th. I was working the holiday, I believe. It might have been the 5th at that time, because I worked midnights into the next day.

Q. Can you tell me what, if anything, you did to prepare for today's deposition?

A. Just get out of bed to come down here.

Q. Did you review any documents or reports?

A. My crime scene photos.

Q. That's it?

A. I think I looked at the accident report vaguely. That was it.

Q. You have any conversation with anybody?

A. No.

Q. Have you talked with Officer Nelson?

A. No.

Q. Have you spoken to Officer Lukanovic?

A. No.

Q. Have you spoken to Lieutenant Kutniewski?

A. No.

Q. Now, you said you responded to a radio run on July 5, 2014?

A. Yes.

Q. And what was the substance of that radio run?

A. The radio run came up for an accident, so we responded. At the time we responded, I met the fire department coming out of the alley. They said they didn't see anything.

We responded to leave to check off, because it was right at check-off, and another call came in saying respond back, which we did.

Q. What time did you first respond?

A. It was, I believe, around 6 something in the morning. I'm not sure of the time.

Q. And you say that when you responded the first time, you ran into members of the fire department?

A. Yes.

Q. And was that an ambulance or --

A. Fire truck.

Q. And the fire truck was coming out of the alley?

A. Yes. I pulled up in front of the house.

Q. In front of what house?

A. Mr. Plummer's house, his block he lives in. Fire truck was coming off the alley.

Q. On Fairmont Street?

A. Yes.

Q. So you were on Fairmont Street?

A. Right.

Q. And where was the fire truck coming from?

A. Out the alley.

Q. Which end of the alley?

A. That would have been the north alley.

Q. The north entrance to the alley?

A. Yes. That's the north alley.

Q. Now, the alley runs north and south?

A. No, it's -- well, that would be, I guess, the northeast alley. The rear alley runs north and south. Then it's an alley that runs, what, east and west to get out.

Q. So did the radio run indicate that the accident occurred in front of Mr. Plummer's house on Fairmont?

A. No, it didn't. Just gave an address.

Q. It gave Mr. Plummer's address?

A. The block.

Q. The block.

A. Right.

Q. The 1200 block of Fairmont Street, Northwest?

A. Yes. This address, yes.

Case 1:15-cv-02147-TJK    Document 14-10    Filed 05/08/17    Page 6 of 10
VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.
DEPOSITION OF OFFICER DARRYL ARRINGTON
November 2, 2016

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 29

A.  No.

Q.  What they tell you was that they observed Mr. Plummer spinning his tires, trying to get into his garage?

A.  They said they observed him spinning his tires.

Q.  Did they tell you they observed him back into his garage?

A.  I don't recollect them saying that they observed him do that.

Q.  Did they tell you that Mr. Plummer lived in that -- owned that garage?

A.  No.

Q.  Did you ask?

A.  No.

Q.  At any point in time, did you run Mr. Plummer's tags to see who owned the car?

A.  Yes.

Q.  And what did you find?

A.  That he lives at that address.

Q.  And so you then learned that it was

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 30

his property?

A.  Correct.

Q.  Now, tell me again why you called the fire department back?

A.  Well, any time there's an accident, we would call for -- we call the board to come out and do an assessment of the operator of the vehicle to see if they've been injured or if they've been drinking.

Q.  But you didn't know there was an accident; isn't that correct?

A.  Well, I saw the damages.

Q.  You saw damages where?

A.  I saw the damages that was done to the garage. I saw the damages that was on Mr. Plummer's vehicle.

Q.  But you didn't see Mr. Plummer strike the garage; is that correct?

A.  No, I didn't see him strike the garage. No, I didn't.

Q.  And the two people that you say

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 31

flagged you down didn't tell you that they witnessed Mr. Plummer strike the garage?

A.  Correct.

Q.  So how did you sort of draw the nexus between the damage to the garage and Mr. Plummer?

A.  Well, the damage to his car is consistent to the damage that's on the garage. The transferring of paint. His wheel of his vehicle that is badly burnt from spinning, the burnt rubber that's on the alley. All that indicates to me that this vehicle in question is the vehicle that struck the garage.

