# EXHIBIT 10

**In The Matter Of:**

*VERE O. PLUMMER vs.*
*DISTRICT OF COLUMBIA, et al.*

*DEPOSITION OF HENRY E. WELSH, III*
*November 2, 2016*

*COURT REPORTERS, ETCetera, INC.*
*"We Guarantee Accuracy, Quality & Consistency!"*
*2833 Smith Avenue, #260*
*Baltimore, MD 21209*
*(410) 653-1115   1-800-947-DEPO   (202) 628-DEPO (3376)*



*"We'll Cover Your Job ANYWHERE in the Country!"*
Original File WELS1102.TXT

Min-U-Script® with Word Index

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF HENRY E. WELSH, III
November 2, 2016

---

DEPOSITION OF HENRY E. WELSH, III — Page 1

VERE O. PLUMMER,     * UNITED STATES
       Plaintiff, * DISTRICT COURT
vs.        * FOR THE
DISTRICT OF COLUMBIA, * DISTRICT OF COLUMBIA
et al.,        * Civil Action No.:
       Defendants. * 15-CV-2157(RDM)
       *   *   *   *   *   *

DEPOSITION OF:
       HENRY E. WELSH, III,
was held on Wednesday November 2, 2016,
commencing at 12:04 p.m., at the Law Offices of
Tilman L. Gerald, 1220 L Street, NW, Suite 700,
Washington, D.C., before Cheryl Jefferies,
Certified Court Reporter.
       *   *   *   *   *

       COURT REPORTERS, ETCetera, INC.
   Maryland        Washington
   (410) 653-1115        (202) 628-DEPO
   "We'll cover your job ANYWHERE in the country!"
       1-800-947-DEPO

---

DEPOSITION OF HENRY E. WELSH, III — Page 2

APPEARANCES:

On behalf of the PLAINTIFF:

       TILMAN L. GERALD, ESQ.
       LAW OFFICES OF TILMAN L. GERALD
       1220 L Street, NW
       Suite 700
       Washington, DC  20005
       (202) 742-2004
       E-mail:  Tilmanlg@gmail.com

On behalf of the DEFENDANTS:

       DAVID A. JACKSON, ESQ.
       OFFICE OF THE ATTORNEY GENERAL
       One Judiciary Square
       441 4th Street, NW
       Suite 630 South
       Washington, DC  20001
       (202) 724-6618
       E-mail:  Davida.jackson@dc.gov

ALSO PRESENT:  Vere O. Plummer

       -oOo-

---

DEPOSITION OF HENRY E. WELSH, III — Page 3

       I-N-D-E-X
   Deposition of Henry E. Welsh, III
       November 2, 2016

EXAMINATION BY: PAGE:
Mr. Gerald                    4

       (NO EXHIBITS MARKED.)

       -oOo-

---

DEPOSITION OF HENRY E. WELSH, III — Page 4

       P-R-O-C-E-E-D-I-N-G-S
WHEREUPON --
       HENRY E. WELSH, III,
a Witness called for examination, having been
first duly sworn, was examined and testified as
follows:
       EXAMINATION
       BY MR. GERALD:
   Q.   Good afternoon, Chief Welsh.
   A.   How are you?
   Q.   I'm good.  Let me begin by apologizing
for misspelling your name.
   A.   That's all right.
       MR. GERALD: You didn't tell me.
       MR. JACKSON: It's on the notice.
       BY MR. GERALD:
   Q.   My name is Tilman Gerald, and I
represent Mr. Vere Plummer, who is the Plaintiff
in this case.
       Have you had a deposition taken
before?

---

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF HENRY E. WELSH, III
November 2, 2016

DEPOSITION OF HENRY E. WELSH, III                    Page 5

A.   Yes.

Q.   All right.  So you know how a deposition goes?  That you have to answer questions and not nod your head?  Your answer should be audible?

A.   Okay.  I might have to be reminded.  But, yes.

Q.   So that she can record it?

A.   Understood.

Q.   If I ask you a question that you don't understand, please ask me to rephrase it so that you can understand it.

A.   Okay.

Q.   If I ask a question that you can't hear or is somewhat jumbled, ask me to repeat it, and I will do that.

A.   Okay.

Q.   From time to time Mr. Jackson, who is your attorney, will interpose an objection.  Please wait until we dispose of the objection before you provide an answer, unless he directs

DEPOSITION OF HENRY E. WELSH, III                    Page 6

you not to answer.

