UNITED STATES DISTRICT COURT**Error! Bookmark not defined.**
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERE O. PLUMMER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C. A. No. 15-cv-2147 (RDM) |
| | ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS'MOTION FOR SUMMARY JUDGMENT**

The Defendants District of Columbia ("the District"), Metropolitan Police Department

("MPD"), Fire and Emergency Medical Services ("FEMS"), Henry Welsh ("Defendant Welsh")

(collectively "Defendants" or "District Defendants"), Battalion Fire Chief Henry Welsh ("Chief

Welsh"), MPD Lieutenant John Kutniewski ("Lieutenant Kutniewski"), MPD police Officer

Sandro Lukanovic, ("Officer Lukanovic"), and MPD Police Officer John Nelson ("Officer

Nelson") (collectively "Defendants" or "District Defendants"), file this motion for summary

judgment.  For the reasons explained below, the Defendants are entitled to judgment as matter of

law as there is no genuine dispute as to any material fact.

**Procedural History and Nature of the Case**

On July 5, 2015, Plaintiff Vere Plummer commenced this law suit by filing a complaint

in the Superior Court for the District of Columbia.  On October 15, 2015, Plaintiff filed an

amended verified complaint.  On December 10, 2015, the Defendants removed the case to the

United States District Court [1].

In Count I, Plaintiff asserts claims for false arrest, false imprisonment and intentional

infliction of emotional distress against Lieutenant Kutniewski, and Officers Lukanovic, and Nelson. In Count II, Plaintiff asserts claims for trespass and destruction of property against the MPD and FEMS under a theory of vicarious liability. In Count III, Plaintiff asserts is a claim for false imprisonment in violation of the Fourth and Fifth Amendments against "MPD and its employees."[1] In Count IV, Plaintiff asserts a claim for negligence against the MPD. In Count V, Plaintiff seems to be asserting a claim for negligence resulting in a violation of the Fourth and Fifth against the District. In Count VI, Plaintiff asserts a claim for malicious prosecution against the MPD. Lastly, in Count VII, Plaintiff asserts a claim for negligence against the District.

As for Chief Welsh, Plaintiff has asserted no claims against him as Chief Welsh is not named as defendant under any of the Counts.

### Facts

This case arises out of events that occurred during the early morning of July 5, 2014. Complaint ¶ 14. Plaintiff Vere Plummer[2] lives at 1222 Fairmont Street, NW, Washington. According to Plaintiff, on July 4, 2014, at around 2 pm or 3 pm, he went to a friend, Kimberly Robinson's, house in Maryland for a Fourth of July gathering. Ex. 1-Pl. Dep. P27:19- P30:15. While at Ms. Robinson's home, Plaintiff had a "couple" of beers "around 7/8 o'clock." Pl. Dep. P32:3-4 (Q How many beers did you have. A. I'm not sure, but a couple.); P32:5-9. According to Plaintiff, he also may have drunk punch that may have contained hard liquor. *Id*., P33:17- P34:2. At approximately 8 pm, Plaintiff took one of his hydrocortisone bills, which was prescribed by his dentist for pain. *Id*., P23:22-P25:21.

---

[1] It is not clear if the term "employees" refers to Lieutenant Kutniewski, and Officers Lukanovic, and Nelson or some other unidentified MPD employee.
[2] Plaintiff is an attorney license to practice law in the District and Maryland. Ex. 1-Pl. Dep. at 7:21-9:11.

When Plaintiff left Ms. Robinson's house, between 10 pm or 11 pm, he drove into the District and parked his car on 15th Street, NW, between L and K Street, at approximately 11:45 pm. *Id.*, P34:16-18; P35:8-16; P36:7-17. According to Plaintiff, he walked around the corner to Vermont Street, an area with which he was familiar because he once had an office in the area. *Id.*, at P35:13-16; P37:2-12. According to Plaintiff, he "was milling about there in that area." *Id.* P35:15-16. Plaintiff testified that he walked around or sat in his car as he listened to music on his new IPod. *Id.*, P35:20- P38:15. At approximately 2:45 am, Plaintiff left the area and drove home. *Id.*, P39:9-13; 40:16-19.

Plaintiff's garage is located in the rear of his house, and it is accessible through a common alleyway that separates the 1200 block of Fairmont Street from the 1200 block of Euclid Street. (Ex. 2-Declaration ("Decl.") of Edwin Landrum, ¶ 3). Residents of Euclid Street also access their garage through the same common alleyway. *Id.*, ¶ 4.

When Plaintiff reached his house, he drove down the alley and angled his car to the left so that he could back into his garage. Pl. Dep. P41:5-12. By angling his car to the left, the front of his car was pointed toward his neighbor, Kenneth Taylor's, garage, which was across the alley from Plaintiff's garage. *Id.*, P41:19-P42:8. Plaintiff claims that as he was backing up, the right rear tire of his car got stuck in a pothole that was close to Mr. Taylor's garage. *Id.*, P43:4-22. According to Plaintiff, he was trying to get his tire unstuck from the hole by rocking his car.[3] *Id.*, P46:9-19. Plaintiff testified that he lost control of his car and struck Mr. Taylor's garage, damaging the frame of the garage. *Id.*, P46:20-22; P54:18-P55:4; Ex. 4 (Deposition Exhibit 3). According to Plaintiff, after he struck Mr. Taylor's garage his car tire got stuck a second time.

---

[3] "Rocking" the car means that Plaintiff was quickly shifting his gears back and forth from drive to reverse.

*Id.*, P47:1-5; P61:13-16.  Plaintiff testified that after spending about 30 minutes trying to free his car from the pothole he fell asleep in his car because he was tired.  *Id.*, P60:9-P61:12.

Edwin Scott**Error! Bookmark not defined.** Landrum and Gary Cooper**Error! Bookmark not defined.**, who lived at 1221 Euclid Street, were home sleeping when Plaintiff crashed into Mr. Taylor's garage.  Landrum Decl.  ¶; Ex. 3-Cooper Decl.  ¶ 3.  According to Mr. Landrum, he woke up from his sleep because he heard "a noise that sounded like a car crash" and he heard "the engine of a car running."  *Id.*, ¶ 7.  Mr. Cooper was awakened from his sleep "by the smell of something burning."  *Id.*, ¶ 6.  When Mr. Landrum walked out his back door to see what was happening, he saw Plaintiff's car close to his garage door.  *Id.*, ¶ 8.  At that point, Mr. Landrum decided to walk out his front door and around the block to the alley.  *Id.*  While walking down the alley, Mr. Landrum saw "that a black sedan had crashed into the garage belonging to Mr. Taylor." *Id.* ¶ 9; Ex. 2-, Cooper Decl. ¶ 7.  According to Mr. Landrum "the car's engine was still running, the car was in the drive position and the lights were on."  Landrum Decl. ¶ 9.  Mr. Landrum further observed a lot of smoking coming from the car because its tires were spinning, which then created a hole in the road surface of the alleyway.  *Id.*, ¶ 10.  When Mr. Cooper went into the alley he saw Plaintiff's car against Mr. Taylor's garage.  *Id.*, ¶ 7.  Mr. Cooper also observed a large amount of smoke from the spinning of the Plaintiff's car's tires.  *Id.*  Mr. Cooper recognized the car as a black Jaguar that belonged to Plaintiff.  *Id.*, ¶ 8.

In response to what he was seeing, Mr. Landrum called 911 and reported, in real time, what he was observing.  Landrum Decl. ¶¶ 9 and 12, Ex. 5-Landrum's 911 Call.  Initially, Mr. Landrum did not know if there was anyone in the car until he walked closer to the car at the request of the 911 dispatcher."  Landrum Decl. ¶¶ 12-14, Ex. 5.  Mr. Landrum saw Plaintiff sitting in the driver's seat, with his head "slummed against the steering wheel."  Landrum Decl. ¶¶ 12-14.  According to Mr. Landrum, Plaintiff appeared to be unconscious.  Landrum Decl. ¶

4

13.  Mr. Cooper**Error! Bookmark not defined.** observed Plaintiff with his "head down and his chin pressing against the upper portion of his chest."  Cooper Decl. ¶ 9.  Because the driver side window was down, Mr. Cooper reached into the car and "shook Mr. Plummer very hard but he was unresponsive."  Cooper Decl. ¶ 11; Landrum Decl. ¶ 15.  Plaintiff responded the second time Mr. Cooper shook him.  Cooper Decl. ¶ 11.  Mr. Cooper offered to help Plaintiff but Plaintiff "waived him off."  *Id*.

