UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

VERE O. PLUMMER                                    :
                                                   :
          Plaintiff,                               :
                                                   :
                                                   :   Civil Action No. 15-cv-2147(RDM)
          v.                                       :
                                                   :
DISTRICT OF COLUMBIA, *et al.*                     :
                                                   :
          Defendants.                              :
                                                   :

<u>PLAINTIFF'S OPPOSTION TO THE DEFENDANTS'</u>
<u>MOTION FOR SUMMARY JUDGMENT</u>

COMES NOW, Vere O. Plummer, the Plaintiff herein, by and through his attorney,

Tilman L. Gerald, hereby opposes the Defendants' motion for summary judgment for the reasons

that are more specifically set forth in the Memorandum of Points and Authorities Submitted in

Support of His Opposition which is attached hereto and incorporated herein by reference as

though set forth in its entirety.

                                        Respectfully submitted

                                        /s/ Tilman L. Gerald
                                        Tilman L. Gerald [928796]
                                        Law Offices of Tilman L. Gerald
                                        1220 L Street, N. W., Suite 700
                                        Washington, D.C. 20005
                                        202.742.2004-Telephone
                                        202.742.2099-Facsimile
                                        Tilmanlg@gmail.com-Email
                                        Counsel for Vere O. Plummer

<u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on the 28th day of June 2017, a copy of Plaintiff's
Opposition to the Defendants' Motion for Summary Judgment and his Memorandum of Points
and Authorities Submitted in Support of His Opposition was served electronically upon David

Jackson, Assistant Attorney General, Office of the Attorney General for the District of Columbia via ECF.

/s/ Tilman L. Gerald
Tilman L. Gerald

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VERE O. PLUMMER | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 15-cv-2147 |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF, PLUMMER'S, OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff, Vere Plummer, through undersigned counsel, submits this Opposition to Defendant's Motion for Summary Judgment. For the reasons explained below, the Defendants are not entitled to judgment as a matter of law as there exists genuine issues of material fact with respect to almost every issue raised.

## PROCEDURAL HISTORY AND NATURE OF CASE

On July 5, 2015, Plaintiff, Mr. Plummer, initiated a lawsuit against Defendants, District of Columbia, Metropolitan Police Department of the District of Columbia, District of Columbia Fire Department, Police Officer Sandro Lukanovic, Lieutenant John Kutniewski, Police Officer John F. Nelson, and Battalion Chief Henry Welsh. On October 15, 2015, Mr. Plummer submitted an amended verified complaint. On December 10, 2015, the Defendants removed the case to the United States District Court.

On May 11, 2017, Defendants submitted a Motion for Summary Judgment. As of the date of this Opposition, Defendants Officer Sandro Lukanovic, Lieutenant John Kutniewski, Police Officer John F. Nelson, and Battalion Chief Henry Welsh have not filed an answer to Mr.

1

Plummer's complaint and the Office of Attorney General has yet to submit arguments in their defense.

## PERTINENT BACKGROUND FACTS

On early morning of July 5, 2017, Plaintiff, Vere Plummer was returning home from a July 4th independence day celebration. He arrived home at or about four o'clock in the morning. He proceeded to park his car in his garage behind his house. As he attempted to back into the garage, his tire became lodged into a pothole. As he was attempting to get out of the pothole, the tire was spinning. After several attempts, he was able to remove the vehicle from the pothole and enter into his garage.

On July 5, 2014, at approximately 3:45 a.m., Mr. Plummer's vehicle's right-rear tire became stuck in a previously repaired, deteriorated pothole when he attempted to back into his garage in the rear alley behind his home. In an attempt to rock the vehicle out of the pothole, Plaintiff lost control of the speed of the vehicle and struck his neighbor's garage causing minimal damage to its frame. Shortly thereafter, Plaintiff continued his attempts to rock the vehicle out of the pothole by intermittently shifting the gears and gunning the engine. These actions caused a coal mixed black substance to expel from the pothole, resulting in further loss of tire traction. After many attempts, Mr. Plummer extracted the vehicle from the pothole and made it into the garage. He fell asleep with the garage door open while he awaited sunrise.

While in his house, Mr. Plummer was suddenly awakened by loud banging on his windshield, blinding flashlights and shouts by members of the DCFD threatening to smash in the window and forcefully remove him. After making a preliminary assessment of the situation, Mr. Plummer informed Defendants that he was not injured and that there was no need to test his blood sugar inasmuch that he is not diabetic. He also requested that the Defendants remove themselves form his property to which they did not comply with his request.

2

Defendants smashed Mr. Plummer's window and forcefully removed him from the vehicle. Without a warrant, or invitation into his home, they arrested him and charged him with, among other things, driving with a suspended license.  All criminal charges against Mr. Plummer were dismissed.

### STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(c) under the Federal Rules of Civil Procedure when the moving party is entitled to judgment as a matter of law and no genuine issue of material fact exists. See *Celotex Corp. v. Catreet*, 477 U.S. 317, 322-323 (1986); *Waterhouse v. District of Columbia,* 286 F.2d 989, 991 (D.C. Cir. 2000).  "The plain language of Rule 56(c) mandates judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential to that party's case, and on which the party will bear the burden of proof at trial." See *Celotex Corp., 477 U.S. 322, supra.* There is no genuine issue of material fact where the relevant evidence in the record, taken as a whole, indicate that a reasonable fact finder could not return a verdict for the non-moving party. See *Anderson v. Lobby, INC.,* 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith,* 475 U.S. 574, 587 (1986).  Facts and inferences drawn therefrom must be viewed in the light most favorable to the non-moving party.  See *Addickes v. S.H. Kress& Co.,* 398 U.S. 144, 157(1970). However, a summary judgment may still be granted if evidence favoring the non-moving party is merely colorable or is not significantly probative.  See *Anderson, supra.,* 259-260..

Once moving party files a proper summary judgment motion, the burden shifts to the non-moving party to produce "specific facts showing that there is a genuine issue for trial.  See Rule 56 (c); *Anderson, supra.,* at 250.  For a non-moving to establish that a genuine issue exists for trial, it must do more than show there is some metaphysical doubt as to material facts.  See *Matsushita,*

3

*supra.,* at 586. Consequently,, when neither party seeks to supplement the record with additional evidence, a motion for summary judgment will operate as a motion for judgment on the evidence of record. As there are genuine issues of material facts, Plaintiff respectfully pray that this Honorable Court deny the Defendants' motion for summary judgment.

## ARGUMENT

**I.     PLAINTIFF STIPULATES THAT THE METROPOLITAN POLICE DEPARTMENT AND THE FIRE EMERGENCY MEDICAL SERVICES ARE NON *SUI JURIS*, AND THEREFORE, COUNT II SHOULD BE DISMISSED.**

Defendants argue that MPD and FEMS are non *sui juris*, and Mr. Plummer stipulates to this argument.

**II.     PLAINTIFF'S COMMON LAW CLAIMS AS ASSERTED IN COUNT V AND VII SHOULD NOT BE DISMISSED BECAUSE DEFENDANT HAD ENOUGH NOTICE THAT SATISFIES THE MANDATORY REQUIREMENT OF D.C. CODE § 12-309.**

In their motion for summary judgment, the Defendants argue that the Plaintiff's common law claims are time barred due to his failure to provide timely notice to the District of Columbia as required under §12-309 of the District of Columbia Code. In essence, the Defendants assert the Plaintiff's §12-309 notice letter, dated January 4, 2016 and postmarked January 5, 2016, was not received by the District of Columbia Office of Risk Management until January 13, 2016. Plaintiff concedes that the letter he addressed to the District of Columbia purporting to be his §12-309 notice was dated January 4, 2015, a Sunday, and was postmarked January 5, 2015. He also concedes that the return receipt indicates that delivery was not made until January 13, 2015.

However, Plaintiff does not concede, as the Defendant District of Columbia suggests, that the police report authored by Officer John Nelson, a defendant in this matter, "...detail a lawful arrest based his (sic) own observations and statements from witnesses. The

4

facts were sufficient to establish probable cause for Plaintiff's arrest...", as claimed. The District contends that the report as constructed fails to give the District of Columbia government sufficient notice of an impending claim.  Plaintiff, in response, asserts that Officer Nelson and MPO Arrington did not have probable cause to arrest Mr. Plummer without a warrant.  District of Columbia Code §23-581(a)(1)(B), which in pertinent part reads, "[A] law enforcement officer may arrest, without a warrant having previously being issued therefor a person who he has probable cause to believe has committed or is committing an offense in his presence..."

In *Schram v. District of* Columbia, 485 A.2d 623 (1984), the court addressed this very issue. The Schram Court reasoned that "...[U]nder §23-581, which is, in all respects relevant here, a codification of the common law of arrest, Schram's arrest was valid only if the police had probable cause to believe a misdemeanor was being committed in their presence. D.C. Code §23-581(a)(1)(B)..." More specifically, the Court held that Ms. Schram's arrest was valid only if the police had probable cause to believe a misdemeanor was committed in their presence. However, because the police officers arrested Ms. Schram for operating a vehicle while under the influence of alcohol or drugs, and it was undisputed that the police arrived on the scene only after she had gotten out of her vehicle the Court found that the arrest was invalid. See *Schram,* supra at 625.

Additionally, "...this jurisdiction has long observed that a warrantless arrest for a misdemeanor not committed in an officer's presence is, absent an exception, contrary to law..." See *Enders v. District of Columbia,* 4 A.3d 457, (D.C. 2010), citing with approval *District of Columbia v. Tulin,* 994 A.2d 788, at 796 (D.C. 2010); *Schram, supra* note 8, 485 A.2d at 624, *Bond v. United States,* 310 A.2d 221, 223-224 (D.C. 1973); *District of Columbia v. Perry,* 215 A.2d 845, 847 (D.C. 1966); *Craig v. Cox,* 171 A.2d 259, 261 (D.C 1961); *(Gerry) Scott v. District*

5

*of Columbia*, 322 U.S. App.D.C. 75, 81, 101 F.3d 748, 754 (1996); *Maghan v. Jerome*, 67 App.D.C. 9, 10, 88 F.2d 1001, 1002(1937).

Applied to this case, it is undisputed that neither Officer Nelson nor MPO Arrington witnessed the misdemeanor offense for which the Plaintiff was arrested on July 5, 2014. In the report prepared by Officer Nelson, he states that he and MPO Arrington responded to a radio run for an accident with injuries in the alley at or near 1219 Euclid Street, N.W. Clearly, they both arrived at the scene after the incident had occurred. Neither Officer Nelson nor MPO Arrington was present when the collision for which Mr. Plummer was arrested occurred. And since the report does not detail facts that would excuse the warrantless arrest of Mr. Plummer, i.e., occurring in the presence of the arresting officer(s), the arrest was invalid under §23-581.