Q.  But do you know when the garage was struck?

A.  Not the exact moment, no, I don't.

Q.  Do you know if it was done that day or a day before?

A.  Yes, I know it was done that day, yes.

Q.  How do you know that?

A.  Because of the radio run.

Q.  You said the radio run just said an

DEPOSITION OF OFFICER DARRYL ARRINGTON    Page 32

accident, right?

A.  Correct.

Q.  And you initially were in front of Mr. Plummer's house on Fairmont Street?

A.  That's where I responded to the first time, correct.

Q.  And the second one was -- just told you to come back?

A.  Correct.

Q.  And didn't mention anything about an accident; is that correct?

A.  Respond back to the scene of the accident.

Q.  That's what it said?

A.  Yes.

Q.  But you can't sit here today and say that Mr. Plummer struck that garage or that property on July 5th, 2014, because you didn't see it?

A.  I didn't see it, no.

Q.  All right. And the witnesses didn't

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF OFFICER DARRYL ARRINGTON
November 2, 2016

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 9

years that I've been a master patrol officer.

Q.  Is that a test that you have to take?

A.  Yes, it is.

Q.  And is any training given with regard to that test?

A.  Well, it's a training composed of all your knowledge that you've acquired on the police department, dealing with a vast knowledge of all aspects, like I say, to weapons, to guns, to drugs.  It's involving a little bit of everything, overall.

Q.  And in your 28 years on the force, would you say that you've had an opportunity to investigate drug cases?

A.  Yes.

Q.  Tell me what kind of cases you've had the opportunity to investigate in your 28 years.

A.  I'm not sure of the depth of -- that you want to know as far as the training -- I mean, investigation.  I mean, from street buying to organized street-level crime.

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 10

Q.  Okay.

A.  My involvement.

Q.  All right.  So would you investigate street crime?  Or would you respond to a radio call involving a street crime?

A.  Yes.

Q.  And you would investigate it once you arrived on the scene?

A.  Correct.

Q.  Have you done any undercover work?

A.  Very little.  That was years ago.

Q.  When you were a younger person?

A.  When it was less dangerous.

Q.  Okay.  That's what I understand.  Have you ever been assigned to a traffic unit?

A.  No.

Q.  Have you investigated traffic accidents?

A.  Yes.

Q.  And do you have any idea how many you investigated?

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 11

A.  All I can say is several.

Q.  Several?

A.  Throughout the 28 years, several.  But I can't give you an exact number.

Q.  More than 10?

A.  Correct.

Q.  More than 20?

A.  I would say.

Q.  More than 30?

A.  Yes.

Q.  Forty?

A.  Yes.

Q.  Fifty?

A.  Well, let's just make the number -- I would say probably more than 300 out of 28 years.  Probably more than 300.

Q.  Three hundred?

A.  Yeah.

Q.  Okay.  So you've investigated a various assortment of automobile accidents?

A.  Correct.

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 12

Q.  All right.  Now, where were you assigned on July 4th, 2014?

A.  The Third District.

Q.  And where is that?

A.  1624 V Street, Northwest.

Q.  And how long have you been assigned there?

A.  Twenty -- my whole career.

Q.  Okay.  And did you have a specific assignment at the Third District?

A.  No.

Q.  What were your duties as of July 4th, 2014?

A.  I was assigned to PSA 304, I believe.  I was training -- I was a training officer.  I had a partner with me that day, and I was assigned to PSA 304.  We were just on a -- out patrolling.

Q.  You had a partner with you on July 4th?

A.  Yes.

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF OFFICER DARRYL ARRINGTON
November 2, 2016

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 49

Q.   And what was the nature of that conversation?

A.   I don't really recall at this time. I just remember we spoke very briefly, like two or three minutes when I was escorting him into the cell block.