A.   Okay.

Q.   Are you on any medication that would otherwise prevent you from telling the truth today?

A.   No.  But do you need to know my medications I'm on?

Q.   Yes, sir.

A.   Zantac and -- what's the other one?  Adderall.

Q.   And what are they for?

A.   ADHD for the Adderall, and acid reflux for the Zantac.

Q.   Now, will you state for the record your name and your current work assignment?

A.   I am a battalion -- Henry Edward Welsh, III.  I'm a Battalion Fire Chief in the Fourth Battalion for the District of Columbia Fire Department.

Q.   How long have you been employed by the District of Columbia Fire Department?

DEPOSITION OF HENRY E. WELSH, III                    Page 7

A.   In January, it will be 31 years.

Q.   And when did you attain the rank of Battalion Chief?

A.   January of 2008.

Q.   What rank did you hold before that?

A.   Captain.

Q.   Can you briefly describe any training that you've had as a fireman?

A.   Briefly?  I'm an EMT.  I've had Firefighter 1 and 2, officers classes, incident command, NIMS classes.  I've had numerous classes through my career.

Q.   NIMS?

A.   NIMS, incident command.

THE REPORTER: Is that all caps, N-I-M-S?

THE WITNESS: Yes.

THE REPORTER: Thank you.

THE WITNESS: I'm losing the -- I'm losing what it stands for right now.  But, yes.

BY MR. GERALD:

DEPOSITION OF HENRY E. WELSH, III                    Page 8

Q.   What did training as an EMT provide you for?  Let me rephrase that.

You said you have training as an EMT?

A.   I do.  I'm actually certified.

Q.   And as an EMT, what do you do?

A.   Myself, now?

Q.   What are you trained to do?

A.   To assist people with medical problems, render first aid for the citizens and the visitors of the District of Columbia.

Q.   Is that the same training that you received as NIMS?

A.   No.  I was just saying incident command structure throughout the country, the way we do incident command for handling major incidents, that's NIMS training.  ICS, incident command training.

Q.   So an example of that would be, I guess, the hurricane that recently happened?

A.   Correct, that kind of training.

Q.   And officer class training?

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF HENRY E. WELSH, III
November 2, 2016

DEPOSITION OF HENRY E. WELSH, III — Page 9

A. Officer, yes. Through the department, yes.

Q. What does that entail?

A. Learning the job of how to be an officer.

Q. All right. And what is your educational background?

A. Associate's degree in fire science from Montgomery College.

Q. Do you reside in Montgomery County?

A. Yes, I do.

Q. Where?

A. Olney, Maryland.

Q. Where in Olney?

A. Specifically my address?

Q. Yes, sir.

A. 18609 Heritage Hills Drive, Brookville, Maryland.

Q. Let me direct your attention to an incident that occurred on July 5th, 2014 at or about the address of 1219 Euclid Street,

DEPOSITION OF HENRY E. WELSH, III — Page 10

Northwest.

A. Okay.

Q. Do you recall that incident?

A. Yes, I do.

Q. Now, can you tell me what you did to prepare for this deposition?

A. Did I prepare?

Q. Did you do anything?

A. I talked to counsel.

Q. Other than speaking with Mr. Jackson, did you review any documents or?

A. Yes.

Q. What documents did you review?

A. My EPCRs from the department, the EPCR report that is filled out.

Q. And what is an EPCR?

A. It's a run sheet for us, for the agency.

Q. Okay.

MR. GERALD: Did you provide those?

MR. JACKSON: Uh-huh.

DEPOSITION OF HENRY E. WELSH, III — Page 11

MR. GERALD: May I see those?

THE WITNESS: Well, they're -- am I allowed to give them to him? These are just my copies of the runs.

MR. JACKSON: Let me see. He just wants to look at them. That's okay. As long as you didn't have any notes on them.

THE WITNESS: No, no notes.

(Mr. Gerald Reviews Documents.)

BY MR. GERALD:

Q. Can you tell me what you know about the incident?

MR. JACKSON: Objection as to the form of the question.