Plaintiff testified that Mr. Cooper**Error! Bookmark not defined.** "banged on the side [of the car], and woke me up."  Pl. Dep. P63:4-6.  According to Plaintiff, Mr. Cooper told him to get out of the car and offered to help get the car unstuck from the hole but Plaintiff did not think it was necessary."  *Id*. P63:7-19.  Eventually, Plaintiff was able to get his tire out of the pothole and backed his car into his garage.  *Id*. P63:20-P64:3.  According to Mr. Landrum, Plaintiff backed his car into his own garage but only after making four attempts to do so.  *Id*. ¶ 12; Landrum Decl. ¶ 16.

In the meantime, the 911 operator sent the police to investigate.  Master Patrol Officer Darryl Arrington ("MPO Arrington")[4], Officer Nelson and Officer Lukanovic responded to the scene.  When they arrived on the scene, each of the officers concluded that Plaintiff's car had hit the garage because the damage and white paint on Plaintiff's car was consistent with the damage and white paint on the garage.  Ex. 6-Lukanovic Dep. P. 96:14 ("I notice damage to the door."); Ex. 7-Nelson Dep. P20:14-16 ("And there was also white paint transfer that was consistent with the color of the garage on Mr. Plummer's vehicle.");  Ex. 8-Arrington Dep. P31: L.4-12 (He determined that Mr. Plummer caused the accident, because of the damage consistent with the

---

[4] MPO was the training officer for Officer Nelson, who had recently graduated from the police academy.

damage on the garage. He also stated that there was paint transfer consistent with his vehicle. The burnt rubber that was on the alley also determined this prediction.)

When Officer Lukanovic entered Plaintiff's garage, the car was running, Plaintiff was behind the steering wheel and Plaintiff appeared to be sleeping.  Lukanovic Dep. P62:16-21; P98:17-18 ("we walked in and found Mr. Plummer asleep behind the wheel."); Arrington Dep. P119:15-21 (Mr. Plummer's condition upon arrival was slumped over as if he was sleep. He was opening and closing his eyes occasionally.)  According to MPO Arrington, Plaintiff was mumbling and he "cranked up his car occasionally." *Id*.  Officer Nelson described Plaintiff as being "passed out."  Nelson Dep. P15:13-16 (Q. And why did you believe that he was intoxicated?  A. He was passed out behind the wheel of his running car.).  Plaintiff's car doors were locked.

According to Officer Lukanovic, when he knocked on the car window Plaintiff looked up and asked Officer Lukanovic "what are you doing?"  Lukanovic Dep. P63:1-5.  Officer Lukanovic described Plaintiff as acting "strange and erratic" because Plaintiff called 911 to report that there was "strange men" in his garage. *Id*., P58:10-21.

Plaintiff's 911 call lasted for approximately sixteen minutes and ten seconds (16:10).  Ex. 9-Plaintiff 911 Call.  When the 911 operator asked Plaintiff if he had crashed into someone's garage, Plaintiff denied it four times.  Plaintiff 911 Call at 1:20-1:28[5]  ("No I did not, I'm in my garage."); at 3:00-3:14 ("No vehicle has crashed. There is no crash here.").  Plaintiff then asks one of the police officers what garage did he hit. *Id*., at 6:50-7:24.  When the officer responds Plaintiff again denies striking Mr. Taylor's garage. *Id*., at 6:50-7:24.  Plaintiff states "I'm sitting here listening to my music minding my own business." *Id*.  Plaintiff then states to the operator "These people are lying to me, telling me that I hit a garage." *Id*. at 7:30.

---

[5] These numbers refer to the approximate minutes and seconds of the 911 recording.

Plaintiff also tells the operator several times that he wants to go home or that he wants to go to sleep. *Id.*, at 3:18 ("…I'm trying to go into my house …"); at 3:51 ("I want these people to get from in front of my car so that I can go into the house."); at 6:24 ("You need to get these people from in front of me. Cause I need to go into my house.); at 9:25 ("I want to go home and go to bed. I can't, I cannot go home and go to bed."), at 10:35 ("… its five o'clock in the morning, and I want to go to sleep."); at 11:21 ("This is false imprisonment, because I can't move out of my car. I can't go home and go to sleep."); and at 13:13 ("I'm under seize. I want to go to bed."). At no time during his 911 call did Plaintiff acknowledge that he damaged or even hit Mr. Taylor's garage. Instead, Plaintiff tells the 911 operator "I've done absolutely nothing. Hello." *Id.*

As Plaintiff continued to talk to the 911 operator, Officer Lukanovic was asking Plaintiff to get out of the car. Lukanovic Dep. P59:1-11. MPO Arrington testified that he gave Plaintiff several commands to "step out of the vehicle" but Plaintiff refused to do so. Arrington Dep. P49:9-18; P51:12-17. MPO Arrington wanted Plaintiff to get out of his car so that he could check on Plaintiff's "welfare." Arrington Dep. at P51:1-6. Plaintiff told the 911 operator that he was not getting out of the car. Plaintiff 911 Call. (There are six police officers outside of my house bothering me. I want them to leave me alone. They're trying to get me out of my car and I'm not moving here.). Because Plaintiff refused to unlock his door and get out of the car MPO Arrington called the fire department. As explained by MPO Arrington, "any time there's an accident, we would call for … [FEMS] to come out and do an assessment of the operator of the vehicle to see if they've been injured or if they've been drinking." Arrington Dep. P30:3-9. Officer Nelson testified that they "didn't know whether [they] had ... someone who was intoxicated or someone who was having a medical emergency." Nelson Dep. P16-1-3. Officer

Nelson testified that fire department was called when Plaintiff refused get out of his car. *Id*., P16:4-7.

Battalion Fire Chief Henry Welsh, III, testified that he went to the scene after receiving a call for assistance from Sergeant Johnny Butler, an officer on fire Truck Company 6. Ex. 10-Welsh Dep. P6:14-19; P12:1-9. When he arrived on the scene he saw the damage to the garage, a tire mark on the roadway, and he could smell the burning rubber. *Id*., P15:17-P16:4. Chief Welsh testified that he was dismayed when he approached Plaintiff's car because the car was still in gear, possibly in the drive position. *Id*., P16:1-14. According to Chief Welsh, Plaintiff did put the car in park when Plaintiff was asked to do so. *Id*.

Chief Welsh testified that he tried to tell Plaintiff to get out of the car to be medically checked but Plaintiff would respond by asking "Why do I have to get out of the car?" Welsh Dep. P16:15-P17:1. Chief Welsh testified that he tried to explain to Plaintiff " i[n] every which way I could, that we just needed to get him out of the car to take a look at him." *Id*., P17:2-21. Chief Welsh testified that although Plaintiff told him that he was okay, Plaintiff did not appear to be okay, based on Chief Welsh experience of being an EMT since 1983. *Id*., P17:8-15. According to Chief Welsh, Plaintiff appeared "glazed." Welsh Dep. P18:16-P19:9. Chief Welsh told Plaintiff that if he let the EMT check his sugar, the fire department would leave if everything was fine. Welsh Dep. P19:10-20.

Because Plaintiff refused to get out of his car, MPO Arrington made the decision to have the fire department break the passenger side window of Plaintiff's car. When the window was broken, Plaintiff stepped out of his car. Plaintiff Dep. P76:20-77:3. Once out of the car, Plaintiff's sugar was checked and found to be a little high but otherwise Plaintiff was medically okay. Welsh Dep. P24:508.

The witnesses told MPO Arrington that Plaintiff had hit the garage and that he was spinning his tires.  Arrington Dep. P26:20-P28:19.  MPO Arrington testified that as the senior officer on the scene he made the decision that Plaintiff was going to be arrested for failing to make his identity known after hitting Mr. Taylor's garage.  Arrington Dep. at P61:13-16; P62:1-12.  MPO Arrington testified that he believed that Plaintiff's arrest was authorized under District law.  Arrington Dep. at P64:13-65:7.

Officer Nelson was the arresting officer.  Nelson Dep. 72:17-77:4.  Officer Nelson testified that he believed that Plaintiff was either intoxicated or having a medical emergency, and he want wanted a certified sobriety test officer to come to the scene but none was available because it was the morning after the Fourth of July holiday.  *Id*.  Officer Nelson testified that he should have arrested Plaintiff for driving while intoxicated but because he was a new officer he made a "rookie mistake."  *Id*., P42:6-20; P53:7-P54:3.