Furthermore, according to the Nelson report, Officers Nelson and Arrington found Mr. Plummer in his garage when they arrived on the scene. The statute which the District contends Mr. Plummer violated is D.C. Code §50-2201.05(c), entitled, "Leaving after colliding", provides as follows:

"(a) Any person who operates or who is in physical control of a vehicle within the District who knows or has reason to know that his or her vehicle has been in a collision shall immediately stop and (1) Where another person is injured, call or cause another to call 911 or call or cause another to call for an ambulance or other emergency assistance if necessary, remain on the scene until law enforcement arrives and provide identifying information to the law enforcement and to the injured person; (2)Where real or personal property belonging to another is damaged or a domestic animal is inured, provide identifying information to the owner or operator of the property or the owner of the domestic animal, provide or cause another to provide identifying information and the location of the collision, to law enforcement or 911..."

Plaintiff did not leave the scene as the Defendants would have this court to believe. In fact, the distance between the garage owned by Mr. Plummer and the garage owned by Mr. Taylor is just a few feet. Unlike the defendant who struck the rear of another vehicle then left the scene in *Lee v. District of Columbia*, 22 A.3d 734 (D.C. 2011) Mr. Plummer remained at

6

the scene, as Officer Nelson's report clearly indicates. The Defendants' reliance upon the declarations of Mr. Cooper and Mr. Landrum to validate the arrest of Mr. Plummer and the existence of probable cause, is unavailing. In *Schram, supra.*, even though Ms. Schram attempted to leave the scene and was stopped by persons other than the police, the Court determined that her arrest was invalid because the offense for which she was charged did not occur in the presence of the arresting officer. Though the Defendants assert that the facts in the report are based upon the observations of Officer Nelson and witnesses and that the report details facts sufficient to establish probable cause, the reality is that the report instead details a circumstance whereby Officer Nelson and MPO Arrington knowingly and willfully unlawfully arrested Mr. Plummer for a misdemeanor offense. They each must admit they did not witness the incident nor did the incident otherwise occur in their individual or collective presence as §23-581 requires. The actions of Officer Nelson and MPO Arrington is further damnable because they knowingly entered Mr. Plummer's garage, his private property, without a warrant and refused to leave, violating United States Constitutional rights guaranteed to Mr. Plummer as well as the laws of the District of Columbia.

In the instant case, the Nelson report does not reasonably suggest that a lawful arrest of the Plaintiff was made. Instead, it clearly adumbrates that an unlawful and/or invalid arrest was made and that Officer Nelson and MPO Arrington both knew that arresting Mr. Plummer was wholly inconsistent with §23-581 of the District of Columbia Code and the policies and procedures of the Metropolitan Police Department. A fair and impartial reading of the Nelson report demonstrates that the District of Columbia had sufficient information to be on notice that the arrest of Mr. Plummer not only offended its own statute(s) but also offended rights guaranteed to Mr. Plummer by the United States Constitution and the laws of the United States. The Nelson report served notice on the District that Mr. Plummer would have a claim against it for false arrest, civil rights

7

violations, violations of constitutional rights and other causes arising out of the conduct and actions of Officer Nelson and MPO Arrington and others that resulted in Mr. Plummer's unlawful arrest. The Court, in determining the sufficiency of the alternative notice provision of §12-309, must look to see if the detail required by the §12-309 notice letter is contained in the police report.

As noted above, the Defendants have conceded the existence of all of the elements mandated by the §12-309 save cause. In Pitts v. District of Columbia, 391 A.2d 803 (D.C. 1978), the Honorable Judge Kern, writing for the court, stated that

"..[O]ur review of the precedents considering whether a particular police report has satisfied the notice requirement of Section 309 persuades us that those decisions implicitly follow a case by case approach in an area where there is no "bright line" tests are applicable. Likewise, we conclude that the determination of whether a particular report or series of reports constitutes statutory notice to the District of Columbia can only be reached after consideration of the particular facts of the case, the nature of the report itself and the objectives sought to be attained by the notice provision..."

The report in this matter contains sufficient detail outlining the facts including the blatant missteps made by both MPO Harrington and Officer Nelson, who by the way was assigned to MPO Arrington for training, that led to the warrantless invalid arrest of Mr. Plummer.

Contrary to the position the District has assumed with respect to the sufficiency of Officer Nelson's report, Plaintiff finds that the report fully satisfies the requirements set forth under §12-309. Entitled "Actions against District of Columbia for unliquidated damages; time of notice." §12-309 reads as follows:

(a) Except as provided in subsection (b) of this section, an action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause and circumstances of the injury or damage. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section..."

8

The issue that this Honorable Court must decide is whether the police reports prepared by Defendant Nelson and MPO Arrington provided the District of Columbia sufficient notice of any apparent impending claims that Mr. Plummer would have against it arising out of his arrest that occurred on July 5, 2014. Since the District admits that the only element missing is "cause", Plaintiff will only address the existence of that particular element. In *Pitts, supra.*, the court stated that "…[H]owever, it is also necessary that the police reports give notice of the "cause…of the injury." We recognize at the outset, that a police report, by its nature may not fully reflect every salient fact concerning the potential liability of the District…"

The reports authored by MPO Arrington and Officer Nelson's detail facts that clearly and unmistakably indicate that no factual, reasonable, or legal basis existed that justified charging and the subsequent warrantless arrest of Mr. Plummer for leaving after colliding. Moreover, both reports state that Mr. Plummer was found sitting in his vehicle in his garage when he was approached by these officers. The collision for which he was purportedly was arrested was for causing property damage to his neighbor's garage. However, the report provides sufficient notice of the "cause" of an injury to satisfy the statutory requirement if it recites facts from which it can reasonably be anticipated that a claim against the District might arise…" *Allen v. District of Columbia* 533 A.2d 1259, at 1262 (D.C.1987): also see *Martin v. District of Columbia, 720 F.Supp.2d 19 (D.C. 2010).*

The report in this matter, prepared and made in Officer Nelson's regular course of duty on July 5, 2014, denotes that Mr. Plummer was arrested in his garage and charged with the following offenses: (1) Leaving after colliding and (2) failure to obey a law enforcement officer's order. Defendant(s) argue that the facts pertinent to this matter are for the most part not in dispute. For instance, the Plaintiff has admitted to striking the garage of his neighbor, Mr. Kenneth Taylor, as

he was preparing to park his car in his garage across the alley from Mr. Taylor's garage. Mr. Taylor's garage is across the alley from where the Plaintiff lives.

Mr. Plummer's residence and garage are only a few yards from Mr. Taylor's garage. Mr. Plummer did not leave the vicinity of the accident though he moved his vehicle into his garage. Plaintiff did not exit his vehicle prior to the Defendants violently breaking the glass to the passenger door to his vehicle and forcibly removing him from both his vehicle and his private property, all without sufficient probable cause. The arrest of the Plaintiff for leaving after colliding when he was present when the police arrived represents an untenable and poor quality of police work as well as a distressing and ugly example of the police intruding upon important rights guaranteed to Mr. Plummer and to other citizens of this great country and the city in which we live. The report does not contain any facts which would plausibly excuse the warrantless arrest of Mr. Plummer for a misdemeanor, in his private garage.

Accordingly, the reports prepared by Officer Nelson and MPO Arrington are indeed pregnant with facts that sufficiently placed the District on notice that their arrest of Mr. Plummer was contrary to the provisions of §23-581, that the arrest was made in bad faith and notice of the likelihood that Mr. Plummer had an apparent and/or impending claim against it for the invalid and warrantless arrest that occurred on the morning of July 5, 2014. Moreover, the District, by virtue of the reports, knew or had reason to know that the arrest of Mr. Plummer without a warrant, in this instance, required an investigation.

Thus, the information found in the subject reports satisfies the cause requirement under the §12-309, and therefore Mr. Plummer's common law claims remain viable. Although strict compliance with §12-309 is mandatory in terms of the timeliness of the notice, the courts in this jurisdiction have accorded greater liberality with respect to the contents of the said notice. See

10

*Wharton v. District of Columbia*, 666 A.2d 1227, at 1230 (D.C. 1995). Also in *Doe by Fein v. District of Columbia*, 697 A.2d 23, at 27 (D.C. 1997), the court there held that the content requirements are to be interpreted liberally and "in close cases doubts are to be resolved in favor of compliance..." Therefore, if this Honorable court finds that any doubt exists regarding the sufficiency of the contents of the police reports and whether they satisfy the statutory requirements of §12-309 any such doubt should be resolved in favor of compliance rather than non-compliance. The Plaintiff respectfully submit that the police reports authored by Officer Nelson and MPO Arrington sufficiently set forth facts sufficient in and of themselves to sufficiently serve notice upon the District of the plainly obvious violations of the laws of the District of Columbia committed by Officer Nelson, MPO Arrington and others, i.e., §23-581 and §50-2201.05(c), as well as the United States Constitution, and consequently that in all likelihood Mr. Plummer had an apparent and impending claim

that it should investigate arising out of his invalid warrantless arrest.

### III.   BATTALION FIRE CHIEF WELSH IS NOT ENTITITLED TO JUDGMENT AS A MATTER OF LAW.

Defendants argue that Chief Welsh should be dismissed from this law suit under theories of respondeat superior liability and they also state that no claims were asserted against him in this suit. In his Complaint, Mr. Plummer notes battalion Chief Welsh as a defendant in the caption, and on page 3. Mr. Plummer includes Chief Welsh's actions in the Facts Common to Causes of Action. Mr. Plummer also requests for judgment against all Defendants. Thus, Battalion Fire Chief Welsh is not entitled to a judgment as a matter of law inasmuch that the Complaint demonstrates that he is a Defendant and is a Defendant to all counts mentioned in the Complaint.

It goes against public policy to allow Chief Welsh to be dismissed from this suit. Among other things, Mr. Plummer has demonstrated in both his complaint and through deposition that

11

Chief Welsh had an active role in ensuring that the officers arrest Mr. Plummer without any probable case. Also, Chief Welsh gave many of the orders during the events that occurred on that day. Chief Welsh is an integral part of this lawsuit and his actions have created harm against Mr. Plummer.

**IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFF'S CLAIMS IN COUNT I AND COUNT III BECAUSE THERE EXIST GENUINE ISSUES OF MATERIAL FACT.**

Count I was for False Arrest, False Imprisonment, and Intentional Infliction of Emotional Distress. Count III is for Deprivation of Civil Rights.

In its motion for summary judgment, the District notes that it is entitled to Summary Judgment for Count I because they believe that there was probable cause for Mr. Plummer's arrest. They believe that the facts demonstrating probable cause are not of genuine issue of material fact. The fact that defendants entered into Mr. Plummer's home without a warrant, invitation, or acceptance into the home coupled with the District attempting to pursue claims against Mr. Plummer for information that they learned after the incident demonstrates that they did not have a probable cause at the time of the incident. As such, the discussion as to whether there was probable cause, here, presents genuine issues of material fact.