Q.   That was it?

A.   That was it.

Q.   Did you have any conversations with him before you arrested him?

A.   Yes, I did.

Q.   And what was the conversation?

A.   The only time that I spoke with Mr. Plummer was just giving him the command to exit the vehicle.

Q.   And why was that command given?

A.   Because Mr. Plummer wouldn't exit the vehicle.

Q.   Mr. Plummer was on his private property; was he not?

A.   That's correct.

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 50

Q.   And you went onto his private property; is that correct?

A.   That's correct.

Q.   Were you ever asked to leave?

A.   No.

Q.   He said it was okay for you to stay on his private property?

A.   No.

MR. JACKSON: Objection.

Q.   He didn't say that?

A.   No.

Q.   He didn't say please leave my property?

A.   No.

Q.   Okay. Did he tell any other police officer to --

A.   I don't recall.

Q.   So after you had done your investigation of the scene -- and that included going into Mr. Plummer's garage?

A.   Yes.

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 51

Q.   All right. Now, why were you going into his garage?

A.   Because I had already concluded that his vehicle was the vehicle in question that struck the garage, and I wanted to check on Mr. Plummer's welfare.

Q.   All right.

A.   Because at that time, I had already -- that was the vehicle that was involved in the accident.

Q.   That's what you had assumed?

A.   Correct. So I went to check on Mr. Plummer, and I asked him, "Can you step out of the vehicle?" At which point, he did not.

Q.   And when he did not, what did you do?

A.   I gave the command several times myself, other officer --

Q.   What other officer?

A.   -- Nelson, fire department.

Q.   When did the fire department arrive?

A.   They came back a few minutes after I

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 52

gave them a call to respond back. So that was probably within -- I'm going to say within 10 minutes of me returning.

Q.   What is a 1050 call?

A.   That's an accident. That's an accident.

Q.   Accident.

A.   Yes.

Q.   Is that just a fender bender? Or what kind of accident?

A.   That's just an accident. Usually it's an 1050-I. If you already know that there's injuries concerned, the I stands for injury.

Q.   Okay. So 1050-I stands for accident with injury?

A.   Correct.

Q.   And how did you know that it was an accident with injury?

A.   I don't recall knowing it was an injury-involved accident.

Q.   Say that again?

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF OFFICER DARRYL ARRINGTON
November 2, 2016

DEPOSITION OF OFFICER DARRYL ARRINGTON          Page 61

Are you asking him if he ever identified them or somebody else?

MR. GERALD: I asked him if he -- is he aware of anybody else having identified the owner of the property who -- as the complainant?

A. I have no idea if anyone spoke with the complainant.

Q. All right. And you're not aware of the complainant or the owner of the property wanting to press charges against Mr. Plummer; is that correct?

A. Correct.

Q. All right. So the idea of charging Mr. Plummer was your idea?

A. Well, I was the senior officer, so I would take that, yes.

Q. So in a situation where that happens and the complainant is identified, or the owner of the property is identified and says, "No, I don't want charges to be brought," what would happen?

DEPOSITION OF OFFICER DARRYL ARRINGTON          Page 62

A. Well, an accident report would still be taken. But Mr. Plummer just wasn't arrested based on just having an accident.

Q. What was Mr. Plummer arrested for?

A. There was failure to obey after being advised several times to exit the vehicle. Couldn't let him sit in that car.

Q. It was his car. Why couldn't he?

A. He was involved in the accident. You have to make your identity known, we have to check him out and make sure he was okay, which he failed to comply.

Q. But it was his car.

A. Yes, it was.

Q. His garage.

A. Yes, it was.

Q. So by what authority did you have to do what you did?

A. Well, put it like this: If I didn't do what I did and Mr. Plummer would have took off in that vehicle and God knows hit someone else or

DEPOSITION OF OFFICER DARRYL ARRINGTON          Page 63

hit -- not hit someone else, or had an accident and struck someone, every finger would have been pointed at me.