A. Right.

Q. Right what?

A. You told me to wait, or could you repeat it? How would you like me to answer that question?

Q. I want you to tell me what you know.

A. What I know about what?

DEPOSITION OF HENRY E. WELSH, III — Page 12

Q. What happened on July 5th, 2014.

A. I received a call from my -- an officer on Truck Company 6. We were coming back from a box alarm. He said he was on a call and he needed my assistance, and I proceeded to the incident.

Q. Do you know the name of the person that called you?

A. Yeah, Sergeant Johnny Butler.

Q. And did Fireman Butler indicate to you --

A. Sergeant.

Q. Sergeant Butler.

A. Yes.

Q. He's fire department, correct?

A. Uh-huh.

Q. Did Sergeant Butler indicate to you why your assistance was needed?

A. He said he had a -- I don't even remember the conversation, but he needed me to come help him with a situation. I can't say for

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF HENRY E. WELSH, III
November 2, 2016

DEPOSITION OF HENRY E. WELSH, III — Page 13

sure exactly what he said to me.

Q. And what time did you arrive at the scene?

A. I don't have a -- we'd have to check the records. I don't have that.

Q. Do you know where those records are?

A. Through our Communications Division. I mean, when they called me, I came on and attached myself to the run. I believe the run was for an assist the police, and Truck 6 went on the call to assist the police.

Q. Do you know how Truck 6 was called?

A. They were dispatched.

Q. By whom?

A. Communications.

Q. Fire department Communications?

A. Yes, through 911. Whether it went through the police side or the police made the request through the fire side or -- I can't answer that.

Q. When you arrived, what did you

DEPOSITION OF HENRY E. WELSH, III — Page 14

observe?

A. The crew was around the car. The officers were there. I think at the time there were two officers. I came up. I was briefing my sergeant what was going on, and I proceeded.

Q. Now, this is Sergeant Butler?

A. That is Sergeant Butler.

Q. And how many policemen were there?

A. I said I think there were two at the time, if I remember correctly.

Q. Do you know who they were? Did you get their names?

A. No.

Q. Did you take any notes at all?

A. No. No.

Q. Were there any other people around at the time?

A. Not that I recall.

Q. And when you arrived, where were the police officers?

A. Not directly by the car. My guys were

DEPOSITION OF HENRY E. WELSH, III — Page 15

around the car.

Q. And the car was in a garage, was it not?

A. Yes. It's two years ago. It's a long time ago.

Q. Long time ago, you're right. And what were they doing in the garage?

A. They were communicating with Mr. Plummer.

Q. And did your guys tell you that Mr. Plummer asked them to leave his property?

A. I don't remember that particularly, but they could have.

Q. Did Mr. Plummer tell you to --

A. I had a conversation with Mr. Plummer.

Q. Did he ask you to leave his property?

A. Every time when I came up to the door, the first thing I did was -- when I observe a situation, when I came up to the scene, we're supposed to look at everything we see. I noticed there was damage to a garage across from the

DEPOSITION OF HENRY E. WELSH, III — Page 16

garage where the car was. I also noticed on the tire you could smell the burning rubber, and there was a tire mark in the asphalt, and I could pretty much see that something happened.

So I got up to the car and I immediately looked in the car, and to my dismay, the car was still in drive. And I asked Mr. Plummer to put the car in park.

Q. And did he put it in park?

A. Yes, he did.

Q. Did Mr. Plummer --

A. Or it was in gear, not -- I don't know if it was in drive or what, but it was in gear. I should say that.

Q. Did Mr. Plummer identify himself to you?

A. No.

Q. Did you ask him to?

A. I continued to talk to him. And every time he -- when I explained myself, he would -- within two minutes he would say to me, "Why do I

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF HENRY E. WELSH, III
November 2, 2016

DEPOSITION OF HENRY E. WELSH, III                 Page 17

have to get out of the car?" I explained to him, I said, "Sir, we're here to -- apparently something's happened here. I need you to get out of the car so we can look at you." I tried to explain it every which way I could, that we just needed to get him out of the car to take a look at him.