When Plaintiff was transported to the Third District police station he was given the Standardized Field Sobriety Test (SFST) by Officer Hakan Huseyin Karaali, an MPD certified SFST officer.  Ex. 12-Karaali Decl.  Plaintiff failed the test because he could not passed HGN test, which test for rapid eye movement common in people who are intoxicated.  *Id*.  Plaintiff also failed the physical portion of the SFST test because he could not do the heal-to-toe steps, made improper turns, and used his arm and the cell wall to keep his balance.  *Id.*  Officer Karaali recommended that Plaintiff be charged with DUI.  *Id.*

### Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "One of the principal purposes of the summary judgment rule is to isolate and

dispose of factually unsupported claims or defenses, and . . . it should be interpreted in a way that allows it to accomplish this purpose." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party bears the initial burden of showing there exists no genuine issues of material fact and the court should rule on legal issues in its favor. *Id.* To survive the motion, the non-moving party must then in opposition "set forth specific facts showing that there is a genuine issue for trial," *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (ruling the nonmoving party must establish more than a mere "scintilla of evidence" in support of its position).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the moving party is entitled to judgment as a matter of law. *Celotex,* at 322. That is to say, if the nonmoving party fails to raise affirmative evidence showing a genuine issue for trial exists, "summary judgment, if appropriate, shall be entered against the adverse party." *Anderson*, 477 U.S. at 257 (quoting Fed.R.Civ.P. 56(e)). Moreover, a court should "grant summary judgment where the non-movant's evidence is conclusory, speculative, or not significantly probative." *Id.*

## Argument

## I.   The Metropolitan Police Department (MPD) and the Fire and Emergency Medical Services (FEMS) are non *sui juris,* and therefore, Count II should be dismissed

In Counts II, III, and IV, Plaintiff has asserted claims against the MPD and FEMS under a theory of vicarious liability. In Count II, Plaintiff has asserted claims for trespass and destruction of property against the MPD and FEMS. Compliant, ¶¶ 44-46. In the introductory sentence to Count II, Plaintiff specifically states that he is bringing "separate causes of action against MPD and [FEMS] for the conduct of its defendant employees …." Count II. In Count III, Plaintiff asserts a claim based on the alleged "Deprivation of Civil Rights" against MPD and

10

employees of MPD. Compliant, ¶¶ 47-49.  In the introductory sentence, Plaintiff states that

Count III is "For a separate cause of action against MPD, and its employee…"  Count IV.  In

Count IV, Plaintiff asserts a negligence claim against MPD.  Compliant, ¶¶ 50-54.  In the

introductory sentence, Plaintiff states that Count IV is "For a separate causes of action against

defendant MPD and [FEMS] for the conduct of its defendant employees …."  Count IV.  The

MPD and FEMS are sub-agencies of the District government and cannot be sued in their own

name.  For this reason Counts II, IV, should be dismissed in their entirety. Count III should be

dismissed to the extent that Count III is against MPD.

It is well settled that bodies within the District of Columbia government are simply not

suable as separate entities, absent statutory provisions for them to sue and be sued.  *Braxton v.

National Capital Housing Auth.*, 396 A.2d 215, 216-17 (D.C. 1978) (per curiam) (concluding

that defendant agency of the District government is not a suable entity); *Roberson v. District of

Columbia Board of Higher Education*, 359 A.2d 28, 31 n. 4 (D.C. 1976) (holding Board of

Higher Education not a suable entity) (dictum); *Miller v. Spencer*, 330 A.2d 250, 251 n. 1 (D.C.

1974) (holding Department of Sanitation not suable); *Trifax Corp. v. District of Columbia,* 53 F.

Supp. 2d 20 (D.C. Cir. 1999) (dismissed claims against the D.C. Office of the Inspector General,

the D. C. Department of Health, D.C. Department of Administrative Services and the D. C.

Department of Human Services as non *sui juris*.)

The MPD is a subordinate agency of the District government and as such in non sui juris.

*See Hunt v. District of Columbia*, No. 02-7044, 2002 U.S. App. LEXIS 18030 (D.C. Cir. 2002)

(per curiam) ("The district court correctly concluded that appellee Metropolitan Police

Department is *non sui juris.*"), *Compare D.C. Water & Sewer Auth. V. Delon Hampton &

Assocs.*, 851 A.2d 410, 412 (D.C.  2012) (D.C. Water and Sewer Authority (WASA) "is a

11

corporate body … that has a separate legal existence within the District government. WASA is *sui juris*; *i.e.*, it has the power to sue or be sued in its own name. D.C. Code § 43-1673 (1)”). The duties and responsibilities of MPD are set forth in DC Code § 5-101.01 *et seq*. Nothing in the statute grants MPD the right to sue or be sued as an independent agency of the District government.

The same is true for the FEMS. FEMS duties and responsibilities are set forth in D.C. Code § 5-401, *et seq*. The statute does not establish FEMS as a separate independent agency with the power to sue and be sued in its own name. It was established long ago that FEMS was a subordinate agency of the District and cannot be sued. *Ray v District of Columbia*, 535 A.2d 868, 869 n. 2 (D.C. 1987) (holding Fire Department, the Board of Police and Fire Surgeons, and the Police and Fire Clinic are not *sui juris* entities.).

Plaintiff's counts against MPD and FEMS are not pleading errors or mistakes because Plaintiff has affirmatively and unequivocally stated that Counts II, III and IV are “separate causes of action” against FEMS and MPD. Moreover, the MPD and FEMS asserted in the answer to Plaintiff's complaint [4] that they were non sui juris. *See* Answer-Fourteenth Defense. In cases where a plaintiff sued a District agency, courts have generally allowed the District to be substituted in place of the agency. *Cooper v. Henderson*, 174 F. Supp. 3d 193, 200 (D.D.C. 2016) and cases cited. However, those issues arose at the motion to dismiss stage. This matter is now at the summary judgment stage in this case and Plaintiff has done nothing to amend his complaint to substitute the District for FEMS and MPD even though he was on notice of MPD and FEMS defense. Plaintiff's intent to sue FEMS and MPD is clear and was not an error. *Id*. (allowing plaintiff to amend the complaint where plaintiff made an error by suing DCPS). Any attempt by Plaintiff to seek to now amend his complaint will be futile. *See Jones v. District of*

*Columbia Water and Sewer Authority* C.C. No. 12-cv-1454 (JEB), *2013 U.S. Dist. LEXIS*, 122483 *11 (D.D.C. 2013) (citing *Arbitraje Casa de Cambio, S.A. de C.V. v. United States Postal Service*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss).

Plaintiff's attempt to hold MPD and FEMS vicariously liable because of the conduct of Lieutenant Kutniewski, Officers Lukanovic and Nelson, and Battalion Fire Chief Welsh fail as a matter of law because neither MPD nor FEMS can be held liable for the actions of these District employees.  Accordingly, Counts II, IV, should be dismissed in their entirety, and Count III should be dismissed to the extent that Count III is against MPD.

II.     **Plaintiff's common law claims as asserted in Counts V and VII[6] should be dismissed because Plaintiff has not complied with the mandatory notice requirement of D.C. Code § 12-309**

In Counts V and VII, Plaintiff asserts claims for negligence against the District.  Because Plaintiff did not give timely notice of these claims as required by D.C. Code § 12-309, the District is entitled to judgment as a matter of law.

In order to maintain any tort action against the District of Columbia for unliquidated damages, a plaintiff must satisfy the mandatory notice requirement of § 12-309.  *See, e.g.*, *Hill v. District of Columbia*, 345 A.2d 867, 869 (D.C. 1975).  In pertinent part, § 12-309 provides that:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the ... [Mayor] of the approximate time, place, cause, and circumstances of the injury or damage.  A report in writing by the Metropolitan Police Department, in the regular course of duty, is a sufficient notice under this section.

---

[6] If the Court interprets Counts I, II and IV as being brought against the District, then this argument is applicable to those Counts.

D.C. Code § 12-309.  The Office of Risk Management (ORM) is authorized to receive notice

under § 12-309.  Ex. Craven Decl. ¶ 14.