In its motion for summary judgment, the District notes that the Fourth amendment, and not the Fifth amendment applies to Plaintiff's False Arrest claim and as such, they are therefore entitled to judgment as a matter of law. Here, Defendant bases their argument on a notion that Mr. Plummer failed to include the Fourth Amendment as one of the reasons in his complaint as to why he is entitled to a judgment here. (pg. 17. "Plaintiff's fifth amendment claim fails because the fourth amendment is the appropriate constitutional provision that protects Plaintiff from unlawful

12

seizures.).  However, Defendant is incorrect inasmuch that Mr. Plummer did include the fourth

amendment in the Complaint. *See Amended Compl. Pg. 11 paragraph 49.*

> "As a result of the actions of these defendants, Plaintiff was deprived of his rights,
> privileges and immunities secured by the United States Constitution, in particular
> the Fourth and Fifth Amendments in contravention of 42 USC § 1983 and the laws
> of the District of Columbia without just cause . . .

With respect to the issues in Count I and Count III, there exists a genuine issue of material

fact as to whether or not the facts in dispute established probable cause for Mr. Plummer's arrest.

Defendants note that an Arrest without a warrant is authorized under District law to which

this is true in the event that the person who he has probable cause to believe has committed or is

committing an offense in his presence.  Here, Mr. Plummer was approached by the authorities

while in his house and his own garage.  The officers did not approach or encounter him while in

the street or any public road.  Moreover, the officers did not pursue any charges against Mr.

Plummer until learning new information after the events occurred.

Defendants claim that Mr. Plummer left the scene after colliding to which that is untrue.

In its argument, Defendants state the Mr. Plummer's vehicle hit his neighbors garage.  Under D.C.

code, the operator of a motor vehicle who knows or has reason to believe that a collision has caused

damage to property belonging to another is to not leave the scene of the accident without making

their identity known.  Here, Mr. Plummer did not attempt to conceal his identity and given the

timing of the events, he did not have a reasonable opportunity to provide any information to his

neighbor. The events under dispute happened very early in the morning to which it was reasonable

for Mr. Plummer to believe that his neighbors were asleep at the time.  The mere notion of Mr.

Plummer failing to leave his identity is a material fact in dispute and thus rids Defendants with

entitlement to summary judgment with respect to this issue.

13

## V.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE QUALIFIED IMMUNITY DOES NOT APPLY IN THIS CASE.

The Defendants are not entitled to qualified immunity because they violated a clearly established right and they should have raised this argument earlier in the case. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known. *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The Supreme Court has emphasized that the "driving force" behind the creation of qualified immunity doctrine is a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). Accordingly, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation. (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991).

In *Saucier v. Katz,* 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right. Second, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

First, as noted in *Hunter,* this issue should have been litigated at the onset of litigation. The object of the doctrine is to ensure that the issues are handled prior to discovery. Here, we are in the summary judgment stage of proceedings. Defendants had plenty of opportunity to raise this issue in the earlier stages of this suit to which they failed to raise the argument.

14

Second, when applying the framework given in *Saucier*, Mr. Plummer clearly satisfies both prongs of the test. For the first prong, the facts that Mr. Plummer alleges makes out a violation of constitutional rights afforded to him under the Fourth and Fifth Amendment. The police officers entered Mr. Plummer's home without a search or arrest warrant. They questioned him, harassed him, and attacked him. The Fourth and Fifth amendment give clearly established rights and are rights that police officers encounter and deal with on a daily, and on-going, basis. Thus, the police were also aware of the rights inasmuch that the understanding thereof is a part of their training.

Inasmuch that Mr. Plummer's facts satisfy both parts of the two pronged-test, and Defendant is only raising this argument now, this Court must find that Defendants are not entitled to Qualified Immunity.

## VI. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE QUALIFEID PRIVILEGE DOES NOT APPLY IN THIS CASE.

In suits for unlawful arrest, qualified immunity shields police officers from liability if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the officer possessed. *Hunter v. Bryant*, 502 U.S. 224 (1991).

Here, the officers could not have believed the arrest to be lawful inasmuch that they were in Mr. Plummer's house without invitation or warrant. Also, at the time of the incident, they had no knowledge of any facts that rightfully calls for his arrest. Also, though the Defendants claim that Qualified Privilege applies, they fail to pinpoint or cite to any facts in their argument. They provided an argument with no basis other than "the evidence is clear."

## VII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IN COUNT I BECAUSE THERE EXISTS GENUINE ISSUES OF MATERIAL FACT.

In order to prevail on an IIED claim, Plaintiff must establish that the Defendants engaged in extreme and outrageous conduct on the part of the defendant which intentionally or recklessly causes the plaintiff severe emotional distress. *Minch v. District of Columbia*, 952 A.d 929 (D.C. 2008). To succeed on a claim of IIED, a plaintiff must show 1) extreme and outrageous conduct on the part of the Defendant which 2) intentionally or recklessly 3) causes the plaintiff severe emotional distress. *District of Columbia v. Thompson*, 570 A.2d 277, 289 (D.C. 1990).

Here, Defendant's actions were extreme and outrageous. Defendants entered into Mr. Plummer's house without a warrant or invitation. They damaged his property and attacked his person for a considerable amount of time. One's home is typically a place wherein one seeks peace. Here, Defendant abused Mr. Plummer in his home and damaged his property.

With respect to this issue, there are several issues of material fact. Defendants note that Chief Welsh arrived on the scene and was concerned for Plaintiff's wellbeing. This is untrue as the facts demonstrate that the authorities had one mission in mind, and that was to place criminal liability on Mr. Plummer. Defendants also note that no force was used to remove Mr. Plummer and that he got out of his car voluntarily. This is untrue. In addition, Mr. Plummer states in his deposition that he was very scared and afraid of the police officers as they were in his house without permission, invitation, or warrant. (Plummer Dep. P. 81 -83).

Defendant's actions were outrageous and they were not in accordance with the D.C. Code. They have Defendants took measures to determine Mr. Plummer's identity and Mr. Plummer allowed Defendants to take his blood, to which they determined that he was medically fine. Even

16

after this determination, Defendants still, violently, broke into Mr. Plummer's window while he was in the car. Defendants claim that their actions were within reason and that there weren't any actions that placed Mr. Plummer in danger. These are material facts that are in dispute with respect to this issue.

**VIII. DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO COUNTS IV AND V BECAUSE THERE EXISTS GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER OR NOT THE DISTRICT CAN BE HELD LIABLE, PURSUANT TO 42 U.S.C. § 1983 AND PLAINTIFF CAN PROVE THE NEGLIGENCE CLAIMS WITHOUT EXPERT TESTIMONY.**

The Defendants argue that Plaintiff's claims for negligent training and supervision must fail because Plaintiff is unable to prove its negligence claims without the benefit of expert testimony. The Defendants claim entitlement to judgment as a matter of law. Plaintiff, on the other hand, vigorously disagrees with the premise advanced by the Defendants that expert testimony is required to prove either negligent training or negligent supervision.

In this case, the Plaintiff was arrested without a warrant inside of his garage for leaving after colliding, property damage, a violation of District of Columbia Code §50-2201.05(c). Plaintiff asserts that the District was negligent in the training that it provided to the officers that arrested plaintiff as well as negligent supervision of them. The District argument that since Plaintiff did not disclose an expert witness to testify on his behalf concerning the applicable standard of care it is entitled to judgment as a matter of law. The argument of the District is sown on fallow ground and accordingly is unsustainable.

In the District of Columbia expert testimony is required only where the subject that is presented is so distinctly related to science, a profession or occupation as to be beyond the ken of the average lay person. However, where negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience, the plaintiff is not required to present

17

expert testimony.  See *District of Columbia v. Arnold & Porter*, 756 A.2d 427, at 433 (D.C. 2000).

In the case at bar, the subject matter involved is not "distinctly' related to any science, profession

or occupation as to beyond the ken or realm of the average lay person.  To wit, whether the District

was negligent in providing training to the defendant police officers does not require expert

testimony.  Moreover, the training manuals and materials used in training police recruits establish

the standard of care.  Additionally, police personnel assigned to provide the training develop the

curriculum to be taught to police recruits.  They not only have the responsibility for training police

recruits but they are uniquely able to provide testimony regarding the standard of care expected of

police of officers.

Sergeant Darren Haskis, appearing as a 30 (b)(6) representative for the District, provided

the following testimony during his deposition on pages 11, line 14-21;12, lines 1-7:

"...Q. Are you able to tell me what the curriculum is, what you teach?

A. I teach basically laws that are—law enforcement as encountered by MPD in the
District of Columbia.

Q. What does that entail?

A. That entails everything from reasonable suspicion contacts, stops and frisks, arrest based
on probable cause for misdemeanors and felonies.  And our procedures in processing
arrests, handling prisoners,, and handling crime scenes, handling traffic scenes, handling
writing and issuing notices of infractions, violation citations. The gamut, basically, of what
MPD officers are expected to do..."

The defendants know that this is not a case with which a jury would be unable to grasp the

issues without the assistance of an expert testimony.  Moreover, facts surrounding arrest of Mr.

Plummer are not complex at all, capable of being understood by and within the realm of a

reasonably prudent lay person.  For instance, this case does not involves an issue with regard to

the use of a weapon, the use of excessive force, such as the cases law that the Defendant has cited

to support its contention that expert testimony is needed to establish the standard of care and any

18

deviation there from. The deposition testimony of Sergeant Haskis clearly establishes the standard of care and a jury will aptly be able to determine whether the police officers in questions adhered to or deviated from the applicable expectations imposed upon them. The Defendant's argument that expert testimony is required to establish the standard of care in this matter is of no moment.

In regard to the proposition that the record evidence does not support Plaintiff's negligent supervision claim is similarly without merit. In the case sub judice, Plaintiff's claim of negligent supervision is premised upon the fact that on July 5, 2014, Officer Nelson was partnered with and under the supervision of MPO Darryl Arrington. MPO Arrington was a training officer on July 4, 2014. See Deposition of MPO Arrington, Page 12, lines 14-18. According to MPO Arrington Officer Nelson was assigned to supervise and essentially monitor the activities of Officer Nelson. In his deposition, MPO Arrington stated that "I was supposed to record his activities and interaction with the citizens of the District of Columbia, assist him in doing various paperwork. Just overall monitoring of his demeanor, how he handles himself on the street. Just basically trying to keep him safe so he can make it home at the end of the tour..." See MPO Arrington's deposition, Pg 13, lines 1-20.

MPO Arrington and Officer Nelson both arrived at the scene at the same time in the same police vehicle. MPO Arrington, the senior of the two, had responsible for the express purpose of providing practical field training to Officer Anderson.

The claim of civil rights violations pursuant to 42 U.S.C. § 1983 is based on the on the court's ruling in *Monnell v. Department of Social Services*, 436 U.S. 658 (1978) which conclude:

> ... that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional

19

violation found by the District Court . .. we must reverse the judgment below. (436 U.S. 654, 703).