Q. But that didn't happen.

A. No, it didn't. That didn't happen at all.

Q. You had no idea that Mr. Plummer would flee the scene?

A. No, no.

Q. Because when you arrived, he was sitting in his car, in his garage --

A. Correct.

Q. -- right, minding his business?

A. Correct.

Q. Correct?

A. Yeah.

Q. And you have no idea whether he would have, at that point in time, contacted the owner of the property and said that the damage was done to the garage, do you?

A. Correct.

DEPOSITION OF OFFICER DARRYL ARRINGTON          Page 64

Q. And as a matter of fact, he wasn't given that opportunity, is that correct?

A. Not when I arrived on the scene, no.

Q. All right. He wasn't given the opportunity after you arrived on the scene; isn't that true?

A. Not when I -- no.

Q. All right. As a matter of fact, you did not offer him the opportunity to identify himself to the owner of the property; isn't that true?

A. Correct.

Q. So by what authority did you do what you did? Is there a statute that allows you to do that, to enter one's private property, remove them from their property --

A. Correct.

Q. -- for an accident that you did not see?

A. Correct.

Q. There is?

Case 1:15-cv-02147-TJK    Document 14-10    Filed 05/08/17    Page 10 of 10
VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.
DEPOSITION OF OFFICER DARRYL ARRINGTON
November 2, 2016

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 117

A.   I was standing up against the wall.

Q.   And did you just remain standing against the wall?

A.   Pretty much, yes.

Q.   Did you assist in removing Mr. Plummer from the car?

A.   No.

Q.   Did you touch his car at all?

A.   I believe I did check his car.

Q.   And what did you check?

A.   The front driver's compartment.

Q.   That's all you did?

A.   Yeah.

Q.   But this was before he was removed; is that correct?

A.   This is after he was removed.

Q.   After he was removed, all right.

A.   Yes.

Q.   Did you do anything else with his car?

A.   No.

Q.   Did you get on the inside of his car?

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 118

A.   I checked the driver's compartment, front seat.

Q.   And why did you check the driver's front seat?

A.   To see if there's anything inside of it, any weapons or drugs, alcohol, anything in his front compartment.

Q.   But why did you do that?

A.   Standard procedure.

Q.   For?

A.   To check the driver's compartment.

Q.   All right. But why are you checking the driver's compartment?

A.   To see if there was anything in his vehicle, any alcohol, any drugs, anything in his car.

Q.   So that was a search?

A.   Yes, of limited -- limited scope in his wingspan, the driver's compartment, front seat.

Q.   Was that a legal search?

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 119

A.   Yes.

Q.   Based upon what, sir?

A.   Based upon to see was there any -- because he was -- of his actions, the way he was carrying on at the scene, I checked his vehicle to see was there any alcohol, any drugs, anything that was in his car.

Q.   So what actions are you speaking of? Describe what you witnessed that made you want to search his car to see if there were any weapons, drugs or alcohol.

A.   Well, basically, mainly was not so much for the weapons, but that's part of it.

While on the scene talking to Mr. Plummer, we entered his garage. He was slumped over like he was asleep. He would open his eyes occasionally, close them. We said, "Mister, can you get out of your vehicle?" He wouldn't get out of the vehicle. He would mumble some words. I really couldn't understand what he was saying.

A few of the times, he would crank up

DEPOSITION OF OFFICER DARRYL ARRINGTON                    Page 120

his car as if he was going to put it in drive. He would rev the gas, but I was hoping he wouldn't put it in drive. At no time did he put that vehicle in drive and hit the gas and make that vehicle move. God knows it would have been a different outcome, but he did not do that.

He just cranked it, revved the gas as if he was going to take off and leave, but he never did it.

Q.   So that led you to --

A.   That led me to believe that something was going on seriously wrong.

Q.   But that led you to conduct a search without a warrant?

A.   I didn't need a warrant.

Q.   Why didn't you need a warrant?

A.   Because he was operating that vehicle, and he was inside a garage. I already knew that that -- by the time I checked out that car, I knew that was the vehicle in question, in my mind, and that he had put -- he had moved the