Q.   Did he tell you that he was okay?

A.   Yes, but he did not appear okay to me, in my 31 years on the job.

Q.   And how much of that 31 years was spent as an EMT?

A.   I was an EMT when I came on the job, but I probably didn't become an EMT with the job until 1988. But I was an EMT since 1983.

Q.   And were you on the scene as an EMT on July 5th?

A.   I was on the scene as -- no, I wasn't the EMT on the scene. I mean, I'm still the senior ranking officer, but I was there to mitigate the problem.

DEPOSITION OF HENRY E. WELSH, III                 Page 18

Q.   What do you mean mitigate the problem?

A.   To come to a conclusion of what we were going to do here.

Q.   And what conclusion did you reach?

A.   Well, okay, so the question was the police wanted him out of the car. He wouldn't get out of the car. So when I got up there and I talked to him, he still wouldn't get out of the car.

Through my training, I was looking at three possibilities -- well, two possibilities: There was a medical emergency, which is very possible at that time of the morning, or there were other substances involved that would make him appear the way he appeared to me.

Q.   Can you describe how he appeared?

A.   Just a little bit -- just a glaze. A glaze, and every time I explained myself, why I needed him out of the car, I was extremely nice, and I was looking out for his welfare. Apparently something had happened, and there was

DEPOSITION OF HENRY E. WELSH, III                 Page 19

no way we could just -- neither one of our agencies could just leave at that time. I mean, with all the stuff that goes on nowadays, we had a -- I had a duty to act. I was looking out for that man. I wasn't doing anything else.

If it was a sugar issue and we left him in the car, there was -- I mean, even when I got there, any one of those firemen could have been hurt.

Q.   But he told you he was okay?

A.   No, not really. Well, he's just, "I'm fine. Why do I have to get out of the car?" And I can't -- I can't even say exactly what he said to me, but the one thing that he continued is every time I went through why we needed him out of the car -- and all I wanted to do was take a look at him.

I said, "Once we get you out, we check your sugar, everything will be fine, and then we can -- then we can leave."

Q.   Okay.

DEPOSITION OF HENRY E. WELSH, III                 Page 20

A.   But I don't remember him ever saying it was his property. I don't remember why I would think it was necessarily his property, because the car wasn't -- I don't even remember, now that I'm looking at it, that it was D.C. plates.

So we didn't have any identification at the time. The police said to me, "We need him out of the car."

Q.   So the police didn't identify him to you?

A.   No.

Q.   Do you know whether the police ran his plates to see who he was?

A.   No, no.

Q.   And if it was his property?

A.   But we still had a situation that we had to resolve. We couldn't just leave him there. He looked like something happened there. There was an incident that happened there. Whether -- there was a duty to act, for his

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF HENRY E. WELSH, III
November 2, 2016

DEPOSITION OF HENRY E. WELSH, III                    Page 21

welfare and for anybody else.

If we left, he could have kept -- left the driveway and kept driving, and he did not look to me that he was in any condition to drive.

Q.   What made you think he was going to drive anywhere?

A.   I don't know, but I can't -- he's still in the car with the keys.  And the car was still running, in gear.  My guys could have even been hurt.  Not by any fault of his own, but an accident.

Q.   But you just said you didn't know whether it was gear.  You said the gear was on.

A.   No, no.  Okay.  I stated that it was in gear, meaning I don't know if it was in drive, reverse or whatever.  And the reason I remember that from two years ago was because I had an extensive talk with my sergeant right after that.  That's why I know that fact.

Q.   Sergeant Butler?

A.   Yes.

DEPOSITION OF HENRY E. WELSH, III                    Page 22

Q.   And what did Sergeant Butler say?

A.   About what?

Q.   Mr. Plummer --

A.   The gear issue, but do you understand the gear?

Q.   The gear issue then.  What did he say about the gear issue?

A.   He said, "It won't happen again, sir." I said, "The first thing you do is make sure the car is in park."

Q.   But you don't know whether the car was in park or not, do you?

A.   My first statement to him was, "Sir, I need you to put the car in park," and he complied.

Q.   All right.  So do you know what -- you don't know what gear it was in when you arrived?

A.   No, I can't remember that now.  I just remember looking at my sergeant.  That's the only reason I remember it.

Q.   Did Mr. Plummer ever show you his

DEPOSITION OF HENRY E. WELSH, III                    Page 23

driver's license?