The primary purpose of the §12-309 notice requirement is to protect the District against

unreasonable claims and to assist it in the defense of the public interest where claims are made

within the applicable statute of limitations but not so long after the event that it is difficult for the

District to obtain evidence for use in the litigation that may result.  *Shehyn v. District of

Columbia*, 392 A.2d 1008, 1013 (D.C. 1978); *see also Pitts v. District of Columbia,* 391 A.2d

803, 807 (D.C. 1978) (general purposes of D.C. Code §12-309 are "(1) to allow the District to

investigate potential claims so that evidence may be gathered while still available, for example

before the relevant sidewalk is paved over or the meter cover fixed, (2) to enable the District to

correct defective conditions, thus increasing public safety, and (3) to facilitate settlement of

meritorious claims and resistance of frivolous ones . . .").  The requirements of the provision are

not mere technicalities.  Rather, because §12-309 departs from the common law norm of

sovereign immunity by allowing suits against the District, the provision's notice requirements

are a mandatory prerequisite to filing a lawsuit against the District.  *District of Columbia v.

Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995); *Gwinn v. District of Columbia*, 434 A.2d 1376,

1378 (D.C. 1981); *Pitts*, 391 A.2d at 807.  Moreover, the notice requirements must be "construed

narrowly against claimants," *Dunmore*, 662 A.2d at 1359, even where a "harsh result" may

occur, *Hill*, 345 A.2d at 869.

In this case, Plaintiff was arrested on July 5, 2014.  The six month notice period expired

on January 5, 2015.  On January 13, 2015, the District received Plaintiff's purported § 12-309

notice letter.  The letter is dated January 4, 2015, but the post mark on the envelope is January 5,

2015.  It is not enough that Plaintiff mailed the letter prior to the expiration because the letter

must be received by the Mayor before the expiration of the six month notice period.  As the D.C.

Court of Appeals stated in *George v. Dade*, 769 A.2d 760, 765 (D.C. 2001), Congress enacted

the notice provision "to make certain that the District *received* notice of potential claims within

six months of the injury, or damage, to ensure adequate opportunity for investigation to

determine facts, and to protect District revenues against unreasonable claims." (emphasis added).

Plaintiff's failure to ensure that his letter, pursuant to § 12-309, was received by ORM before

January 13, 2015 is fatal to his common law claims in Counts V and VII.

Even if Plaintiff attempts to rely on the police report completed by Officer Nelson

Plaintiff's claims will still fail because the police report does not meet the "cause" requirement

of § 12-309.  In order for a police report to meet the cause requirement the report must "recite[]

facts from which it could be reasonably anticipated that a claim against the District might arise."

*Pitts v. District of Columbia*, 391 A.2d at 809.  In *Martin v. District of Columbia*, 720 F. Supp.

2d 19 (D.D.C. 2010), the court found that the police report detailing plaintiff's arrest did not

satisfy the cause requirement because the fact in the report only suggested a lawful arrest and

there were no facts concerning an assault and battery.

In this case, the facts in Officer Nelson's report detail a lawful arrest based his own

observation and statements from witnesses.  The facts in the police report were sufficient to

establish probable cause for Plaintiff's arrest.  Nothing in the report puts the District on notice

that it should anticipate a law suit being filed.  Accordingly, the District is entitled to judgment

as a matter of law as to Counts V and VII.

**III.  Battalion Fire Chief Welsh is entitled to judgment as a matter of law because Plaintiff has not asserted any cause of action against him**

Plaintiff has asserted seven counts of liability in his complaint.  In each of the counts

Plaintiff has identified which of the defendants each count is alleged against or which defendant

would be subject to liability under a particular count.  Plaintiff does not directly assert any of the counts against Chief Welsh.

Even if Plaintiff's intent was to assert a claim against Chief Welsh under a theory for respondeat superior liability arising from the actions of the fire personnel that were on the scene, that claim would fail.  Respondeat superior liability would apply to the District, as the employer, for the wrongful conduct of its employees acting within the scope of their employment.  *Harris v. United States VA*, 776 F.3d 907, 917 (D.C. Cir. 2015) ("The VA, through the doctrine of *respondeat superior*, would be liable for torts committed by the VA police officers acting in their scope of employment.") (*Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997) ("The District is liable for an assault and battery committed by a D.C. police officer under the doctrine of *respondeat superior* if the officer was acting within the scope of his employment.").  Chief Welsh is not the employer of the fire personnel on the scene and for this reason he could not be held liable under a theory of respondeat superior.  Accordingly, Chief Welsh should be dismissed from this entire law suit.

**IV.    There was probable cause for Plaintiff's arrest, and therefore, the Defendants are entitled to judgment as a matter of law as to Plaintiff's common law false arrest and false imprisonment claims in Count I and the Fourth Amendment false arrest claim in Count III**

Plaintiff alleges that he was unlawfully arrested because there was no probable cause for his arrest.  In Count I, Plaintiff asserts common law claims for false arrest and false imprisonment against Lieutenant Kutniewski, Officer Lukanovic and Officer Nelson.  In Count III, Plaintiff claims that his arrest violated his rights under the Fourth and Fifth Amendments and seeks to hold the MPD, Lieutenant Kutniewski, Officer Lukanovic and Officer Nelson liable.

**a.    The Fourth Amendment rather than the Fifth Amendment applies to Plaintiff's false arrest claim, and therefore, the Defendants are entitled to judgment as a matter law**

As an initial matter, Plaintiff's Fifth Amendment claim fails because the Fourth Amendment is the appropriate constitutional provision that protects Plaintiff from unlawful seizures. The Supreme Court has long held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of [the Fifth Amendment], must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Fourth Amendment provides the "explicit textual source of constitutional protection" against subjecting citizens to searches and seizures without probable cause. U.S. Const., amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, … but upon probable cause …"). In *Elkins v. District of Columbia*, 690 F.3d 554, 560-62 (D.C. Cir. 2012), the D.C. Circuit rejected an attempt by plaintiff to bring a claim for an illegal search under the Fifth Amendment. The Court held that "[t]he remedy for any harm to [plaintiff] from the search of her home is governed by the Fourth Amendment …" *Id*. Because Plaintiff's false arrest claim is properly analyzed under the Fourth Amendment rather than under the Fifth Amendment, the Defendants are entitled to judgment as a matter of law as to Plaintiff's Fifth Amendment claim asserted in Count III.

      **b.**      **There was probable cause for Plaintiff's arrest, and therefore, the Defendants are entitled to judgment as a matter of law as to Plaintiff's common law claims for false arrest and false imprisonment and as to Plaintiff's false arrest claim under the Fourth Amendment**

Plaintiff's false arrest claim fails because there was probable cause for Plaintiff's arrest, and therefore, the Defendants are entitled to judgment as a matter of law.

There is no practical distinction between false arrest and false imprisonment as the issue

underlying both claims is the lawfulness of the arrest and detention. *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010). The same is true for a false arrest claim under the Fourth Amendment because "[t]he elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim." *Wesby v. District of Columbia*, 765 F.3d 13, 19 (D.C. Circuit 2014) (citing *Scott v. District of Columbia*, 101 F.3d 748, 753-54 (D.C. Circuit 1996); *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) ("[t]he elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim, ... the constitutional claim cannot stand if the common law fails for lack of sufficient evidence.") (quoting *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001)). Thus, a finding of probable cause will defeat false arrest claims under both the common law and the Fourth Amendment.

"The assessment of probable cause is an objective one. An arrest is supported by probable cause if, at the moment the arrest was made, … the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect has committed or is committing a crime." *Wesby* at 19 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (internal quotations omitted); *Bradshaw* at 324 ("An officer has probable cause to arrest an individual when he or she has reasonably trustworthy information at the moment of arrest sufficient to warrant a reasonably prudent person in believing that the suspect has committed or is committing an offense.") (quoting *Funchess v. United States*, 677 A.2d 1019, 1020-21 (D.C. 1996)). To establish probable cause, it is not necessary or required that a police officer possess "the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972), *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)

18

("[probable cause] does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands."). However, there must be "some evidence supporting the elements of a particular offense, including the requisite mental state. *United States v. Christian,* 187 F.3d 663, 667, (D.C. Cir. 1999); *Wesby,* 765 F.3d at 20.

### i.      Arrest without a warrant is authorized under District law

A police officer can make an arrest without a warrant a person who has committed or is committing a felony. D.C. Code § 23-581 (a)(1)(A). District law also allows a police officer to make a warrantless of "a person who he has probable cause to believe has committed or is committing an offense in his presence …" D.C. Code § 23-581 (a)(1)(B). Under subsection (D) of the Code, a police officer who has probable cause to believe that a person has violated the traffic law by fleeing the scene of an accident, can make a warrantless arrest "if the officer has reasonable grounds to believe that, unless the person is immediately arrested, reliable evidence of alcohol or drug use may become unavailable or the person may cause personal injury or property damage." D.C. Code § 23-581 (a)(1)(D) and (2)(F).