In the instant case, Officer Nelson and MPO Arrington were acting under color of law when they arrested Mr. Plummer. The Nelson report is proof that supports an assertion that the Metropolitan Police Department's customs and policies were invoked during the warrantless arrest; and thus, the case "unquestionably involves official policy as the moving force of the constitutional violation" committed by Officer Nelson and MPR Arrington.

Respectfully submitted,

/s/Tilman L. Gerald
Tilman L Gerald [928796]
Law Offices of Tilman L. Gerald
1220 L Street N.W. Suite 700
Washington D.C. 20005
202.742.2004 (tel)
202.742.2099 (fax)
tilmanlg@gmail.com
*Attorney for Plaintiff*

20

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Vere O. Plummer** | : | |
| | : | **Civil Action No. 15-cv-2147 (RDM)** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **District of Columbia, et al.** | : | |

PLAINTIFF'S RESPONSES TO THE DEFENDANTS'
STATEMENT MATERIAL FACTS AND PLAINTIFF'S STATEMENT
OF ADDITIONAL FACTS REQUIRING DENIAL OF
THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW, Vere O. Plummer, Plaintiff herein, by and through counsel, hereby submit his Response to the Defendants' Statement of Material Facts and Plaintiff's Statement of Additional Facts Requiring Denial of the Defendants' Motion for Summary Judgment as follows:

1. Plaintiff Vere Plummer lives at 1222 Fairmont Street, NW, Washington.

RESPONSE: Disputed to the extent that the Defendants do not indicate whether the Plaintiff lives in the state of Washington or Washington, D.C. In further response, Plaintiff resides at 1222 Fairmont Street, N. W., Washington, D.C.

2. Plaintiff is an attorney license (sic) to practice law in the District of Columbia and Maryland. Ex.1-Pl Dep.7;21-9-11.

Response: Disputed. However, Plaintiff does not dispute that he is attorney licensed to practice law in the District of Columbia. He dispute that he is licensed to practiced law before the state courts in the state of Maryland.

3. On July 4, 2014, Plaintiff went to a friend's house in Maryland for a Fourth of July gathering. Pl. Dep.P27:19-P30:15.

Response: Undisputed.

1

4.  While at Ms. Robinson's home, Plaintiff drank at least a "couple" of beers and drank punch that contained hard liquor. Pl. Dep. P32:3-4(Q How many beers did you have. A. I'm not sure, but a couple.); P32:5-9; P34:2.

    Response: Disputed. In further response, Plaintiff's complete answer is that he consumed a couple of beers during the time he was at the residence he consumed s couple of beers the last of which was between 7:00 p.m./8:00p.m. When asked if whether other than beer and wine, was there any hard liquor there, Plaintiff responded that it could have been and that he may have had a punch that may have had something in it but that he really did not recall. Plaintiff did See Pl. Dep. P32:4-9;Pl. Dep. P:33:16-22; P34:2.

5.  Plaintiff arrived home at approximately 2:45 am. Pl. Dep. 39:9-13; 40:16-19.

    Response: Disputed. Plaintiff's left downtown at approximately 2:45 a.m.

6.  When Plaintiff reached his house, he drove down behind his house to park in his garage. Pl. Dep. P41:5-12.

    Response: Undisputed.

7.  Across the alley from Plaintiff's garage was a garage belonging to Kenneth Taylor. Pl. Dep. P41:19-P42:8.

    Response: Undisputed.

8.  Plaintiff lost control of his car and struck Mr. Taylor's garage, damaging the frame of the garage. Pl. Dep. P46:20-22; P54:18-P:55-4 (Exhibit 4) Deposition Exhibit 3).

    Response: Disputed to the extent that Plaintiff did not state that he lost control of his car.

9.  When the police arrived on the scene, Plaintiff called 911, and the call lasted for 16 minutes. Ex. 9

    Response: Undisputed.

2

10. When the 911 operator asked Plaintiff is (sic) he had crashed into someone's garage, Plaintiff denied hitting a garage. Ex. 9 at 1:20-1:28("No, I did not, I'm in my garage,"); at 3:00-3:14("No vehicle has crashed. There is no crash here.").

Response: Undisputed, but this is not a material fact. At the time of the arrest of the neither Officer Nelson nor MPO Arrington were not privy to this conversation. Also, there was no crash.

11. Plaintiff asks one of the police officers what garage did he hit, and when the officer told him he denied striking Taylor's garage.  Ex. 9 at 6:50-7:30 (These people are lying on me, telling me that I hit a garage.").

Response: Undisputed.

12. Plaintiff told the 911 operator, "I'm sitting here listening to my music minding my own business." Ex. 9 at 6:50-7:30.

Response: Undisputed, but this is not a statement of material fact.

13. Plaintiff told the operator several times that he wants to go home or that he wants to go to sleep. Id. At 3:18 ("I'm  trying to go into my house..."); at 3:51 ("I want these people from in front of my car so that I can go into the house."; at 6:24 ("you need to get these people from in front of me. Cause I need to go into my house: at 9:25 ("I want to go home and go to bed.  I can't, I cannot go home and go to bed."), at 10:35 ("...its five o'clock in the morning and I want to go to sleep,"; at 11:21 ("This is false imprisonment, because I can not move out of my car. I can't go home and go to sleep,"; and at 13:13 ("I am under seize, I want to go to bed,".

3

Response: Undisputed but this is not a material fact as the Defendants were not aware of the content of the call that Plaintiff made to 911 prior to arresting Plaintiff on the morning of July 5, 2015.

14. At no time during his 911 call did Plaintiff acknowledge that he damaged or even hit Mr. Taylor's garage. Ex. 5-Pl. 911 Call.

Response: Plaintiff disputes whether this is a material fact as the Defendants did not know of nor were they aware of the contents of Plaintiff's conversation with the 911 operator prior to arresting the Plaintiff.

15. Plaintiff told the 911 operator "I've done absolutely nothing. Hello." Pl. 911 Call.

Response: Undisputed, but Plaintiff disputes whether this is a material fact as the Defendants did not know of nor were they aware of the contents of the telephonic conversation that Plaintiff had with the 911 operator prior arresting the Plaintiff.

16. There were no visible signs of a pothole prior to July 5, 2014. Pl. Dep. P. 119:16-17 (so that day if you come out and look at that, you would never see a hole.).

17. Response: Undisputed.

18. When the window was broken, Plaintiff stepped out of his car. Pl. Dep.76:20-77.1

Response: Undisputed. Plaintiff exited his vehicle only after the front passenger window was broken by the Defendants.

19. Plaintiff's license had been suspended as of May 19, 2014 as a result of an unpaid ticket in Virginia. Exh. 13.

Response: Undisputed. The Plaintiff had already paid the ticket prior to receiving notice that his permit had been suspended. Plaintiff submits that this is not a fact material to any issue in this case and did justify the warrantless arrest of the Plaintiff on July 5, 2014.

4

20. Plaintiff's garage is located in the rear of his house and is accessible through a common alley way that separates the 1200 block of Fairmont Street from the 1200 block of Euclid Street. (Exh. 2-Declaration ("Decl") of Edwin Landrum ¶ 3).

Response: Undisputed, however, this does not constitute a material fact.

21. Residents of Euclid Street also access their garage through the same common alleyway. Landrum Decl. ¶4.

Response: Undisputed, however, this is not a material fact.

22. Edwin Scott Landrum lived at 1221 Euclid Street, and was at home sleeping when Plaintiff crashed into Mr. Taylor's garage. Landrum Decl. ¶¶2,3.

Response: Plaintiff objects to the characterization the he crashed into Mr. Taylor's garage. He does not know what Mr. Landrum was doing at the time of the incident. If he is required to provide a response Plaintiff states that Mr. Landrum's statement does not constitute a material fact and accordingly is disputed.

23. Mr. Landrum was woken from his sleep because he heard "a noise that sounded like a car crash" and he heard "engine of a car running". ¶7

Response: Plaintiff incorporates by reference his response to No. 22.

24. Mr. Landrum walked down the alley and saw Plaintiff's car against Taylor's garage.

Response: Disputed.

25. Walking down the alley, Mr. Landrum saw "that a black sedan had crashed into the garage belonging to Mr. Taylor," his neighbor. Id. ¶9

Response: Disputed. Mr. Landrum did not see Plaintiff strike the garage.

26. Mr. Landrum observed that "the car's engine was still running, the car was in the drive position and the lights were on." Landrum Decl. ¶9

5

Response: Disputed.

27. Mr. Landrum observed a lot of smoking coming from the car because its tires were spinning, which then created a hole in the road surface of the alleyway. *Id.*, ¶10

Response: Disputed. Plaintiff has no way of knowing what Mr. Landrum observed.

28. Mr. Landrum saw Plaintiff sitting in the driver's seat, with his head "slumped against the steering wheel." Landrum Decl. ¶¶12-14

Response: Disputed, Plaintiff's head was not "slumped against the steering wheel" as Mr. Landrum asserts.

29. Plaintiff appeared to Mr. Landrum to be unconscious. Landrum Decl. ¶13.

Response: Disputed. Plaintiff at no time lost consciousness.

30. Mr. Landrum called 911 and reported, in real time, what he was observing. Landrum Decl. ¶¶ 9 and 12, Ex. 5-Landrum's 911 Call.

Response: Disputed. This is not a material fact. Plaintiff has no way of knowing what Mr. Landrum did or did not do.

31. According to Mr. Landrum, Plaintiff backed his car into his own garage but only after making four attempts to do so. Landrum Decl. ¶16.

Response: Undisputed to the extent that Plaintiff's recollection is that he took more than a single time to back his car into his garage.

32. The surface of the alley road way was in good condition. Landrum Decl. ¶16.

Response: Disputed to the extent that the statement fails to indicate a relevant time period.

Gary Cooper

6

33. Gary Cooper, lived at 1221 Euclid Street, and was home sleeping when Plaintiff crashed into Mr. Taylor's garage. Ex. 3-Cooper Decl. ¶6

Response: Disputed. Plaintiff has no way of knowing what Mr. Cooper was doing. Further, Plaintiff disputes the characterization that he crashed into Mr. Taylor's garage as Mr. Cooper did not witness any crash.

34. Mr. Cooper was awakened from his sleep "by the smell of something burning." Cooper Decl. ¶6.

Response: Disputed to the extent that Plaintiff does not know exactly what Mr. Cooper smelled or what awakened him.

35. When Mr. Cooper went into the alley he saw Plaintiff's car against Mr. Taylor's garage. Cooper Decl. ¶7 .

Response: Disputed. Mr. Cooper did not see Plaintiff's vehicle against the Taylor garage.

36. Mr. Cooper observed a large amount of smoke from the spinning of the Plaintiff's car's tires. Cooper Decl. ¶7.

Response: Disputed, Plaintiff's tires was not the source of any smoke.

37. Mr. Cooper recognized the car as a black Jaguar that belonged to Plaintiff. Cooper Decl. ¶8.

Response:  Undisputed. Mr. Cooper may have known that Plaintiff owns a Black Jaguar.