A.   No.

Q.   Did you ask him for it?

A.   No.  What was that -- what was that going to get me?

MR. JACKSON: Let him ask the questions.

THE WITNESS: Okay.  Sorry.

BY MR. GERALD:

Q.   You would know that he owned the property if you asked him for his driver's license.

A.   But there was something that happened in that roadway.

Q.   Okay.  What --

A.   So I thought he had a medical condition.  So we're on the scene, and we have a duty to act.

Q.   And what is that duty?

A.   To make sure that he's okay.

Q.   And what would have happened had he

DEPOSITION OF HENRY E. WELSH, III                    Page 24

opened the door?

A.   Exactly what's in the report.

Q.   So you would have taken his blood?

A.   We -- yes.

Q.   You took his blood, did you not?

A.   Right.  Yes.

Q.   And you found that his blood was okay?

A.   A little high, but yes.

Q.   All right.  And that was after you had broken the window to his car?

A.   Correct.  Correct.

Q.   So could he have gotten back in the car after you had taken his blood, or gone into the house?

A.   Yes, absolutely.

Q.   But he wasn't allowed to; is that correct?

MR. JACKSON: Objection.

Q.   You can answer.

A.   Well, you just said to let him clear it up before I talk.

VERE O. PLUMMER vs.
DISTRICT OF COLUMBIA, et al.

DEPOSITION OF HENRY E. WELSH, III
November 2, 2016

DEPOSITION OF HENRY E. WELSH, III    Page 25

MR. GERALD: It's already clear.

MR. JACKSON: Objection as to the form of the question.

You can answer.

A.    Repeat the question?

Q.    Was he allowed to go into his house?

A.    After we were done, he was turned over to MPD. MPD came up after the EMTs checked the sugar.

So I don't know what -- I didn't have a conversation with the police at that part. Once I got him out of the car, the EMTs took over and checked to make sure he was okay.

Q.    And then the EMTs handed him over to the police?

A.    Or the police were just there. I mean, they didn't hand him over for -- yes, the police had him. We came to assist the police with a situation, and we do that all the time.

Q.    So was the decision to break his window, was that a fire department decision? Or

DEPOSITION OF HENRY E. WELSH, III    Page 26

was it a fire department decision together with the MPD?

A.    After I talked to him and I couldn't get him to comply, I said, "Do you want him out of the car?" And they said, "Yes, we need him out of the car."

Because I would have, I guess, stayed another hour talking to him. But, so it was the only option.

I remember saying, "Sir, this is a beautiful car. Please, could you just unlock the door so we can get you out and take a look and make sure you're okay?"

Q.    So that was an assurance that you gave to him?

A.    To him.

Q.    Right?

A.    Right.

Q.    But you also knew that if he got out of the car, then the police were going to --

A.    No, I didn't, because if he got out of

DEPOSITION OF HENRY E. WELSH, III    Page 27

the car and his sugar was 400, we were taking him to the hospital and getting him medical care.

Q.    But it wasn't 400?

A.    From his appearances, it could have very easily been a diabetic emergency.

Q.    Was that the only observation that you made, that it could have been a diabetic emergency?

A.    Or a possible seizure. It was a medical emergency possibly.

Q.    All right.

A.    But that's what I was thinking it could be at that time of the morning.

Q.    All right. Did you personally -- well, strike that.

How was Mr. Plummer's window -- or how did you gain access to Mr. Plummer's car?

A.    I believe one of the windows was taken out.

Q.    All right. And how was that --

A.    I figured that would be the cheapest

DEPOSITION OF HENRY E. WELSH, III    Page 28

way.

Q.    How was that accomplished?

A.    With a Halligan bar.

Q.    And how do you do that with a Halligan bar?

A.    You break it. You break the window.

Q.    And is that something you swing?

A.    Yes.

Q.    But you didn't swing the Halligan bar?

A.    No.

Q.    Who did?

A.    Sergeant Butler.

Q.    Did Sergeant Butler take care not to damage the car?

A.    We did our best, yes. I said no big swing, just pop it and get the door open.

Q.    And how many swings did it take to pop the window?

A.    One or two. I know the first one didn't take because I told him to take it easy.

Q.    Are you aware of any other damage that