### ii.      Leaving after colliding

In order to determine if there was probable cause for Plaintiff's arrest, the Court must look at the elements of the laws that Plaintiff is alleged to have violated. *Wesby*, at 19 (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). Under the District's traffic laws, it is unlawful for the operator of a motor vehicle, "who know[s] or has reason to believe" that a collision has caused damage to property belonging to another, to leave the scene of the accident without making their identity known to the property owner or to the police. D.C. Code 50-2201.05c. Identity, as defined by District law, includes name, address, telephone number, license plate number, vehicle identification number and car insurance information. D.C. Code § 50-2201.02

19

(8).  Further, in *Sandwick v. District of Columbia*, 21 A.3d 997, (D.C. 2011), the Court of Appeals recognized that the leaving after colliding statute contained an "mental element" that "imposes upon the driver of a vehicle a positive, affirmative course of action; it specifically designates several acts following the accident which the operator of the vehicle must do to avoid the statutory penalty."

In this case, at the moment of Plaintiff's arrest, Officer Nelson had reasonably trustworthy information to establish probable cause to believe that Plaintiff knowingly left the scene of an accident without making himself known in violation D.C. Code § 50-2201.05c. When the police arrived on the scene, Officer Nelson spoke to Mr. Cooper and Mr. Landrum, who reported that they observed Plaintiff's car against Mr. Taylor's garage as Plaintiff sat in the car with the engine running and the tires spinning.  As Plaintiff sat in his car, either sleeping or unconscious, he was woken up by Mr. Cooper and Mr. Landrum who offered to help Plaintiff park his car in the garage.  It would be reasonable for Officer Nelson to conclude that when Plaintiff was woken up, Plaintiff knew or should have known that he collided with Mr. Taylor's garage because the damage was clearly visible.  *See* Ex. 4.

There was sufficient evidence that Plaintiff was not going to make his identity known to Mr. Taylor or the police on the scene.  In *Lee v. District of Columbia,* one "object and purpose" of the law is to "assure the procuring of information which will insure complete identification of the party, the car, and the location of his residence." 22 A. 3d 734, 743 (D.C. 2011) (quoting *Oden v. District of Columbia*, 79 F.2d 175, 176 (D.C. Cir. 1935).  To achieve this goal the information must be report immediately. *Lee*, at 743.

The facts known to the Defendant Officers were sufficient to establish probable cause that Plaintiff was violating the law by not making his identify known.  After crashing into Mr.

Taylor's garage, Plaintiff made no attempt to contact him, or leave his information at the scene. Instead, Plaintiff backed his car into his own garage and went to sleep. Plaintiff refused to get out of the car once the police were on the scene. Moreover, Plaintiff made his intentions known when he told the 911 operator several times that he wants to go home or that he wants to go to sleep. *Id.*, at 3:18 ("…I'm trying to go into my house …"); at 3:51 ("I want these people to get from in front of my car so that I can go into the house."); at 6:24 ("You need to get these people from in front of me. Cause I need to go into my house.); at 9:25 ("I want to go home and go to bed. I can't, I cannot go home and go to bed."), at 10:35 ("… its five o'clock in the morning, and I want to go to sleep."); at 11:21 ("This is false imprisonment, because I can't move out of my car. I can't go home and go to sleep."); and at 13:13 ("I'm under seize. I want to go to bed."). At no time did Plaintiff give any indication that he was going to contact Mr. Taylor to report the damages Plaintiff caused to Mr. Taylor's garage.

Additionally, Plaintiff testified at this deposition that he held his driver's license up to his car window for the purpose of identifying himself to the police. However, Plaintiff's driver's license had been suspended at that time, and therefore it was invalid and unreliable. Ex. 13. While no case on point has been found, it is highly unlikely, given the purposes of the statute, that an invalid driver's license would establish compliance with the law. Accordingly, there was probable cause for Plaintiff's arrest.

There were also sufficient facts supporting probable cause because the facts of this case could lead a prudent person to reasonably believe that if Plaintiff was not arrested he could cause further injury to a person or property. D.C. Code § 23-581 (a)(1)(D). After hitting Mr. Plummer's garage, Plaintiff backed his car into his own garage and fell back to sleep. The engine was still running when the police arrive. According to MPO Arrington, Plaintiff

21

"cranked" his engine.  MPO Arrington testified that he was concerned that Plaintiff could drive out of the garage, have another accident or hit a person.  Arrington Dep. P62:19-P63:3.  MPO Arrington testified that he did not want to be held responsible if Plaintiff drove away.  *Id*. Plaintiff's erratic behavior as witnesses by neighbor, fire officials and the Defendants Lukanovic and Nelson, and MPO Arrington was sufficient to lead a reasonable prudent person to believe that Plaintiff could drive out of his garage and cause further damage to property or injure a person. Plaintiff's arrest was lawful because there was probable cause to believe that Plaintiff violated the traffic law when he failed to make his identity known after causing property damages.

### iii.    Driving under the influence

The Defendant can escape liability if it can be shown that probable cause existed to arrest for any offense, even if it differs from the offense for which the arrest was actually made. *Enders*, 4 A.3d at 469 ("[I]n defending against a claim of false arrest, the District can prevail if it can show that probable cause existed to arrest for any offense, even if it differs from the offense for which the arrest was actually made[.]").  Here there was sufficient evidence to support probable cause to believe that Plaintiff operated a vehicle while impaired in violation to D.C. law.  D.C. Code § 50-2206.14 (No person shall operate or be in physical control of any vehicle in the District while the person's ability to operate or be in physical control of a vehicle is impaired by the consumption of alcohol or any drug or any combination thereof.).

There is undisputed evidence that Plaintiff was in physical control of his car.  Mr. Cooper and Mr. Landrum saw Plaintiff back his car into his garage.  As Plaintiff sat in the driver's seat of his car while in the garage, he was seen by Chief Welsh, MPO Arrington, and Officers Lukanovic and Nelson sitting behind the steering wheel as the car's engine was running.  Chief

22

Welsh saw that Plaintiff's car was in gear.  Plaintiff shifted the gear to the park position when asked to do so by Chief Welsh.

Officer Nelson testified that he believed that Plaintiff was either intoxicated or having a medical emergency.  The medical emergency dissipated once Plaintiff was cleared by FEMS. Officer Nelson testified that he wanted a certified sobriety test officer to come to the scene but none was available because it was the morning after the Fourth of July holiday. Officer Nelson testified that he should have arrested Plaintiff for driving while intoxicated but because he was a new officer he made a "rookie" mistake.

The reasonableness of Officer Nelson's belief that there was probable cause for Plaintiff's arrest is clear.  No reasonable jury could find for Plaintiff on this issue, and therefore, the Defendants are entitled to judgment as a matter of law.

## V.     Qualified immunity

The Defendants are entitled to qualified immunity because they did not violate a clearly established right.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotations omitted).  Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  *Id*.  "The protection of qualified immunity applies regardless of whether the government official's error is a 'mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Id*. (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting *Butz v. Economou*, 438 U.S. 478, 507 (1978)

(qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).  Because qualified immunity is "an immunity from suit rather than a mere defense to liability… it is effectively lost if a case is erroneously permitted to go to trial."  *Id*., (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  The Supreme Court has emphasized that the "driving force' behind the creation of the qualified immunity doctrine [is] a desire to ensure that insubstantial claims against government officials [will] be resolved prior to discovery."  *Id*. at 231-32 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)) (internal quotations omitted).

In *White, et al. v. Pauly, et al*. the Supreme Court "again … reiterated the longstanding principle that clearly established law should not be defined at a high level of generally." 137 S.Ct. 548, 552 (2017)(per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  In other words, "[i]t is not enough to reiterate that the Fourth Amendment's restrictions against arrest without probable cause are clearly established: the inquiry must be made more contextually, at a finer level of specificity."  *Wesby, at* 26.  Moreover, "the clearly established law must be particularized to the facts of the case.  Otherwise, plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  *Pauly* (quoting *Anderson v. Creighton*, 483 U. S. at 640).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court required the trial court to follow a rigid two-step process for evaluating whether a government employee was entitled to qualified immunity.  First, the court must determine whether the plaintiff has "alleged facts showing a violation of a constitutional right," and, second, the court must decide "whether the constitutional right was clearly established at the time of the incident."  *Pearson v. Callahan*, 555 U.S. at 232.  The Supreme Court, in *Pearson*, stated that the sequence of the two step analysis

24

"should not be regarded as an inflexible requirement." *Id*. at 227.  Instead, lower courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.