38. Mr. Cooper observed Plaintiff with his head down and his chin pressing against the upper portion of his chest." Cooper Decl. Cooper Decl. ¶10

Response: Disputed to the extent that Mr. Cooper does not specifically indicate when he saw Mr. Plummer with his head down and his chin pressed against the upper portion of his chest.

7

39. Because the driver side window was down, Mr. Cooper was able to reach into the car and "shook Mr. Plummer very hard but he was unresponsive." Cooper Decl. ¶11.

Response: Disputed, Plaintiff has no recollection of Mr. Cooper shaking him as he states. This statement is not material to any issue in this matter.

40. Plaintiff responded the second time MR. Cooper shook him. Cooper Decl. ¶11; Pl. Dep. P63:4-6 (Mr. Cooper "banged on the side [of the car], and woke me up.")

Response: Undisputed to the extent that Plaintiff indicates that Mr. Cooper rather did not shake him "a second time". He banged on the side of Plaintiff's vehicle according to Plaintiff.

41. Mr. Cooper offered to help Plaintiff but Plaintiff "waived him off." Cooper Decl. ¶11

Response: Undisputed.

42. The roadway in the alley as being in "good condition." Cooper Decl. ¶9.

Response: Disputed to the extent since the statement does not refer to a specific time period. .

43. The 911 operator sent the police to investigate. Ex. 9-Arrington Dep. P22:9-2

Response: Disputed to the extent that Plaintiff does not know who sent the police to investigate.

44. Master Patrol Officer Darryl Arrington ("MPO Arrington"), MPO was the training officer for Officer Nelson. Arrington Dep. P12:12-P13:20.

Response: Undisputed as per the deposition testimony of MPO Arrington.

45. MPO Arrington determined that Mr. Plummer caused the accident, because the damage was consistent with the damage on the garage. Arrington Dep. P31: L.4-12.

8

Response: Disputed to the extent that it is unclear how MPO Arrington determined that Mr. Plummer caused the accident.

46. MPO Arrington took pictures of the scene. Ex. 4

Response: Disputed.

47. MPO Arrington observed that there was paint transfer consistent with his vehicle. The burnt rubber that was on the alley also determined this prediction. Arrington Dep. P31: L.4-12.

Response: Disputed. Plaintiff's tires did were not damage or burnt as result of the being stuck in the hole in the alley. What MPO Arrington may have thought was debris from Plaintiff's tires was the material used to pave the alley.

48. MPO Arrington observed Plaintiff slumped over as if he was sleep, and he would open and close his eyes. Arrington Dep. P119:15-21.

Response: Disputed. Though that is the testimony of MPO Arrington, it is consistent with the defendant's version of the events and facts that led up to the warrantless arrest of the Plaintiff.

49. Plaintiff was mumbling. Arrington Dep. P119:15-21.

Response: Disputed. What MPO Arrington said was the Plaintiff would mumble some words, not that he was mumbling. Again, it is consistent with the Defendants version of the facts and events that led up to the warrantless arrest of the Plaintiff and the states are calculated to justify the warrantless arrest of Plaintiff for a misdemeanor that did not occur in the presence of MPO Arrington or Officer Nelson.

50. Plaintiff "cranked up his car occasionally." Arrington Dep. P119:15-21-P12:6.

9

Response: Disputed. The defendants have asserted that Plaintiff was unconscious, asleep yet he apparently awoke to start his vehicle.

51. MPO Arrington gave Plaintiff several commands to "step out of the vehicle" but Plaintiff refused to do so. Arrington Dep. P49:918; P51:12-17

Response: Disputed. MPO Arrington and his fellow police officers had no right to be on Plaintiff's property without a warrant.

52. MPO Arrington wanted Plaintiff to get out of his car so that he could check on Plaintiff's "welfare". Arrington Dep. P51:1-6.

Response: Disputed. Again, that is consistent with the Defendant's version of the facts and events leading up to the warrantless arrest of Plaintiff for a misdemeanor offense that did not occur in the presence of either Officer Nelson or MPO Arrington.

53. MPO Arrington explained that "any time there's an accident, we would car for ... [FEMS] to come out and do an assessment of the operator of the vehicle to see if they've been injured or if they've been drinking." Arrington Dep. P30:3-9

Response: Disputed. That is the deposition testimony of MPO Arrington which again is very consistent with the Defendants' version of the facts and events leading up to the warrantless and illegal arrest of the Plaintiff for a misdemeanor traffic offense that did not occur in the presence of either Officer Nelson or MPO Arrington.

54. MPO Arrington, as the senior officer on the scene, made the decision that Plaintiff was going to be arrested for failing to make his identity known after hitting Mr. Taylor's garage. Arrington Dep. At P61:13-16; P62:1-12.

Response: Undisputed, however, the deposition testimony of MPO Arrington is consistent with the Defendant's version of the facts and events to justify the warrantless

10

arrest of the Plaintiff for a misdemeanor traffic offense which did not occur in the presence of Officer Nelson, Officer Lukanovic or MPO Arrington.

55. MPO Arrington testified that he believed that Plaintiff's arrest was authorized under District law. Arrington Dep. At P64:13-65:7

Response: Disputed. This an opinion offered by MPO Arrington offered to justify the arrest of Plaintiff without a warrant. Officer Arrington knew or had reason to know that under the laws of the District of Columbia, a police officer is unable to make an arrest for a misdemeanor without a warrant unless the misdemeanor occurs in his presence, unless he can demonstrate that the person may not be apprehended, may cause injury to others, or may tamper with, dispose, of or destroy evidence. MPO. Arrington statement is in furtherance of the version of the facts and events that the Defendants are seeking to use to justify the warrantless arrest of the Plaintiff.

Officer Nelson

56. When Officer Nelson first arrived on the scene he saw damage to a garage black substance and what looked to be a tar like substance possibly burning rubber sprayed through the alley. Ex. 7-Nelson Dep. P16:14-21; P17:1-2.

Response: Disputed.

55. Officer Nelson observed white paint transfer that was consistent with the color of the garage on Mr. Plummer's vehicle. Nelson Dep. P20:14-16.

Response: Disputed. Officer Nelson, did not have the expertise to determine    what he characterized as "paint transfer" purportedly found on Plaintiff's vehicle matched or was identical to the paint on the Mr. Taylor's garage or that markings were there prior to July 5, 2014. The term "paint transfer" is the same characterization used by MPO Arrington.

11

*56. Officer Nelson observed Plaintiff "passed out." Nelson Dep. P15:13-16 (Q.

And why did you believe that he was intoxicated? A. He was passed out behind the

wheel of his running car.); P17:1-4, P35:1-2.

Response: Disputed. This statement is taken out of context and the testimony is in

furtherance of the version of the facts and events that the Defendants are trying to utilize

to justify the illegal and warrantless arrest of the Plaintiff for a misdemeanor traffic

offense that did not occur in the presence of Officer Nelson, Officer Lukanovic or MPO

Arrington.

57. Officer Nelson "didn't know whether [they] had … someone who was intoxicated or

someone who was having a medical emergency." Nelson Dep. P16:1-3.

Response: Disputed. Again, this is an attempt by Officer Nelson to justify the arrest of

Plaintiff without a warrant, probable cause and in violation of the civil rights of the

Plaintiff.

58. Officer Nelson believed that there was probable cause to believe that Plaintiff was

intoxicated. P47:1-12.

Response: Disputed.  Officer Nelson admitted that he had no formal training that would

have enabled him to make a determination or to recognize when one is intoxicated.

59. Officer Nelson believed that probable cause was supported by what Landrum and Cooper

had told him. Nelson Dep. P25:10-16.

Response: Disputed. Neither Mr. Landrum nor Mr. Cooper was present when Mr.

Plummer accidentally hit Mr. Taylor's garage. See Declarations of Mr. Landrum and Mr.

Cooper.

12

60. The fire department was called when Plaintiff refused get out of his car. Nelson Dep. P16;4-7.

Response: Disputed to the extent that Plaintiff has no way of knowing why the fire department was called.

61. Officer Nelson was the arresting officer. Nelson Dep. P72:17-P77:4; Ex. 11-Arrest Report.

Response: Undisputed.

62. Officer Nelson testified that he should have arrested Plaintiff for driving while intoxicated but because was a new officer he made a "rookie mistake". Nelson Dep. P53:7-21.

Response: Disputed. Though this what Officer Nelson said, the Plaintiff was not intoxicated and though he was in his vehicle he was not operating it under while intoxicated or under the influence of alcohol. This is not a material fact.

63. Nelson testified that he believed that Plaintiff was either intoxicated or having a medical emergency. Nelson Dep. P15:13-P16:3.

Response: Disputed. Though he testified as to what he believed was the case, this is merely his opinion. He has no training that would enable him to render such an opinion and further it is offered to justify the illegal arrest of the Plaintiff.

64. Officer Nelson testified that he should have arrested Plaintiff for driving while intoxicated but because he was a new officer he made a "rookie" mistake. Nelson Dep. P42:6-20; P53:7-54:3.

Response: Disputed to the extent that this statement represents an opinion of Officer Nelson.

13

65. Plaintiff 'revved" the engine to his car. Nelson Dep. P101:3-15.

Response: Disputed. Officer Nelson's testimony was that he could not remember if Plaintiff's vehicle was running.

66. Officer Nelson believe (sic) that there was probable for arresting Plaintiff for leaving after colliding and driving under the influence totality of the circumstances. Nelson Dep. P22:1-3.

Response: Disputed. The Plaintiff did not leave the vicinity of the incident and was only a few feet from the Taylor garage.

67. Officer Nelson spoke with Landrum and Cooper who told him what they had observed. Nelson Dep. P24:4-21.

Response: Undisputed, however, but this is not a material fact which would serve to justify the arrest of the Plaintiff under the attending circumstances.

68. Officer Nelson believed that Plaintiff had the opportunity to report the accident at the time he hit Taylor's garage but did not do so. Nelson Dep. P53:7-21.

Response: Disputed. Officer Nelson nor MPO Arrington ever spoke to Mr. Taylor at all during their investigation of this matter. It is reasonable to believe that since the incident occurred early, that Plaintiff would have spoken to Mr. Taylor later in the morning but did not have the opportunity to do so.

69. Officer Nelson did not discuss with Officer Lukanovic what charges he was going to bring against Plaintiff. Nelson Dep. P137:8-17.

Response: Disputed.

Officer Sandro Lukanovic

70. Officer Sandro Lukanovic he responded to a call about "a man striking a garage door with a green vehicle."

Response: Disputed. Plaintiff truly does not know why Officer Lukanovic responded or what he was told. If he was responding to a call re a man driving a green vehicle striking a garage door, the he apparently was not at the right place.

71. Upon arriving at the scene Officer Lukanovic entered Plaintiff's garage without permission because he determined that there was probable cause to believe Plaintiff's car had struck Mr. Taylor's garage because there was damage to the garage and to Plaintiff's vehicle. Lukanovic Dep. P47:19-48:17.