A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or [] Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Doe v. District of Columbia*, 796 F. 3d 96, 104 (D.C. Cir. 2015) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)).  Thus, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083.

In this case, Plaintiff claims that there was a lack of probable cause to justify Chief Welsh, and Officers Lukanovic and Nelson entering his property without his permission and refusing to leave.  However, Plaintiff will be unable to show that under the facts and circumstance of this case, his rights under the Fourth Amendment was clearly established. Indeed, the Supreme Court has recognized that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey v. Arizona,* 437 U.S. 385, 392 (1978).  Similarly, District law authorizes a police officer who "has reasonable grounds to believe that, unless the person is *immediately* arrested, reliable evidence of alcohol or drug use may become unavailable or the person may cause personal injury or property damage." D.C. Code § 23-581 (a)(1)(D) (emphasis added). Thus, the "Fourth Amendment does not require police officers to delay in the course of an

investigation" in order to obtain a warrant, "if to do so would gravely endanger their lives or the lives of others." *Warden Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1964).

MPO Arrington's concern that if Plaintiff was not immediately removed from his car Plaintiff could drive away and injure someone or cause more property damage. MPO Arrington's concern that he could possibly be held responsible if Plaintiff did cause further damage or injury was also reasonable under the facts and circumstance confronting him. Officers Lukanovic and Nelson conduct was also reasonable. They both had probable cause to believe that Plaintiff crashed his car in Taylor's garage. They observed Plaintiff slumped over the steering wheel of his car and the car engine running. Plaintiff's behavior was erratic and he appeared "glazed." Chief Welsh also acted reasonably when he entered Plaintiff's garage for the sole purpose of doing a limited medical examination.

Under the facts and circumstance of this case, Plaintiff will be unable to identify a clearly established right that was violated by the Defendants. Accordingly, the Defendants are entitled to qualified immunity.

## VI.    Qualified privilege

As to Plaintiff's false arrest claim under the common law, the Defendants' conduct was privileged. The standard for qualified privilege is similar to that for qualified immunity. The qualified privilege differs from qualified immunity in that there is a good faith element associated with the qualified privilege. *District of Columbia v. Minor*, 740 A.2d 523, 531 (D.C. 1999) (noting that the standard for common-law privilege "resembles the section 1983 probable cause and qualified immunity standards . . . (with the added clear articulation of the requirement of good faith)"). To be entitled to the qualified privilege defense, a police officer is not required to "demonstrate probable cause in the constitutional sense" but the officer must demonstrate that

26

"(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable" *Bradshaw,* 43 A.3d at 323.

In this case, the evidence is clear. The Defendants had a good faith believe that their conduct was lawful under the facts and circumstances they faced. Here, the Defendants are protected under the qualified privilege defense for the same reason that they are entitled to qualified immunity. According the Defendants are entitled to summary judgment as to Plaintiff's common law false arrest and false imprisonment claim in Count I and the Fourth Amendment claim in Count III.

## VII.    Defendants are entitled to summary judgment as to the intentional infliction of emotional distress claim in Count I

In addition to the false arrest claim in Count I, Plaintiff also asserted a claim for intentional infliction of emotional distress (IIED). The Defendants should be granted summary judgment because Plaintiff cannot show that police engaged in extreme and outrageous conduct.

In order to prevail on an IIED claim, Plaintiff must establish that the Defendants engaged in "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C. 2008). There is no general duty of care to avoid causing mental distress, and liability is not imposed for all conduct that causes mental distress. *See Duncan v. Children's Nat. Medical Center*, 702 A.2d 207, 211 (D.C. 1997). Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." As the United States Court of Appeals for the District of Columbia Circuit stated in *Browning, et al. v. Clinton, et al*, 292 F.3d 235, 240-249, (D.C. Cir. 2002), a claim for intentional infliction of emotion distress "is reserved for truly outrageous conduct." This very demanding standard is infrequently met. *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 186 (D.D.C. 1997).

27

In order to establish the first element, "[t]he conduct must be so extreme in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1261 (D.C. 2016) (quoting *Williams v District of Columbia*, 9 A. 3d 484, 493-94 (D.C. 2010)). To the extent that Plaintiff is claiming that his arrest alone was extreme and outrageous, that argument fails because an arrest supported by probable cause does not rise to the level of extreme and outrageous conduct. *Kotch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007) ( "As the officers had probable cause to arrest [plaintiff] the arrest itself cannot form the basis for a claim of extreme and outrageous conduct.").

Even if there was no probable cause to justify Plaintiff's arrest, the Defendants conduct falls far short of rising to the level of extreme and outrageous. In determining if conduct is extreme and outrageous this Court must consider: "(1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place." *King, et al v. Kidd*, 640 A.2d 656, 668 (D.C. App. 1993). Applying these considerations to the instant case, the evidence is insufficient to establish that the Defendants' conduct rose to the level of extreme and outrageous conduct.

When the Defendant officers first arrived on the scene their initial concern was for the safety of Plaintiff. Because Plaintiff had been in an accident, MPO Arrington followed protocol by calling FEMS to make sure that Plaintiff was not suffering from a medical emergency. When Chief Welsh arrived on the scene, he too was concerned for Plaintiff's wellbeing. Chief Welsh wanted Plaintiff to get out of the car so that Plaintiff could be medically checked by FEMS personnel. When Plaintiff refused to get out of his car, he was warned that his car window would be broken. Even in light of this warning Plaintiff still refused to open his car door, so he

28

should not have been surprised when his window was broken. Even when breaking the car window the Defendants took steps not to injure Plaintiff by breaking the passenger side window. No force was used to remove Plaintiff. Instead, Plaintiff got out of his car voluntarily. After FEMS checked Plaintiff's blood level and determine that Plaintiff was medially fine, Chief Welsh and the other fire personnel left the scene. At that point Plaintiff was placed under arrest.

The Defendants' conduct fell well within the contemporary community standards of decency expected of police. This is not a case were the police shot an unarmed man in the back or cut off a person's ability to breathe through positional suffocation. To the contrary, the action of the Defendants in this case was appropriate and decent under the circumstance. Accordingly, no reasonable jury could find that the Defendants' conduct was extreme and outrageous, and therefore, the Defendants are entitled to judgment as a matter of law.

**VIII. The District is entitled to judgment as a matter of law as to Counts IV and V because the District cannot be held liable, pursuant to 42 U.S. C. § 1983, and Plaintiff cannot prove his negligence claims without expert testimony**

In Count IV, Plaintiff asserts what appears to be a negligent training and supervision claim. In Count V, Plaintiff claims that the District's negligence caused a deprivation of Plaintiff civil rights in violation of the Fourth and Fifth Amendments. Complaint ¶¶ 58, 59. The District is entitled to judgment as a matter if law because, as explained below, Plaintiff cannot prove his negligence claims without expert testimony, there is no evidence supporting the negligent supervision and training claim, and the District cannot be held vicariously liable, pursuant to 42 U.S.C. § 1983, for constitutional torts committed by a District employee.

**a**. **Plaintiff lacks expert testimony**

The District is entitled to judgment as a matter of law as to the negligence claims because Plaintiff does not have an expert who can opine as to the appropriate standard of care by which

the District's alleged negligent conduct can be judged.

In order to prove negligence, a plaintiff must establish "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Gilbert v. Miodovnik*, 990 A.2d 983, 988 (D.C. 2010); *Messina v. District of Columbia,* 663 A.2d 535, 537 (D.C. 1995). Although expert testimony is not required to prove negligence "for acts within the realm of common knowledge and everyday experience, a plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Id.* at 538; *District of Columbia v. Arnold & Porter*, 756 A.2d 535, 538 (D.C. 2000). However, no expert testimony is needed if the subject matter is within the realm of common knowledge and everyday experience. *Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001). This exception only applies when everyday experience makes it clear that jurors could not reasonably disagree over the care required. *See Bostic v. Henkels & McCoy, Inc.*, 748 A.2d 421, 425-26 (D.C. 2000).