Response: Disputed. Plaintiff's vehicle is a Black Jaguar not green.

72. Officer Lukanovic testified that when he asked Plaintiff to get out of the car Plaintiff started to act "strange and erratic' by calling 911 to report that there were strange men in his garage. Lukanovic Dep. P58:10-21.

Response: Disputed. Officer Lukanovic's testimony is in furtherance of the version of the facts, events and circumstances the defendants are attempting to use to justify the illegal and warrantless arrest of the Plaintiff for a misdemeanor traffic violation which did not occur in his presence or in the presence of Officer Nelson or MPO Arrington.

73. According to Officer Lukanovic, Plaintiff was sleeping behind the steering wheel with the engine running. Lukanovic Dep. P62:16-21; P98;17-18 ("we walked in and found Mr. Plummer asleep behind the wheel.").

Response: Disputed. See Plaintiff's response to No. 72.

15

74. Officer Lukanovic knocked on the window at which point Plaintiff looked up and as Officer Lukanovic "what are you doing?" Lukanovic Dep. P63:1-5.

Response: Disputed. See Plaintiff's response to No. 72.

75. Officer Lukanovic saw the damage to Mr. Taylor's garage door. Lukanovic Dep. P. 96:14.

Response: Disputed. See Plaintiff's response to No. 72

76. *When Officer Lukanovic entered Plaintiff's garage the car was running and Plaintiff was behind the steering wheel and Plaintiff appeared to be sleeping. Lukanovic Dep. P62:16-21; P98:17-18 ("we walked in and found Mr. Plummer asleep behind the wheel.")

Response: Disputed. According to Officer Nelson and MPO Arrington when they arrived on the scene they were the first officer to respond and went into Plaintiff's garage. Officer Lukanovic was not present at that time but supposedly arrive later.

78. Plaintiff's car doors were locked.

Response: Undisputed.

79. When Officer Lukanovic knocked on the car window Plaintiff looked up and asked Officer Lukanovic "what are you doing?" Lukanovic Dep., P63:1-5.

Response: Disputed.

80. Officer Lukanovic described Plaintiff as acting "strange and erratic" because Plaintiff calling 911 to report that there were "strange men' in his garage. *Id.*, P58:10-21.

Response: Disputed. Plaintiff was in fear for his safety and well being because he had do nothing to warrant the intrusion that was visited upon him by the Defendant police officers.

16

81. As Plaintiff continued to talk to the 911 operator, Officer Lukanovic was asking Plaintiff to get out of the car. Lukanovic Dep. P59:1-11.

Response: Disputed.

82. Officer Lukanovic asked Plaintiff several times to open his car door P59:1-11.

Response: Disputed.

83. Officer Lukanovic concluded that there was reasonable suspicion to investigate the accident based on the description of the car from the 911 dispatcher and the damage to the garage door and Plaintiff's car. Lukanovic Dep. P96:7-21.

Response: Disputed. According to MPO Arrington, the investigation was conducted by him and Officer Nelson.

84. Officer Lukanovic believed that Plaintiff violated the law when he parked his car in the garage after the accident and fell asleep without making his identity known. Lukanovic Dep. P101:11-21.

Response: Disputed. See Plaintiff's response to No. 72. In further response the officers at the scene knew the identity of the Plaintiff or should have known by asking Mr. Landrum and Mr. Cooper.

85. Officer Lukanovic left the scene before Plaintiff and he had no involvement with criminal charges being brought against Plaintiff he did not prepare the arrest report, and had no input to the report because he was checking off as his shift was ending. Dep. P37:15-P38:19; P55:8-11 (Q So after you signed off, you were done with this case. A Yes, sir. I was -I was checking off.); P56;13-19 (I didn't review the arrest paperwork because I didn't make the arrest ..."); P. 37:L. 19-21 P. 38:L. 1-11.

17

Response: Undisputed to the extent that Officer Lukanovic may have left the scene before Plaintiff was transported to jail.

Battalion Fire Chief Henry Welsh, III

86. Battalion Fire Chief Henry Welsh, III, testified that he went to the scene after receiving a call for assistance from Sergeant Johnny Butler, an officer on Fire Truck Company 6. Ex. 10-Welsh Dep. P6:14-19; P12-19.

Response: Undisputed. However, while that may have been Chief Welsh's testimony it is not a material fact.

87. When he arrived on the scene he saw the damage to the garage, a tire mark on the roadway, and he could smell the burning rubber. Welsh Dep. P15:17-P16:4.

Response: Disputed.

88. Chief Welsh was dismayed when he approached Plaintiff's car because the car was still in gear, possibly in the drive position. Welsh Dep. P16:1-14.

Response: Disputed. Chief Welsh had no way of knowing if the Plaintiff's vehicle as still in gear or the drive position.

89. Chief Welsh he tried to tell Plaintiff to get out of the car to be medically checked but Plaintiff would respond by asking "Why do I have to get out of the car?" Welsh Dep. P16:15-P17:1.

Response: Disputed.

90. Chief Welsh tried to explain to Plaintiff "i[n] every which way I could, that we just needed to get him out of the car to take a look at him. Welsh Dep. P17:2-21.

Response: Disputed.

18

91. Chief Welsh testified that although Plaintiff told him that he was okay, Plaintiff did not appear to be okay, based on Chief Welsh experience of being an EMT since 1983. Welsh dep. P17:8-15.

Response:

92. Plaintiff appeared "glazed". Welsh Dep. P19:10-20.

Response: Disputed.

93. Chief Welsh told Plaintiff that if he let the EMT check his sugar, the fire department would leave if everything was fine. Welsh Dep. P18:16-P19:9.

Response: Disputed.

94. Once out of the car, Plaintiff's sugar was checked and found to be a little high but otherwise Plaintiff was medically okay. Welsh Dep. P24:5-8.

Response: Undisputed.

Officer Hakan Huseyin Karaali

95. When Plaintiff was transported to the Third District police station he was given the Standardized Field Sobriety Test (SFST) by Officer Hana Huseyin Karaali, an MPD certified SFST officer. Ex. 12-Karaali Decl.

Response: Undisputed.

96. Plaintiff failed the test because he found not passed HGN test, which test for rapid eye movement common in people who are intoxicated. Karaali Decl.

Response: Disputed.

97. Plaintiff also failed the physical portion of the SFST test because he could not do the heal-to-toe steps ,made improper turns, and used his arm and the cell wall to keep his balance Karaali Decl.

19

Response: Disputed. Plaintiff was not able to complete the test due to physical limitations involving his back.

98. Officer Karaali recommended that Plaintiff be charged with DUI. Karaali Decl.

Response: Undispute.

99. On January 13, 2015, the District received Plaintiff's purported § 12-309 notice letter. Ex. 14-Decl. Of Lena Craven.

Response: Undisputed.

100. The letter is dated January 4 2015, but the post mark on the envelope   January 5, 2015. Craven Decl.

Response: Undisputed.

101. The facts in Officer Nelson's report detail a lawful arrest based his own observation and statements from witnesses. Ex .11.

Response: Disputed. The report details an unlawful arrest without a warrant for a misdemeanor traffic offense that did not occur in the presence of Officer Nelson.

102. Here, there is no record evidence that the District failed to use reasonable care supervising Lieutenant Kutniewski, Officers Lukanovic, and Nelson, or Chief Welsh.

Response: Disputed. The evidence details that the MPO Arrington failed to properly supervise Officer Nelson, who was assigned to him for field training.

103. There is not record evidence that any of these individuals had a proven history of violating the constitutional rights of citizens.

Response: Undisputed.

104. There is no record evidence that any Lieutenant Kutniewski, Officers

20

Lukanovic and Nelson, or Chief Welsh employee had been disciplined or   the subject of any form of internal investigation.

Response:

105. There is no record evidence that any of these individuals were incompetent in conducting accident investigation such that close supervision or additional training was required, or that my supervision failed to reform his or her duties in an inappropriate manner.

Response: Disputed. The record reveal that the subject officers disregarded the laws that they have sworn to uphold and the actions taken in arresting Plaintiff without a warrant was contrary to the training, procedures and laws of the District of Columbia.

106. Moreover, there is no record evidence the MPD officer or FEMS employees were improperly trained or that there was a wide spread problem with the MPD and FEMS training programs relating to accident investigations,

Response: Disputed. The Washington Post did an article on the MPD in January 7, 2017 detailing the unfortunate miscues of the MPD which causes  distrust among the citizenry and which has been costly to the city in terms of damages paid.

107.There is no evidence that Lieutenant Kutniewski or Officer Lukanovic had any involvement criminal charges being brought against Plaintiff.

Response: Disputed. Lt. Kutniewski, the watch commander for that shift, was in communications with MPO Arrington re the decision to forcibly extract Plaintiff from his vehicle.  Officer Lukanovic was on the scene prior to the time that Plaintiff was removed from his car.

21

108. Lieutenant Kutniewski never went to the scene, and there is no evidence that he approved, direct, or ordered the arrest of Plaintiff.

Response: Undisputed to the extent that Lt. Kutniewski was not at the scene. As the watch commander he had responsibility for the supervision of the officers on duty for that shift including Officers Nelson, Lukanovic and MPO Arrington.

109. Moreover, there is no evidence that Lieutenant Kutniewski had an contact With Plaintiff when Plaintiff was at the Third District Police Station.

Response: Undispute.

Arron Horton

110. Arron Horton is responsible for overseeing the District's Department of Transportation Street and Bridge Maintenance Branch, which is responsible for road repair. Ex. 15-Horton Dep. P8:2-P9:2.

Response: Undispute.

111. Prior to July 5, 2014, DDOT has no records of any complaints regarding the alley at issue. Horton Dep. P32:18-21.

Response: Undisputed.

112. There were no records of any repaired being aide in the alley within five year prior to the incident. *Id.*, P31:3-13.

Response: Undisputed.

113. There is no evidence as to how long the pothole has existed.

Response: Undisputed.

22

## STATEMENT OF ADDITIONAL FACTS

The Plaintiff hereby asserts the following additional, undisputed material facts that require the denial of Defendants Motion for Summary Judgment;

1. That Plaintiff was arrested on July 5, 2014, without a warrant and without probable cause.

2. That Plaintiff was arrested for leaving after colliding, property damage, but the offense did not occur in the presence of Officer John Nelson, the arresting officer. See Deposition of John Nelson, P36, lines 3-5.

3. That MPO Arrington assigned to train Officer Nelson. Deposition of MPO Arrington, P13, lines 1-21.

4. That in arresting the Plaintiff for leaving after colliding, property, damage, Officer Nelson and MPO Arrington did not follow the protocol established by the §23-581 of the District of Columbia Code.

5. That in arresting Plaintiff for a misdemeanor traffic offense that did not occur in his presence without a warrant, Officer Nelson violated the 4th Amendment rights of the Plaintiff.