Expert testimony is generally required when the issue is beyond the ken of the average lay person. In cases involving police operations, training and supervision, expert testimony is required because of the specialized nature of police work. *See Smith v. District of Columbia, et al.*, 882 A.2d 778, 792-793 (D.C. 2005) (requiring expert testimony on claims of failure to train, supervise and discipline police officers); *District of Columbia v. White*, 442 A.2d 159, 164-165 (D.C. App. 1982) (requiring expert testimony concerning adequacy of MPD's weapons safety training); *District of Columbia v. Peters*, 527 A.2d 1269 (D.C. 1987) (requiring expert testimony for training police regarding confrontations with people under the influence of narcotics); *Holder v. District of Columbia*, 700 A.2d at 741-742 (stating that police use of force is an issue beyond

the kin of the average jury); *Griggs v. Washington Metropolitan Area Transit Authority, et al*.,
C.A. No. 99-1552 (RMU), 2002 U.S. Dist. LEXIS 18413 (D.D.C. Sept. 2002).  Plaintiff does not
have an expert in the field police or fire department practices concerning investigations if motor
vehicle accident in case similar to the instant case.  A party seeking to present an expert witness
must first comply with the expert disclosure requirement in Fed. R. Civ. P. 26(a)(2).  Plaintiff
has made no such disclosures.  Accordingly, Plaintiff can prove none of the alleged acts of
negligence without expert testimony, and therefore, the District is entitled to judgment as a
matter of law as to Counts IV and V.

**b.  There is no record evidence to support Plaintiff's negligent supervision and training claim**

Even if Plaintiff was not required to present expert testimony, there is insufficient
evidence to support his negligent supervision and training claim because no such evidence was
developed during discovery.

A claim for negligent supervision is not based on principle of *respondeat superior*, but
rather they are direct claims of negligence against the employer.  *Brown v. Argenbright Security,
Inc*., 782 A.2d 752, 759-760 (D.C. 2001).  In order to prevail on a negligent supervision theory,
Plaintiff must prove that the employer breached its duty to use reasonable care in the supervision
of an employee and the employer's breach of the duty proximately caused the injury.  *Phelan v.
City of Mount Rainer*, 805 A.2d 930, 936-941 (D.C. 2002).  Accordingly, under District of
Columbia law, to establish a claim for negligent supervision plaintiff must show "that an
employer knew or should have known its employee behaved in a dangerous or otherwise
incompetent manner, and that the employer, armed with that actual or constructive knowledge,
failed to adequately supervise the employee." *Giles v. Shell Oil Corporation*, 487 A.2d 610, 613
(D.C. 1985); *Samm v. Martin,* 940 A.2d 138, 142 (D.C. 2007) (upholding summary judgment

31

where there was no evidence that the employer had knowledge of employee's misconduct) (reversed on other grounds); *Phelan,* at 936-941(upholding summary judgment were there was insufficient evidence to put city on notice that police officer would use his service weapon during a personal off-duty shooting incident).

Here, there is no record evidence that the District failed to use reasonable care supervising Lieutenant Kutniewski, Officers Lukanovic, and Nelson, or Chief Welsh. There is no record evidence that any of these individuals had a proven history of violating the constitutional rights of citizens. There is no record evidence that Lieutenant Kutniewski, Officers Lukanovic, and Nelson, or Chief Welsh had been disciplined or the subject of any form of internal investigation. There is no record evidence that any of these individuals were incompetent in conducting accident investigation such that close supervision or additional training was required, or that any supervisor failed to perform his or her duties in an inappropriate manner. Accordingly, summary judgment should be entered in favor of the District as to Plaintiff's negligent supervision and training claim.

### c. No liability under § 1983

The Civil Rights Act, 42 U.S.C § 1983, is an enabling act which establishes the right to sue for money damages for the violation of a plaintiff's rights under the United States Constitution or other federal laws. Under the statute:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

Accordingly, to state a claim under § 1983, a plaintiff must allege and prove the violation of a

right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.  *See West v. Atkins,* 487 U.S. 42, 48 (1988).  However, municipal liability under § 1983 is severely limited.

It was settled long ago that a municipality cannot be held liable under §1983 on the theory of *respondeat superior*.  *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978).  As explained in *Monell,* the District can be held liable for the plaintiff's constitutional claims only if the plaintiff alleges facts that indicate his or her injury was caused by a policy or custom of the District.  *Id*., 694.  Thus, in order to prevail on his claim pursuant to **§** 1983, Plaintiff must show that a custom or policy of the District caused the alleged constitutional violation.  *Id.*  As the Supreme Court has explained, "at the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."  *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 824 (1985).  Stated otherwise, the municipal policy, practice, or custom must be the "moving force" behind the alleged constitutional injury.  *Monell.* "There are a number of ways in which a "policy" can be set by a municipality to cause it to be liable under § 1983: the explicit setting of a policy by the government that violates the Constitution; the action of a policy maker within the government; the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become "custom"; or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations."  *Baker v District of Columbia*, 326 F. 3d 1302, 1306-07 (D.C. Cir. 2003) (internal citations omitted).

Plaintiff has not alleged and cannot establish that an unconstitutional custom, policy or practice was the moving force that caused an alleged violation of his constitutional rights.  In

fact, Plaintiff alleges that his rights under the Fourth and Fifth Amendment were violated because of "negligent, reckless and/or careless" conduct.  Negligent conduct is insufficient to establish a constitutional violation against the District pursuant to § 1983.  *See Daniels v. Williams*, 474 U.S. 327, (1986) (holding that negligent acts by government officials do not give rise to a due process violation).

Moreover, there is no record evidence the MPD officer or FEMS employees were improperly trained or that there was a wide spread problem with the MPD and FEMS training programs relating to accident investigations.  Plaintiff cannot show that a District policymaker exhibited deliberate indifference to a need for more training.  Plaintiff provided the following answer in response to the District's interrogatory asking for facts supporting the § 1983 claim:

> 15. State all facts that support your claim under 42 U.S.C. §1983 against Defendant District of Columbia as alleged in Count III of the amended verified complaint.
>
> ANSWER: The Plaintiff in this case is an African American male, who suffered a deprivation of his rights and privileges by the Defendants, individually and severally, who at all times pertinent were employees and/or agents of the District of Columbia, operating under the color of the laws, ordinances, and regulations of the District of Columbia. The arrest and detention for leaving after colliding when the Plaintiff did not leave the scene violated rights and privileges that are guaranteed to the Plaintiff under the laws and Constitution of the United States.

Exhibit 16.  Clearly, Plaintiff has not and cannot establish a custom, policy or practice approved by a District policymaker that was the moving force that caused the alleged violation of Plaintiff's constitutional rights.  Accordingly, the District is entitled to judgment as a matter of law as to Counts IV and V.

### IX.    Plaintiff's malicious prosecution claims fails

In Count VI, Plaintiff asserts a malicious prosecution claim against "the MPD."  As previously stated, MPD is not a suable entity and, to the extent this claim is construed to be against the District because Plaintiff has failed to give notice of his claim as required by §12-

309.  Further, to the extent that "MPD" is interpreted to include Lieutenant Kutniewski and Officer Lukanovic, Plaintiff's malicious prosecution claim fails as to these two Defendants because they had no involvement in bringing criminal charges against Plaintiff.

A person who wrongfully causes criminal charges to the brought against another person can be sued for malicious prosecution.  *Pitt v. District of Columbia*, 491 F.3d 494, 505 (D.C. Cir. 2007), (citing *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (noting that malicious prosecution actions may only be brought against "persons who have wrongfully caused the charges to be filed")).  There is no evidence that Lieutenant Kutniewski or Officer Lukanovic had any involvement in criminal charges being brought against Plaintiff.  Lieutenant Kutniewski never went to the scene, and there is no evidence that he approved, direct, or ordered the arrest of Plaintiff.  Moreover, there is no evidence that Lieutenant Kutniewski had any contact with Plaintiff when Plaintiff was at the Third District police station.  Officer Lukanovic left the scene before Plaintiff, and there is no evidence that he any involvement with criminal charges being brought against Plaintiff.

Plaintiff's malicious prosecution claim also fails for the additional reason that Plaintiff cannot prove an essential element of his claim.  In order to succeed on a claim for malicious prosecution, a plaintiff must prove "(a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'Malice,' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *DeWitt v. District of Columbia*, 43 A.3d 291, 296 (D.C. 2012) (quoting *Jarett v. Walker*, 201 A.2d 523, 526 (D.C. 1964); *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980).  Probable cause is an essential issue in a malicious prosecution case.  *Moore v. Hartman*, 102 F.Supp.3d 35, 114-115 (D.C. Dist.