6. That according to the curriculum taught to police officers a warrantless arrest for a misdemeanor not committed in the presence of the officer, a warrant is required unless the officer articulate that unless the person is arrested immediately he or she may (i) not be apprehended; (ii) cause injury to others; or (iii) tamper with, dispose of or destroy evidence. See text of §23-581 of the District of Columbia Code and Laws Arrest curriculum.(Exhibit No. 6)

23

# EXHIBIT ONE

DEPOSITION OF OFFICER DARRYL ARRINGTON

Q.   All right.  Now, where were you assigned on July 4th, 2014?

A.   The Third District.

Q.   And where is that?

A.   1624 V Street, Northwest.

Q.   And how long have you been assigned there?

A.   Twenty -- my whole career.

Q.   Okay.  And did you have a specific assignment at the Third District?

A.   No.

Q.   What were your duties as of July 4th, 2014?

A.   I was assigned to PSA 304, I believe.  I was training -- I was a training officer.  I had a partner with me that day, and I was assigned to PSA 304.  We were just on a -- out patrolling.

Q.   You had a partner with you on July 4th?

A.   Yes.

DEPOSITION OF OFFICER DARRYL ARRINGTON

Q.    Who was that?

A.    Officer Nelson.

Q.    And how long has Officer Nelson been on the force?

A.    I have no idea how long he's been on.

Q.    I said how long had he been when he was with you?

A.    Oh, a short period of time.  Maybe -- a few months, maybe.

Q.    A few months?

A.    Yes.

Q.    And what responsibilities were you given with respect to Officer Nelson?

A.    I was supposed to record his activities and interaction with the citizens of the District of Columbia, assist him in doing various paperwork.  Just the overall monitoring of his demeanor, how he handles himself on the street.  Just basically trying to keep him safe so he can make it home at the end of the tour.

Q.    And your tour lasted from what time?

# EXHIBIT TWO

arresting the gentleman.

Q.    Okay.  Do you know the facts that led up to the arrest of the gentleman, as you say?

A.    Apparently, the gentleman was found in a garage abutting a public alley.  They believed that they had a medical emergency, the police on scene, and they called in the fire department.  And apparently the fire department assisted the police on scene in gaining access to the vehicle.

Q.    Okay.  Now, I think you said that part of the curriculum that you teach relate to constitutional law?

A.    Yes, sir.

Q.    Are you able to tell me what the curriculum is, what you teach?

A.    I teach basically laws that are -- law enforcement as encountered by MPD in the District of Columbia.

Q.    What does that entail?

A.    That entails everything from reasonable suspicion contacts, stops and frisks,

arrests based on probable cause for misdemeanors and felonies.  And our procedures in processing arrests, handling prisoners, and handling crime scenes, handling traffic scenes, handling writing and issuance of notices of infractions, violation citations.  The gamut, basically, of what MPD officers are expected to do.

Q.    All right.  So that as it relates to the 4th and 14th Amendment; is that a fair statement?

A.    Yeah, the 4th Amendment, absolutely.

The 14th Amendment?  Can you refresh my memory on the 14th?

Q.    The 14th --

A.    I'm sorry, the 4th Amendment is something that will --

Q.    Due process.

A.    Yes, yes.  Absolutely, yes.

Q.    And as described in terms of your powers under the 10th Amendment, all of that works -- you teach that as well?

# EXHIBIT THREE

**1.4.3 - LAWS OF ARREST**                                                           3

## METROPOLITAN POLICE DEPARTMENT
Institute of Police Science

### PERFORMANCE OBJECTIVES

| SUBJECT: Laws of Arrest | PROGRAM: Lateral Transfer |
| --- | --- |

4.4.3.1 Define "Police Powers"

4.4.3.2 Define Arrest

4.4.3.3 Define constitutional requirement for a lawful arrest

4.4.3.4 Describe and list the elements of an arrest

4.4.3.5 Describe the requirements of an arrest without a warrant

4.4.3.6 Discuss who can arrest other than police officers

4.4.3.7 Demonstrate when and what force can be used to make an arrest

D.C.-15 CV 2147- 000150

| Elapsed Time | Laws of Arrest | Instructor Notes |
|---|---|---|
| (0:10) | **4.4.3.1    DEFINE "POLICE POWERS"**<br><br>Police Powers are authorities conferred by the United States Constitution (Tenth Amendment) upon the individual states to enforce rules and regulations.<br><br>Because the right to privacy is so highly valued in our free society, the Fourth Amendment places specific limitations or restrictions on certain police powers.  Police powers are divided into two classifications:<br><br>o  Investigative Powers<br>o  Arrest Powers<br><br>Investigative powers include but are not limited to:<br>1.  The power to stop<br>2.  The power to frisk for self protection only<br>3.  The power to order someone out of a car<br>4.  The power to question<br>5.  The power to detain<br><br>Police arrest powers are:<br>1.  The power to use force<br>2.  The power to search<br>3.  The power to exercise seizure and restraint | Overhead #1 and handout #1 |
| (0:15) | **4.4.3.2    DEFINE "ARREST"**<br><br>An arrest is defined as the taking of a person into custody against his or her will for the purpose of criminal prosecution or interrogation (Dunaway v. New York, 442 U.S. 200 [1979]).  An arrest deprives a person of liberty by legal authority.  Mere words alone do not normally constitute an arrest.  There must be some kind of restraint.  A person's liberty must be restricted by law enforcement officers to the extent that the person is not free to leave at his own volition.  It does not matter whether the act is termed an arrest or a mere stop or detention.  When a person has been taken into custody against his or her will for purposes of criminal prosecution or interrogation, there is an arrest under the Fourth Amendment.  On the other hand, no arrest or seizure occurs when an officer simply approaches a person in a public place and asks if he or she is willing to answer questions as long as the person is not involuntarily detained. |  |
|  | **4.4.3.3    CONSTITUTIONAL REQUIREMENT FOR A LAWFUL ARREST** | Overhead #2 |

D.C.-15 CV 2147- 000151

| Elapsed Time | Laws of Arrest | Instructor Notes |
|---|---|---|
| | In order for an arrest to be valid, police MUST comply with requirements of the Fourth Amendment, as interpreted by the U.S. Supreme Court and the laws of the District of Columbia.<br><br>The right of a person to be secure in their person, protects citizens from illegal seizures of their persons, which is an arrest.<br><br>An Arrest Based on less than Probable Cause Is Illegal.<br><br>REQUIREMENTS OF A LAWFUL ARREST<br>There are four factors which must be met for a lawful arrest:<br><br>1. THE ARREST MUST BE MADE WITH LAWFUL AUTHORITY<br>The arrest must be made by lawful authority, that is: The officer has properly identified himself as an officer by being in uniform, showing his badge of authority, or where the person is apprehended in the commission of an unlawful act.<br><br>Example:      An off-duty officer who walks into a store and finds a robbery/holdup in progress is not required to first display his badge in order to make the arrest, for, by doing so, he would be endangering his life and adding to the possibility that the felon would escape.  (This is an example of a person apprehended in the commission of an unlawful act.)<br><br>2. THE ARREST MUST BE MADE IN A LAWFUL PLACE<br>It is said that no place furnishes refuge from arrest; however:<br><br>    a. Arrests should not be made in a courtroom while the court is in session, except for an offense committed therein and in the presence of the officer, and after the arrest has been ordered by the court.  (Example:  An officer seeing a person commit an assault in a courtroom would certainly be justified in arresting that person.  However, in most cases, the officer should not arrest the person unless directed by the Judge or Magistrate.<br><br>    b. Under ordinary circumstances, arrests may not lawfully be made on the grounds of a foreign embassy, unless the arrest is requested by the embassy.<br><br>    c. Officers are reminded that civil police have no authority to make arrests or to continue pursuit onto a military reservation.  Therefore, if circumstances arise that are of | |

| Elapsed Time | Laws of Arrest | Instructor Notes |
|---|---|---|
| | sufficient importance to necessitate continuance of pursuit and/or apprehension, the officer should stop at the sentry gate and contact the proper authority, usually, the officer of the day, on the military reservation. If the officer has a warrant or summons to serve, he should contact the military police. | |

d. The provisions of the laws and regulations within the District of Columbia for the protection of public or private property, and the preservation of peace and order are extended to all public buildings and grounds belonging to the United States within the District of Columbia. However, it is the policy of this department to notify, when practical, the agency having jurisdiction in a public building of any intent to arrest someone within that building and to request their assistance in doing same.

Example:    A Metropolitan Police Officer who has a warrant for someone who is employed in a building belonging to the United States should contact the Special Police Officer on duty in that building and request their aid in making the arrest. Cooperation between the various police organizations within the District of Columbia is most important because of the similarities of their duties and over-lapping jurisdictions.

3. THE ARREST MUST BE MADE AT A LAWFUL TIME. An arrest may lawfully be made at any time, day or night; HOWEVER: The department and the courts view with disfavor arrests on warrants for minor offenses at late and unusual hours of the night. However, in the event a member comes in contact with a citizen wanted on such a warrant at a late or unusual hour (e.g., during the course of a traffic stop) the officer shall execute the warrant.

D.C. Code, Section 13-303 prohibits the service on Sunday of any writ, process, warrant, order, Judgment, or decree, except in cases of treason, felony, or breach of the peace. However, in a memorandum from General Counsel, dated June 30, 1983, case law (Edwards v. D.C.) is cited which states that any criminal warrant issued (search or arrest) falls under the breach of the peace exception and, therefore, officers can execute service of these types of warrants even on Sundays.

4. THE ARREST MUST BE FOR A LAWFUL REASON.

a. On legal process, such as warrants or attachments, etc.