2015); *Ammerman v. Newman*, 384 A.2d 637, 639 (D.C. 1978) ("[l]ack of probable cause is an essential element and a showing of probable cause is thus a valid defense which warrants a directed verdict for the defendants."). "The issue in a malicious prosecution case is not whether there was probable cause for the initial arrest, but whether there was probable cause for the "underlying suit." *Pitt* at 502 (citing *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1282 (D.C. 2002).

Here, as demonstrated in Section IV, above, there was probable cause for charges of leaving after colliding and DUI to be initiated against Plaintiff. There was ample evidence that after causing property damage to Mr. Taylor's garage, Plaintiff did not make his identity known but rather backed his garage into his own with the intent of going into his house and going to sleep. Plaintiff did not acknowledge that he was even involved in an accident because he repeatedly denied to the 911 operator that he had hit Mr. Taylor's garage.

There was also sufficient evidence to establish probable cause and charge Plaintiff with DUI. Officer Karaali, certified to administer the SFST test, gave Plaintiff the SFST test at the Third District police station and documented the results of the test in his report. Plaintiff failed the test because he could not pass the HGN test, which tests for rapid eye movement common in people who are intoxicated. Plaintiff also failed the physical portion of the SFST test because he could not do the heal-to-toe steps, made improper turns, and used his arm and the cell wall to keep his balance.

Additionally, Plaintiff's conduct on the scene was unusual. After hitting Mr. Taylor's garage, Plaintiff was found in his car either passed out or sleeping, with the engine running and the tire spinning, which caused a considerable amount of smoke that woke up two of Plaintiff's

neighbors.  Plaintiff had a hard time backing his car into his own garage and was only able to do so after four attempts.

When the police and the fire department arrived, Plaintiff was again observed to be either sleeping or passed out and had to be woken up by Chief Welsh and Officer Lukanovic.  When Plaintiff first woke up he did not recognize that the people in his garage were police officers. Plaintiff called 911 to complain of strange people flashing lights in his eyes.

All of this evidence is sufficient to establish probable cause to charge Plaintiff with leaving after colliding and DUI.  Accordingly, the District is entitled to judgment as a matter of law.

**X.     The District is entitled to judgment as a matter of law as to Count VII because there is no evidence of a defect to the roadway in the alley or that the District had notice of any defect**

In Count VII, Plaintiff claims that the District's failure to repair and maintain the alley roadway created a hazardous condition that caused his right rear tire to be stuck in a "pothole" and "smash into his neighbor's garage …" The District is entitled to judgment as a matter of law because there is no evidence that the District had notice of a dangerous condition.  Further, even if a dangerous condition did exit, Plaintiff lacks expert testimony as to the applicable standard of care in repairing and maintaining brick roadways.

The District "is not the insurer of safety of those who utilize its street and sidewalks." *Briscoe v. D.C.,* 62 A.3d 1275, 1279 (D.C. 2012) (quoting *Rajabi v. Potomac Electric Power Co.*, 650 A.2d 1319, 1322 (D.C 1994).  "It is the law in this jurisdiction that a party may not succeed in a negligence claim against the District [] for injuries sustained as a result of defective conditions in its streets or highways unless the party demonstrates that the District had actual or constructive knowledge of the dangerous condition bringing about the injury." *District of*

37

*Columbia v. Fowler*, 497 A.2d 456, 461 (D.C. 1985) (citing *District of Columbia v. Woodbury*, 136 U.S. 450, 463 (1890).  Actual notice can be shown through any evidence that would allow the jury to know with certainty, rather than to speculate and "draw impermissible inferences." *Washington Metro. Area Transit Auth. v. Ferguson*, 977 A.2d 375, 377 (D.C. 2009).  "Actual notice is that which a party actually possesses." *Wilson v. District of Columbia*, 2013 CA 0077332 B, 2016 D.C. Super. Lexis 3, *4-5 (Feb. 2016) (rejecting Plaintiff's argument that actual notice can be inferred from circumstantial evidence offered by an expert testimony).

Plaintiff cannot show actual knowledge on the part of the District.  Aaron Horton, Acting Chief of Maintenance, testified pursuant to Fed. R. Civ. P. 30(b)(6) that he is responsible for overseeing the Street and Bridge Maintenance Branch, which is responsible for road repair.  Ex. 15 Horton Dep. P8:2-P9:2.  Mr. Horton testified that prior to July 5, 2014, DDOT has no records of any complaints regarding the alley at issue.  *Id.*, P32:18-21.  He also testified that there were no records of any repairs being made in the alley within five year prior to the incident.  *Id.*, P31:3-13.

Plaintiff's testimony supports the testimony of Mr. Horton.  Plaintiff testified that before his tire got stuck in the alleged pothole "it wasn't a problem prior to it happening."  Pl. Dep. P117:10-20.  Plaintiff also testified that prior to the July 5, 2014, there was no visible defect to the road way.  *Id.*, P119:16-17 (So that day if you'd come out and looked at that, you would never see a hole.).  Mr. Cooper and Mr. Landrum also describe the roadway in the alley as being in "good condition."  Cooper Decl. ¶ 9; Landrum Decl. *Id.*, ¶ 11.  Thus, there is no evidence that DDOT received any complaints from any source that the roadway in the alley was in disrepair and created a hazardous condition.  Accordingly, Plaintiff cannot prove that the District had actual notice of the alleged pothole.

Constructive notice can be established by showing 1) "that a dangerous condition existed...; and 2) that the dangerous condition existed for such a duration of time that the District should have been aware if District Authorities had exercised reasonable care." *Lynn v. District of Columbia*, 734 A.2d 168, 171 (D.C. 1999). The factors relevant to proving constructive notice are the "length of time that the defective condition existed, whether the condition was obvious or latent, and the severity or dangerousness of the condition". *Briscoe v. D.C.,* 62 A.3d at 1279.

Applying these factors to this case, Plaintiff cannot establish constructive notice. There is no evidence as to how long the pothole has existed. DDOT had no reason to do any road repair as there have been no complaints about the condition of the alleyway. Plaintiff admits that simply by looking at the road, the pothole was not visible, and therefore, the alleged pothole was not obvious so even with the exercise of reasonable care DDOT would not have discovered the alleged defect. Because the pothole was not at all clearly visible, Plaintiff cannot show that the problem was so severe that with the exercise of reasonable care DDOT should have discovery the pothole. This is true particularly in light of the fact that DDOT received no citizen complaints about the condition of the alleyway.

Plaintiff has described the pothole as being "manmade" and "chiseled" by DDOT. Pl. Dep. P91:9-18. According to Plaintiff, when DDOT attempted to fix the pothole, it used a machine that "carved in a (sic) area which a tire fit directly into." *Id*. According to Plaintiff "stuff [] came out the hole and it kept coming out" and the "stuff deteriorated." Pl. Dep 119:3-5. According to Plaintiff, he was informed of the "stuff" by "somebody that was around that area who was knowledgeable. He was an engineer or some kind of a construction engineer or something like that." Pl Dep., P119:5-P120:1. Plaintiff's knowledge of the alleged road repairs is based on impermissible hearsay that cannot defeat summary judgment.

Moreover, Plaintiff is required to put on expert testimony in order to prove that the machine DDOT used caused the alleged pothole and that the "stuff" that came out of the hole related contributed to the hazardous condition under the roadway.  The appropriateness of the machines and material used by DDOT to repair road is beyond the ken of the average layperson. Without expert testimony, a jury would have to speculate as to the type of equipment and material that should be used to construct or repair the streets in the District.  The District did not have notice of the alleged "pothole" and Plaintiff does not have an expert who can establish a standard of care and a breach of duty on part of the District. Accordingly, the District is entitled to judgment as a matter of law as to Count VII.

### Conclusion

For the forgoing reasons judgment as a matter of law should be granted in favor of the Defendants as there is no genuine dispute as to any material fact.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Michael K. Addo*
MICHAEL K. ADDO [1008971]
Chief, Civil Litigation Division, Section IV

/s/David A. Jackson
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW
Suite 630 South
Washington, DC  20001
 (202) 724-6618
 (202) 741-8999 (fax)

davida.jackson@dc.gov