D.C.-15 CV 2147- 000153

| Elapsed Time | Laws of Arrest | Instructor Notes |
|---|---|---|
| (0:30) | b. Based on probable cause to believe the person to be arrested has committed or is committing a felony.<br><br>c. Based on the fact that the subject has committed or is committing an offense in the presence of the arresting person.<br><br>d. Based on probable cause that a person has committed a misdemeanor where statute permits such arrest on probable cause if one of the following conditions exists:<br>1. The subject(s), unless immediately arrested, may not be apprehended.<br>2. The subject(s), unless arrested, may cause injury to others.<br>3. The subject(s), unless arrested, may tamper with, dispose of or destroy evidence.<br><br>**4.4.3.4        DESCRIBE AND LIST THE ELEMENTS OF ARREST**<br><br>Four essential elements must be present for an arrest to take place. (Acronym: AIR-U)<br><br>AUTHORITY TO ARREST<br>An officer must be acting under real or assumed legal authority in taking a person into custody (MPDC authority comes from the D.C. Code Title 4, Section 136)<br><br>INTENTION TO ARREST<br>Without the requisite intent, there is no arrest even if a person is temporarily stopped or inconvenienced (i.e. traffic stops, citizen contacts, etc.). The requirement of [the] intention to arrest is essentially subjective meaning that it exists in the mind of the police officer. When it is not clear from the officer's act whether there was intent to arrest or not, the U.S. Supreme Court has said that "a policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation" (Berkemer v. McCarty, 35 CRL 3192, [1984].<br><br>The general rule is that a person has been arrested if, under the totality of the surrounding circumstances, a reasonable person would not believe himself of herself free to go.<br><br>SEIZURE AND DETENTION (RESTRAINT)<br>Restraint of the subject may be either actual or constructive: | Overhead #3 |

| Elapsed Time | Laws of Arrest | Instructor Notes |
|---|---|---|
| | o  Actual seizure is accomplished by taking the person into custody with the use of      hands or firearms (denoting use of force without touching the individual) or by      merely touching the individual without the use of force.<br><br>o  Constructive seizure is accomplished without any physical touching, grabbing,      holding, or the use of force.  It occurs when the individual peacefully submits to      the officer's will and control.<br><br>NOTE:  Mere words alone do not normally constitute an arrest.<br><br>THE INDIVIDUAL'S UNDERSTANDING<br> The understanding that he or she is being arrested may be conveyed to the arrestee through words or actions.  In most cases the police officer says, "You are under arrest," hence conveying intention through words.  Similarly, some actions strongly imply that a person is being taken into custody, even though the police officer makes no statement.<br><br>The element of understanding is not required for an arrest in the following instances:<br><br>a.  If the suspect is drunk or under the influence of drugs and     does not understand what is going on,<br><br>b.  If the suspect is insane, and<br><br>c.  If the suspect is unconscious.<br><br>Examples of actions that strongly imply arrest occur when a suspected burglar is subdued by police and taken to a squad car, or when a person is being handcuffed to be taken to the police station even though no words are spoken.<br><br>**4.4.3.5 REQUIREMENTS FOR AN ARREST**<br>          **WITHOUT A WARRANT**<br><br>A large proportion of the arrest made by police officers are effectuated without an arrest warrant ever having been issued. Needless to say, such warrantless arrests account for a high percentage of the problems officers encounter in terms of a case not being prosecuted or the officer facing a lawsuit alleging false arrest.  Officers must be sure that they act in strict compliance with the requirements authorizing their making an | Show overhead #1 |
| (1:00) | | |

# EXHIBIT FOUR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

IN THE MATTER OF:                              :

VERE O. PLUMMER,                               :

        Plaintiff,                             :

                          : C.A. No.
        v.                                    : 15-cv-2147 (RDM)

DISTRICT OF COLUMBIA, ET AL.,                  :

        Defendants.                            :

Thursday,
September 8, 2016

Washington, DC

DEPOSITION OF:

### VERE O. PLUMMER

called for examination by Counsel for the Defendants, pursuant to Notice of Deposition, in the Office of Attorney General, located at 441 4th Street, NW, when were present on behalf of the respective parties:

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433       WASHINGTON, D.C. 20005-3701       www.nealrgross.com

80

on there.

Q    So when they took a blood test then your window must have been down.

A    I put the window down for that fireman to prick my finger.

Q    Right.  And so once that was done then you rolled your window back up?

A    Yes.

Q    Okay.

A    I was scared, man.

Q    Okay.  And so I just want to stick with Battalion Chief Welsh.  What else did he do other than direct somebody to break your car window and tell you to get out of the vehicle?

A    What do you mean what else did he do? I don't understand what you mean what else did he do.

Q    What else did he do?  Did he physically touch you?

A    I don't recall that.

Q    Do you know Officer John Nelson and what his role in all this was?

EXHIBIT FIVE

| Elapsed Time | Laws of Arrest | Instructor Notes |
|---|---|---|
| | Sight: the Officer sees X stab Y, or S breaking into a residence.<br>Hearing: the Officer hears a shot, or a cry for help from inside an apartment.<br>Smell: the Officer smells gasoline, gunpowder, gas fumes, or marijuana.<br>Touch: the Officer examines doors or windows in the dark, or touches car muffler of engine to determine if it has just been used.<br>Taste: the Officer tastes a white substance to identify it as sugar, salt, or something else!<br><br>Note:   The above example for taste should not actually be performed in the field.<br><br>An exception to the "in the presence of" rule is that a police officer has power to arrest a person if he or she has probable cause to believe that a person has committed a felony, even though the felony was not committed in the officer's presence.<br><br>a. Arrests for Felonies in Public Places The police are not required to obtain an arrest warrant before arresting a person in a public place even if there was time and opportunity to do so (U.S. v. Watson, 423 U.S. 411 [1976].<br><br>b.       Arrests for Felonies in Homes Police officers must have an arrest warrant to enter a person's home to arrest him or her if circumstances allow them time to obtain a warrant.  The reason is that entry into a private home is an extreme intrusion, and an entry for making an arrest is nearly as intrusive as an entry for a search.  There is an exception if exigent circumstances or consent justify a warrantless arrest.<br><br>ARREST BY POLICE FOR MISDEMEANORS<br>Police officers have the power to arrest without a warrant for misdemeanors if the offense is actually committed or attempted in their presence.  The police cannot make an arrest if the misdemeanor was merely reported to them by a third party unless it is one of the previously discussed twelve probable cause misdemeanors.  Arrests for misdemeanors in homes In the case of a minor offense, a warrantless entry into a home to make an arrest will rarely be justified.<br><br><br>NOTE:       D.C. Code, Section 32-905 provides that, upon the application of any member of the Washington Humane Society who witnessed any violation of the laws or ordinances | |

| Elapsed Time | Laws of Arrest | Instructor Notes |
|---|---|---|
| (1:30) | for the Prevention of Cruelty to Animals, the Police force of the District of Columbia shall arrest the offending parties without a warrant and take such offending parties before the court for trial; evidence of membership in the society shall be exhibition of a badge or certificate of membership. **4.4.3.6   WHO CAN ARREST, OTHER THAN POLICE OFFICERS** Arrests can be made by a citizen when he has probable cause to believe the person he is arresting committed a felony or one of the thirteen probable cause misdemeanors in his presence. (Simple Assault, Theft II, RSP value under $250, Unlawful Entry, Shoplifting, Panhandling, Attempt UUV, or Attempt Theft I, DUI/ DWI, OAS/ OAR, Reckless Driving, Leaving After Colliding, Illegal Dumping) Example:      Sam Storekeeper calls you to his store where he is holding Rita Stealer whom he has caught trying to leave his store without paying for certain items of merchandise, valued at $28. He has made a perfectly valid arrest, and you are required to assume custody of the defendant and book her, using Sam as the complainant. A private citizen can also make an arrest in aid of a law enforcement officer or special police officer, or other person authorized by law to make an arrest (D.C. Code, Section 23-582). | |
| (1:45) | **4.4.3.7   WHEN AND WHAT FORCE CAN BE USED TO MAKE AN ARREST** NON-DEADLY FORCE The general rule is that non-deadly force may be used as long as it is reasonable force. Reasonable force is defined as force that a prudent and cautious person would use if exposed to similar circumstances; it is limited to the amount of force that is necessary to achieve valid and proper results. Anything beyond that becomes unreasonable force. Example:      The police arrest a suspect who kicks, uses fists, and refuses to be handcuffed. The police may use as much force as is necessary to bring that person under control. Suppose, however, that after subduing him, the police beat him up. Such use of force is unreasonable because it is unnecessary to place the suspect under control and therefore it becomes punitive. The problem is that the term reasonable force is extremely | |

| Elapsed Time | Laws of Arrest | Instructor Notes |
|---|---|---|
| | subjective. It depends upon the circumstances in each case and the perception of the judge or jury. The officer therefore needs to remember the circumstances that led him or her to use a certain kind of force so that he or she can articulate the reasons on the witness stand and then hope that the jury will agree. Most states allow the use of non-deadly force under myriad circumstances; these are the most common: <br><br> 1.    to overcome an offender's resistance to a lawful arrest; <br> 2.    to prevent escape; <br> 3.    to retake a suspect after escape; <br> 4.    to protect persons and property from harm; <br> 5.    to protect the officer from bodily injury. <br><br> DEADLY FORCE <br> The safest rule is that deadly force may be used only when the life of the officer or another person is in danger of death or serious bodily injury, and the use of force is immediately necessary to preserve that life. A detailed discussion of deadly force will be conducted during Firearms Training. <br><br> SUMMARY <br> The power of arrest is the most important power that law enforcement officers possess. It enables them to deprive a person of the freedom to carry out daily personal and business affairs, and it initiates a person the processes of criminal justice, which may ultimately result in that person being fined or imprisoned. Since an arrest has a potentially great detrimental effect upon a person's life, the law provides severe limitations and restrictions on the law enforcement officer's exercise of the power of arrest. It is therefore, essential for every law enforcement officer to fully understand the body of law governing arrest. <br><br> Police officers must be well informed about the law of arrest because successful prosecution usually depends upon the legality of the arrest. If the arrest is legal, then searches of person and the area within the arrestee's control is also legal; conversely, if the arrest is illegal, any evidence obtained thereafter is not admissible in court. | |

## 1.4.3 - LAWS OF ARREST

6

| Elapsed Time | Laws of Arrest | Instructor Notes |
|---|---|---|
| | arrest without a warrant.<br><br>D.C. Code, Section 23-381 provides that a law enforcement officer may arrest, without a warrant having previously been issued:<br><br>A person whom he or she has probable cause to believe is committing any offense in the officer's presence (it is a well established principle that an offense is committed "in the presence" of the officer where any of his or her senses affords knowledge that an offense is being committed. (Taylor v. U.S.)<br><br>Probable Cause Misdemeanors<br>A person whom he or she has probable cause to believe has committed (not necessarily in the officer's presence) a felony or one of the following misdemeanors:<br>a. Simple Assault - DC Code 22-504<br>b. Unlawful Entry - DC Code 22-3102<br>c. Panhandling - DC Code<br>d. Attempt Unauthorized Use of a Vehicle - DC Code 22-3815<br>e. Attempt Theft I ($250 or more) - DC Code 22-3811<br>f. Theft II (less than $250) - DC Code 38-11<br>g. Shoplifting - DC Code 22-3832<br>h. Receiving Stolen Property (less than $250) DC Code 22-3832<br>I. D.U.I./D.W.I.<br>j. O.A.S./O.A.R.<br>k. Reckless Driving<br>l. Hit and Run (Leaving after Colliding)<br>m. Illegal Dumping<br><br>Additionally, if the arrest is made for one of these misdemeanors not committed in the officer's presence, the officer must articulate that, unless immediately arrested, the person:<br><br>a. May not be apprehended;<br>b. May cause injury to others; or<br>c. May tamper with, dispose of, or destroy evidence.<br><br>ARRESTS BY POLICE FOR FELONIES<br>A police officer has power to arrest a person who has actually committed a felony in the presence of the police. The term in the presence of a police officer refers to knowledge gained firsthand by the officer as a result of using any of his or her five senses (sight, hearing, smell, touch, or taste). Therefore, the police may make a warrantless arrest if probable cause is established by such means as these: | |